UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ENERGOINVEST DD,<br><br>        Petitioner,<br><br>     v.<br><br>DEMOCRATIC REPUBLIC<br>OF CONGO and SOCIETE NATIONALE<br>D'ELECTRICITE (S.N.E.L.),<br><br>        Respondents. | CIV. _____ (  ) |

## AFFIDAVIT OF PETER R. GRIFFIN

I, Peter R. Griffin, pursuant to 28 U.S.C. § 1746, hereby certify under penalty of perjury as follows:

1.     I am a Partner of the law firm of Shearman & Sterling LLP.  I represented Energoinvest in the arbitration proceedings before the International Court of Arbitration in Docket No. 11441.

2.     The attached copy of the "Award" of the International Court of Arbitration is an accurate, true and correct reproduction of the original Award issued by that body in Docket No. 11441.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 16th day of June, 2003.

                  _____
                       (signature)

**FILED**

**JUN 1 7 2003**

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

03-1314



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

# SENTENCE

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38. Cours Albert 1er. 75008 Paris. France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Website www.iccwbo.org   E-mail arb@iccwbo.org

# COUR INTERNATIONALE D'ARBITRAGE

## AFFAIRE No. 11441/KGA

## ENERGOINVEST DD

### (Bosnie-Herzegovine)

### c/

## 1.  REPUBLIQUE DEMOCRATIQUE DU CONGO
### (Précédemment République du Zaïre)

### (Rép. Dem. du Congo)

## 2.  SOCIETE NATIONALE D'ELECTRICITE (S.N.EL)

### (Rép. Dem. du Congo)

Ce document est un original de la sentence rendue conformément au Règlement de la Cour Internationale d'Arbitrage de la CCI.

1

COUR INTERNATIONALE D'ARBITRAGE
DE LA
CHAMBRE DE COMMERCE INTERNATIONALE

## AFFAIRE N° 11441/KGA

**ENERGOINVEST DD**
Hamdije Cemerlica 2, 71000 Sarajevo (Bosnie-Herzégovine)
représentée par Mes Brenno Brunoni et Andrea Molino, « Spiess Brunoni
Pedrazzini Molino », Via Pioda 14, CH 6900 Lugano (Suisse), ainsi que par
Mes. Danforth Newcombe, Peter Griffin et Barbara Diggs, « Shearman &
Sterling », 114, Av. des Champs-Elysées, F 75008 Paris (France)

- **Demanderesse** -

c o n t r e

## 1. REPUBLIQUE DEMOCRATIQUE DU CONGO
(anciennement République du Zaïre)
en la personne de S.E. le Ministre de Justice et Garde des Sceaux de la
République Démocratique du Congo, Palais de Justice, Place de
l'Indépendence, Kinshasa-Gombe (République Démocratique du Congo), non-
comparante

- **Défenderesse N°1** -

et

## 2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)
2831 Avenue de la Justice, Kinshasa-Gombe (République Démocratique du
Congo)
représentée par Mes. Daniel Fauquet et Didier Joseph, « CSM Bureau Francis
Lefebvre » 1-3 Villa Emile Bergerat, F 92522 Neuilly-sur-Seine, Cedex Paris
(France)

- **Défenderesse N°2** -

# SENTENCE  FINALE

# Table des matières

| | | |
|---|---|---|
| I. | Les Faits | 3 |
| II. | La Procédure d'Arbitrage | 6 |
| III. | Les Parties | 17 |
| | A. Energoinvest | 17 |
| | B. La République Démocratique du Congo | 18 |
| | C. La Société Nationale d'Electricité | 19 |
| IV. | Juridiction du Tribunal Arbitral | 20 |
| | A. En ce qui concerne la Défenderesse n°1 | 20 |
| | B. En ce qui concerne la Défenderesse n°2 | 26 |
| V. | Droit de la Demanderesse au paiement des sommes réclamées | 39 |
| VI. | Engagement de la RDC | 44 |
| VII. | Engagement de la S.N.EL | 45 |
| | A. Le projet «*Katana-Goma*» est un ouvrage public | 46 |
| | B. La S.N.EL est-elle partie à l'Accord de Credit du 2 avril 1980 ? | 49 |
| | C. La S.N.EL est-elle partie à la Convention de Rééchelonnement ? | 50 |
| | D. La S.N.EL est-elle partie au Contrat du 9 décembre 1980 ? | 52 |
| | E. La S.N.EL est-elle obligée par l'acceptation des traites ? | 54 |
| VIII. | Solidarité | 55 |
| IX. | Demande de paiement des intérêts | 58 |
| X. | Frais de l'arbitrage | 61 |

3

# I - LES FAITS

1. En date du 2 avril 1980, la société demanderesse, ENERGOINVEST, et le Conseil Exécutif de la République du Zaïre (aujourd'hui République Démocratique du Congo), représenté par le Département de l'Energie et le Département des Finances, ont conclu un contrat dénommé « Accord de Crédit », dans lequel la société ENERGOINVEST est qualifiée de « Prêteur » et le Conseil Exécutif de la République du Zaïre est qualifié de « Emprunteur ».

2. Par ce contrat, le Prêteur s'engage à financer 85% de la valeur totale en devise étrangère du marché ayant pour objet la construction de la ligne de transport électrique haute tension allant de Bukavu jusqu'à Goma, en passant par Katana (projet dénommé « *Katana-Goma* »).

3. Le préambule de l'Accord indique clairement qu'il s'agit d'un projet d'intérêt national pour l'Etat Zaïrois. En effet, on lit dans ce préambule :
*« Le Zaïre, pays jeune et en pleine croissance économique, a décidé de moderniser son infrastructure et compte y parvenir notamment par le biais de la coopération bilatérale et multilatérale.*
*A cet effet, le Conseil Exécutif du Zaïre ayant jugé nécessaire de construire par l'intermédiaire de S.N.EL., Société Nationale d'Electricité, une ligne de transport d'énergie électrique de haute tension de 110 KV allant de BUKAVU jusqu'à GOMA en passant par KATANA, y compris deux postes de transformation ainsi que des postes de distribution pour le réseau moyenne tension dans la ville de GOMA, bénéficiera d'un crédit de ENERGOINVEST, Société Yougoslave, aux conditions spécifiques et garanties définies dans le présent Accord de Crédit ».*

4. Le but d'ENERGOINVEST dans la concession d'un tel crédit est l'acquisition du marché. En effet, l'Accord de Crédit prévoit qu'un contrat

(désigné comme « *Contrat Technique* ») sera signé entre la S.N.EL, mandatée par l'Etat zaïrois pour la réalisation de l'investissement et ENERGOINVEST afin de régler « *notamment les questions des études, de la fourniture des équipements et de la supervision des montages des travaux techniques.* » Ce contrat devra être annexé à l'Accord de Crédit (voir le dernier paragraphe du préambule à l'Accord de Crédit).

5. Il est également prévu dans l'Accord de Crédit que celui-ci serait réputé caduc « *si dans un délai de 6 mois suivant la signature* [...] *le Contrat Technique n'était pas conclu.* » (article 7.2)

6. L'Accord de Crédit porte la signature non seulement d'ENERGOINVEST, d'une part, et du Commissaire d'Etat au Département de l'Energie ainsi que du Commissaire d'Etat au Département des Finances, en tant que représentants du Conseil Exécutif de la République du Zaïre, d'autre part, mais aussi celle de la S.N.EL.

7. Le 9 décembre 1980, la S.N.EL et ENERGOINVEST ont conclu un contrat comprenant l'Accord de Crédit du 2 avril 1980, les « Conditions Générales » du marché, et cinq Marchés Particuliers qui, dans leur ensemble, sont considérés constituer le « Contrat Technique ».

8. Le montant du financement par ENERGOINVEST (soit 85% du coût du projet) était initialement estimé à « [...] *environ 15,18 millions de dollars US* [...] » (article 1.1 de l'Accord de Crédit), mais ENERGOINVEST avait également pris l'engagement « [...] *d'élever le montant du crédit pour l'achèvement complet du projet* [...] », au cas où le crédit de 15,18 millions de US$ prévu ne serait pas suffisant (article 1.3 de l'Accord de Crédit). En réalité, aux termes de la lettre du 1 avril 1985 de la S.N.EL. au Commissaire d'Etat aux Finances et Budget (doc. n°4 annexé à la Demande d'Arbitrage) suite aux effets combinés de l'inflation mondiale sur le coût du fret maritime et de

l'application des formules contractuelles de révision des prix, le financement du projet par ENERGOINVEST a atteint le montant de USS 21,544,690.21.

9. L'Accord de Crédit prévoyait non seulement les conditions du financement et les intérêts que ce financement aurait produits et qui devaient s'ajouter au capital, mais aussi les conditions et délais dans lesquels il aurait dû être remboursé. En particulier, on prévoyait que pour obtenir le remboursement du crédit le Prêteur devait émettre 36 traites (20 pour l'intérêt et 16 pour le principal) tirées sur la S.N.EL. et sur lesquelles le Conseil Exécutif du Zaïre s'engageait à donner son aval pour la S.N.EL. (article 4.5 de l'Accord de Crédit).

10. Les traites ont été régulièrement émises, acceptées et avalisées.

11. Suite au défaut de remboursement par l'Emprunteur dans les délais convenus, une « Convention de Rééchelonnement » a été signée le 31 mai 1986 entre ENERGOINVEST et le Conseil Exécutif de la République du Zaïre.

12. Par effet de cette Convention, conformément à la dernière mise à jour du montant du contrat, de nouvelles traites ont remplacé les précédentes par rapport aux créances échues qui ont fait l'objet du rééchelonnement. Ces nouvelles traites ont été également acceptées par la S.N.EL et avalisées par le Commissaire d'Etat aux Finances, Budget et Portefeuille de la République du Zaïre. Les échéances de l'Accord de Crédit postérieures à la date du rééchelonnement, soit à partir du 1er janvier 1997, n'ont pas été affectées. La Convention de Rééchelonnement a été considérée comme « [...] partie intégrante de l'Accord de Crédit du 02 avril 1980 [...] » et n'affecte pas la validité des clauses de celui-ci (article 7 de la Convention de Rééchelonnement).

13. Une fois encore, les obligations de paiement n'ont pas été respectées. Dans une lettre du 4 mars 1991 du Ministère des Finances de la République du Zaïre au Gouverneur de la Banque du Zaïre (doc. n°7 annexé à la Demande d'Arbitrage), avec copies au Premier Ministre, au Secrétaire d'Etat aux Finances et à ENERGOINVEST, la dette envers ENERGOINVEST est reconnue et il est demandé qu'un paiement mensuel de US$ 1,000,000 soit fait en faveur d'ENERGOINVEST à partir du 1ᵉʳ janvier 1991 « [...] *jusqu'à l'apuration complète de ces arriérés et la couverture totale des échéances régulières convenues.*» (sic).

Apparemment aucun paiement n'a plus été effectué après cette date.

14. C'est donc sur la base de l'Accord de Crédit, de la Convention de Rééchelonnement ainsi que de la reconnaissance de dette contenue dans la lettre mentionnée ci-dessus que le 2 mars 2001, ENERGOINVEST a introduit sa Demande d'Arbitrage contre la République Démocratique du Congo et contre la S.N.EL.

15. Il n'y a pas eu et il n'y a pas de réclamations concernant la bonne exécution de l'ouvrage (soit la réalisation du projet « *Katana-Goma* »), dont la réception définitive est intervenue le 18 avril 1986.

## II - LA PROCEDURE D'ARBITRAGE

16. Le 4 mars 2001, la société ENERGOINVEST (ci-après « Energoinvest » ou « Demanderesse ») a introduit une Demande d'Arbitrage auprès de la Cour Internationale d'Arbitrage de la Chambre de Commerce Internationale contre la République Démocratique du Congo (ci-après « RDC » ou « Défenderesse n°1 ») et la Société Nationale d'Electricité de la République Démocratique du Congo (ci-après « S.N.EL. » ou « Défenderesse n°2 »).

17. La Demande d'Arbitrage était basée sur l'Accord de Crédit du 2 avril 1980, sur la Convention de Rééchelonnement du 31 mai 1986 et sur la reconnaissance de dette du Ministère des Finances de la République du Zaïre dans sa lettre du 4 mars 1991. Elle était accompagnée par un dossier comprenant sept documents, et les conclusions de la Demanderesse étaient que les deux Défenderesses soient condamnées solidairement au paiement en sa faveur de la somme de US$ 12,087,653.49, majorée des intérêts au taux conventionnel de 9% par an, à compter de la date de chaque échéance contractuelle, ainsi qu'au paiement des frais de l'arbitrage, y inclus les frais de sa défense.

18. La clause d'arbitrage invoquée par la Demanderesse était celle de l'art. 6 de l'Accord de Crédit, qui est formulée de la manière suivante :
« *Tout différend ou litige pouvant découler du présent Accord de Crédit sera préalablement soumis à un règlement amiable entre les parties.*
*A défaut d'une telle solution amiable et satisfaisante, le différend ou litige sera soumis au Conseil d'Arbitrage désigné suivant le règlement de conciliation et d'arbitrage de la Chambre de Commerce Internationale de Paris. Pour le règlement du conflit, le Conseil d'Arbitrage siègera à ZURICH et les droits matériels suisses seront d'application.* »

19. Dans sa demande, la Demanderesse mentionnait qu'un contrat similaire entre les mêmes parties avait été signé le 4 mars 1986 pour le financement de l'aménagement hydroélectrique de Mobayi et d'autres travaux de transport d'énergie électrique (projet « *Mobayi* ») et que les Défenderesses étaient également défaillantes par rapport à ce deuxième contrat. Puisque cette défaillance faisait l'objet d'une procédure d'arbitrage parallèle, mais séparée, enregistrée à la Cour Internationale d'Arbitrage de la CCI sous le n° 11442/KGA, la Demanderesse demandait, en voie préliminaire, la jonction des deux procédures arbitrales.

20. Aucune des deux Défenderesses n'a répondu à la Demande d'Arbitrage dans le délai qui leur avait été imparti par la Cour en application du Règlement.

21. Le 7 mai 2001, le Secrétariat de la Cour a informé les parties qu'en l'absence de soumission d'une réponse par les Défendeurs dans le délai qui leur avait été imparti, le dossier allait être soumis à la Cour à l'une de ses prochaines sessions, afin que celle-ci décide de l'éventuelle mise en marche de la procédure d'arbitrage conformément à l'article 6(2) du Règlement. Dans la même communication, l'attention des parties était attirée sur l'article 6(3) du Règlement, aux termes duquel : « *Si l'une des parties refuse ou s'abstient de participer à l'arbitrage ou à tout stade de celui-ci, l'arbitrage a lieu nonobstant ce refus ou cette abstention.* »

22. Lors de sa session du 18 mai 2001, la Cour Internationale d'Arbitrage a pris les décisions suivantes :
- ne pas joindre cette affaire à l'affaire 11442/KGA;
- mettre en route la procédure conformément à l'article 6(2) du Règlement (tout en estimant possible « *prima facie* » l'existence entre les parties d'une convention d'arbitrage visant le Règlement, sauf au Tribunal de statuer sur sa propre compétence);
- soumettre cette affaire à un Tribunal Arbitral de trois membres ;
- confirmer la nomination de Me Marc Ronca, du Cabinet d'Avocats Schellenberg Wittmer de Zurich (Suisse), en qualité de co-arbitre sur proposition de la Demanderesse;
- accorder 15 jours aux Défenderesses pour désigner conjointement un co-arbitre, faute de quoi un co-arbitre serait nommé par la Cour en leur lieu et place conformément à l'article 9(6) du Règlement;
- prendre les mesures nécessaires à la désignation du Président du Tribunal Arbitral;
- fixer la provision pour frais de l'arbitrage à US$ 300,000, sous réserve de réajustements ultérieurs, tout en invitant les parties à régler cette

provision à raison de US$ 150'000 à la charge de la Demanderesse et US$ 150'000 à la charge des Défenderesses.

23. Par lettre du 1ᵉʳ juin 2001 adressée à la Cour Internationale d'Arbitrage de la CCI et pour information au Ministre de l'Energie du Congo et au Conseil de la Demanderesse, la S.N.EL. a fait connaître son souhait de trouver une solution négociée au litige, tout en exprimant l'opinion que la Cour Internationale d'Arbitrage de la CCI ne serait pas compétente à juger de l'affaire, parce que : *« Le recours au règlement de conciliation et d'arbitrage de la Chambre de Commerce Internationale n'implique pas de plein droit la reconnaissance par les parties de la compétence de la Cour Internationale d'Arbitrage ni l'institution d'un Tribunal Arbitral par ladite Cour. »*

24. Par lettre du 3 août 2001 adressée à la Cour Internationale d'Arbitrage de la CCI et pour connaissance au Conseil de la Demanderesse, le Ministre de Justice et Garde des Sceaux de la République Démocratique du Congo a fait connaître que son Ministère a la compétence pour représenter l'Etat Congolais dans la procédure d'arbitrage et a proposé d'avoir des discussions avec la Demanderesse afin de rechercher un règlement amiable du litige.

25. Par lettre du 31 octobre 2001, la Demanderesse a informé la Cour Internationale d'Arbitrage de la CCI que des négociations en vue d'un accord extra judiciaire avaient en effet eu lieu à Paris, mais qu'elles n'avaient malheureusement pas abouti. Par conséquent, elle a demandé la continuation de la procédure d'arbitrage.

26. Le 23 novembre 2001, le Secrétariat de la Cour a informé les parties qu'étant donné que les Défenderesses n'avaient pas procédé à la nomination conjointe d'un co-arbitre, la Cour avait décidé de nommer Me Mohamed Abu-Samra, de Khartoum (République du Soudan) en qualité de co-arbitre, en lieu

et place des Défenderesses défaillantes, ceci conformément à l'article 9(6) du Règlement.

27. Le 18 décembre 2001, le Secrétariat de la Cour a informé les parties que lors de sa session du 14 décembre 2001, la Cour avait nommé Avv. Renato Roncaglia de Genève (Suisse) en qualité de Président du Tribunal Arbitral, sur proposition du Comité National Italien et que, de telle manière, le Tribunal Arbitral était entièrement formé et que le dossier de l'affaire lui avait été transmis. Il était indiqué dans cette lettre que le siège de l'arbitrage était Zurich, conformément au choix des parties dans la clause d'arbitrage.

28. Le 29 janvier 2002, le Tribunal Arbitral a envoyé aux parties un projet d'Acte de Mission, rédigé sur pièces, conformément à l'article 18 du Règlement et a invité celles-ci à lui faire parvenir leurs commentaires et suggestions dans un délai de 15 jours.

29. La Demanderesse a soumis certains commentaires en date du 13 février 2002, tandis que les deux Défenderesses n'ont fait parvenir aucun commentaire au Tribunal Arbitral. Toutefois, en date du 30 janvier 2002 la S.N.EL. a adressé une lettre (presque certainement écrite avant la réception du projet d'Acte de Mission) au Tribunal Arbitral. Dans cette lettre, la S.N.EL., sans donner aucune réponse à la Demanderesse sur le fond de l'affaire, se limitait tout simplement à demander la jonction de cette procédure à l'autre procédure arbitrale entre les mêmes parties (inscrite à la Cour de la CCI sous le n°11442/KGA), ainsi qu'à souhaiter que des audiences auxquelles les parties puissent participer soient prévues par le Tribunal.

30. Par son Ordre du 21 février 2002, le Tribunal Arbitral a informé les parties qu'il ne lui était pas possible de se prononcer sur la demande de jonction des deux procédures d'arbitrage tant que la Défenderesse n°1 ne déclarait pas son accord à ce sujet. En même temps, le Tribunal Arbitral a transmis aux parties le

projet définitif de l'Acte de Mission, et les a invitées à le signer et à le renvoyer avant le 20 mars 2002.

31. Seule la partie Demanderesse a signé l'Acte de Mission dans le délai mentionné ci-dessus.

32. Entre temps, les Défenderesses n'ayant pas payé leur partie de la provision pour frais d'arbitrage, la totalité de ladite provision (soit USS 300'000) a été payée par la Demanderesse, ce dont le Secrétariat de la Cour lui a donné acte dans sa communication du 18 mars 2002.

33. Le 17 avril 2002, l'Acte de Mission signé par la Demanderesse et par le Tribunal Arbitral a été transmis à la Cour pour approbation conformément à l'article 18(3) du Règlement.

34. L'Acte de Mission a été approuvé par la Cour lors de sa session du 17 mai 2002 et il a été successivement transmis par le Secrétariat de la Cour aux Défenderesses avec invitation à le signer.

35. Par Ordre du 23 mai 2002, le Tribunal Arbitral a accordé aux parties un délai jusqu'au 28 juin 2002 afin que la Demanderesse puisse préciser sa demande et compléter ses soumissions comme elle l'avait demandé, et que les Défenderesses puissent répondre à la Demande d'Arbitrage, ce qu'elles n'avaient pas encore fait. Dans le même Ordre, un délai ultérieur jusqu'au 26 juillet 2002 a été accordé à la Demanderesse pour une éventuelle réplique à la réponse des Défenderesses (si une telle réponse était soumise), et aux Défenderesses jusqu'au 23 août 2002 pour une duplique à l'éventuelle réplique de la Demanderesse. Après quoi, le Tribunal Arbitral s'est réservé de convoquer une audience procédurale à Zurich afin de donner aux parties l'opportunité de mieux illustrer leurs soumissions respectives et aussi pour décider, après l'audition des parties, de l'éventuelle admission d'autres moyens

de preuve ainsi que d'une manière plus générale, de la suite à donner à la procédure.

36. Par lettre du 28 mai 2002, la Défenderesse n°2 a renvoyé au Tribunal Arbitral copie de l'Acte de Mission dûment signé par elle et a signifié son intention de prendre part à la procédure arbitrale si une audience pour la comparution des parties était fixée par le Tribunal Arbitral et la notification lui en était faite au moins 30 jours à l'avance, accompagnée d'une invitation personnellement adressée au signataire de la lettre, M. Alphonse Muyumba Kelenge, Président du Comité de Gestion Provisoire de la S.N.EL. ainsi qu'à M. Loliki M'Bembe, chef de la Division Juridique de la S.N.EL.

37. Le 14 juin 2002, le Secrétariat de la Cour a informé les parties de la réception de l'Acte de Mission signé par la Défenderesse n°1.

38. De cette manière et bien que par étapes successives, l'Acte de Mission a été finalement signé par toutes les parties.

39. Entre-temps, le Tribunal Arbitral a adopté un calendrier prévisionnel de la procédure arbitrale et en a informé les parties ainsi que le Secrétariat de la Cour (communication du 3 mai 2002). Ce dernier a transmis le calendrier prévisionnel à la Cour lors de sa session du 31 mai 2002 (communication du 31 mai 2002).

40. La partie Demanderesse a soumis son Mémoire en Demande, accompagné d'un dossier comprenant 45 documents ainsi que des déclarations écrites rendues par trois témoins dans le délai établi par l'Ordre du 23 mai 2002 (soit, comme on l'a dit, avant le 28 juin 2002).

41. Dans ce mémoire, les conclusions d'ENERGOINVEST sont formulées de la manière suivante :

> *« En conclusion, le Demandeur demande au Tribunal Arbitral une sentence :*
>
> i)    *ordonnant aux Défendeurs de payer au Demandeur, conjointement et solidairement, un montant de 11.725.845,37 dollars au titre du capital (sous réserve d'augmentations ultérieures) plus les intérêts au taux contractuel de 9% courant à partir de la date d'échéance de chaque versement et jusqu'à ce que le paiement complet soit effectué;*
>
> ii)    *ordonnant aux Défendeurs de payer, conjointement et solidairement, au Demandeur les coûts de la procédure d'arbitrage (comprenant les frais d'avocat, les coûts internes, les frais d'experts et autres dépenses associées);*
>
> iii)    *avec intérêts sur les montants octroyés à un taux approprié;*
>
> iv)    *faisant droit à toute autre demande que le Tribunal jugera appropriée en faveur d'Energoinvest. »*

42. Les deux Défenderesses n'ont soumis aucune réponse à la Demande d'Arbitrage dans le délai fixé par l'Ordre du 23 mai 2002. Toutefois, compte tenu de la lettre de S.N.EL. du 28 mai 2002, où celle-ci souhaitait la convocation d'une audience, le Tribunal Arbitral, par Ordre du 3 juillet 2002, a fixé au 12 septembre 2001 à 10 heures une audience des parties à Zurich, au siège du cabinet d'Avocats Schellenberg Wittmer.

43. Par lettre du 12 juillet 2002 adressée au Tribunal Arbitral, la S.N.EL s'est justifiée de ne pas avoir déposé une réponse à la Demande d'Arbitrage, en disant avoir cru devoir attendre que la demande soit mieux précisée et la soumission de documents complétée et que, d'ailleurs, elle avait rencontré des difficultés de compréhension du fait que la demande ainsi que certains documents étaient en langue anglaise. Pour ces raisons elle a demandé qu'un nouveau délai lui soit accordé.

44. Par Ordre du 18 juillet 2002, le Tribunal Arbitral a décidé qu'il ne pouvait pas accorder un nouveau délai à la S.N.EL., délai qui ne changerait de toute manière pas le fait qu'elle n'avait pas fait connaître sa réponse à la Demande d'Arbitrage jusqu'à l'audience du 12 septembre 2002, audience qui avait été fixée, entre autres, justement pour *« donner aux Défenderesses une chance additionnelle de s'exprimer et de participer activement à la procédure »*.

45. Par le même Ordre, le Tribunal a attiré l'attention des parties sur le paragraphe G-3 de l'Acte de Mission, conformément auquel:
*« La langue de l'arbitrage est la langue française.*
*La Demanderesse est autorisée à utiliser la langue anglaise dans ses soumissions, mais dans ce cas, si les Défenderesses le demandent, elle devra fournir aux Défenderesses une traduction conforme en langue française.*
*Les documents produits par les parties et dont les originaux sont rédigés en une langue autre que la langue française ou la langue anglaise devront être accompagnés d'une traduction conforme en langue française. »*
La Demanderesse a été invitée à se conformer à cette disposition, ce qu'en effet elle a fait en envoyant à la S.N.EL. une traduction en français des actes et documents précédemment soumis en langue anglaise.

46. Le 22 juillet 2002, le Secrétariat de la Cour a informé le Tribunal Arbitral et les parties de la réception d'une lettre par laquelle Mes Didier Joseph et Daniel Fauquet du cabinet CMS Bureau Francis Lefebvre à Paris signifiaient avoir assumé la représentation de la Défenderesse n°2 et demandaient un délai de deux mois pour répondre à la Demande d'Arbitrage.

47. Dans la même communication, le Secrétariat de la Cour a aussi pris note que la représentation de la Demanderesse était maintenant assurée non seulement par Mes Brenno Brunoni et Andrea Molino, du cabinet Spiess Brunoni Pedrazzini Molino à Lugano (Suisse), tel qu'indiqué dans la Demande

d'Arbitrage, mais aussi par Mes Denforth Newcomb, Peter Griffin et Barbara Diggs du cabinet Shearman & Sterling à Paris.

48. Par Ordre du 26 juillet 2002, le Tribunal Arbitral a confirmé son Ordre précédent du 18 juillet 2002.

49. Le 12 septembre 2002, une audience a eu lieu à Zurich avec la participation des conseils de la Demanderesse ainsi que des conseils de la Défenderesse n°2. La Défenderesse n°1 ne s'est aucunement manifestée.

A cette occasion, les conseils de la Défenderesse n°2 ont soumis au Tribunal et aux conseils de la Demanderesse un Mémoire en Défense accompagné de six documents.

Tout au long de l'audience les deux parties présentes ont eu l'opportunité d'exposer leurs arguments respectifs et de discuter de la suite à donner à la procédure. A conclusion de l'audience et avec l'accord des parties, le Tribunal a décidé :

- d'octroyer à la Demanderesse un délai jusqu'au 4 octobre 2002 pour soumettre sa réplique au Mémoire en Défense de la Défenderesse n°2;
- d'octroyer à la Défenderesse n°2 un délai ultérieur jusqu'au 25 octobre 2002 pour soumettre sa duplique;
- d'octroyer aux deux parties un délai ultérieur jusqu'au 5 novembre 2002 pour faire connaître au Tribunal Arbitral si une prolongation de l'instruction de l'affaire était éventuellement souhaitée et pour quelles raisons et par quels moyens;
- de fixer l'audience de plaidoiries à Paris les 9 et 10 décembre 2002, en l'absence d'une demande de prolongation de l'instruction.

50. Le 4 octobre 2002, la Demanderesse a présenté son Mémoire en Réplique accompagné de quatre documents.

51. Le 25 octobre 2002, la Défenderesse n°2 a présenté son Mémoire en Duplique accompagné de dix documents.

52. Aucune des parties n'a demandé une prolongation de l'instruction.

53. L'audience de plaidoiries en présence du Tribunal Arbitral, a eu lieu comme prévu les 9 et 10 décembre 2002 au siège de la Cour Internationale d'Arbitrage de la CCI à Paris, avec la participation de :
- Me Andrea Molino, Peter Griffin et Susy Pedrinis, pour la Demanderesse;
- Me Didier Joseph pour la Défenderesse n°2;
- M. Loliki Mbembe, chef de la Division Juridique de la S.N.EL.
Personne ne s'est présenté pour la Défenderesse n°1.

54. Aucune question préliminaire n'ayant été soulevée, les conseils des parties présentes ont plaidé et contre-plaidé. Ils ont aussi remis au Tribunal un sommaire écrit de leurs arguments et de leurs conclusions.

55. En particulier, la Défenderesse n°2 a déclaré qu'abstraction faite de toute autre contestation, raison et argument de sa défense, elle n'avait de contestation à faire ni par rapport aux montants réclamés par la Demanderesse, ni par rapport aux dates d'échéance à compter desquelles les intérêts sont réclamés (voir procès-verbal du 13 décembre 2002).

56. A conclusion de l'audience le Tribunal a prononcé la clôture des débats conformément à l'art. 22(1) du Règlement et le 13 décembre 2002 il a envoyé aux parties ainsi qu'au Secrétariat de la Cour le procès-verbal de l'audience. Aucune des parties n'a soulevé de remarques à ce sujet.

## III - LES PARTIES

### A. ENERGOINVEST

57. La société **ENERGOINVEST**, la Demanderesse, est une société d'ingénierie établie en 1951 dont le siège social est à Sarajevo (Bosnie-Herzégovine).

58. La documentation que la Demanderesse a présentée au sujet de son activité démontre qu'il s'agit d'une société bien connue et affirmée sur le plan international, agissant dans plusieurs domaines de l'ingénierie avec une spécialisation dans le domaine de l'énergie électrique et notamment dans la conception et la construction de postes de transformation électrique, lignes de transport à haute tension et équipements électriques.

59. Il n'est pas surprenant que la République du Zaïre, au moment où elle a décidé d'investir dans le développement de ses ressources hydroélectriques et dans la modernisation de ses infrastructures, y inclus les lignes de transport d'énergie électrique à haute tension et les postes de transformation et distribution de l'énergie électrique, se soit adressée à ENERGOINVEST. D'autant que la proposition d'ENERGOINVEST était non seulement très digne de confiance d'un point de vue technique, mais sans doute très intéressante pour la République du Zaïre d'un point de vue financier.

60. Il faut souligner qu'ENERGOINVEST a rempli sans faute ses obligations contractuelles, puisqu'il n'est pas contesté par les Défenderesses que le projet « *Katana-Goma* » a été bel et bien achevé par ENERGOINVEST à leur pleine satisfaction, comme le prouve la réception définitive de l'ouvrage intervenue le 18 avril 1986 (voir lettre de la S.N.EL. du 9 mai 1986, doc. n°18-A, annexé au Mémoire en Demande), et ceci malgré les problèmes de remboursement du

crédit qui s'étaient manifestés déjà lors des travaux et qui font l'objet de la présente procédure d'arbitrage.

61. Dans ses mémoires et certains des documents qu'elle a produits, la Demanderesse n'a pas manqué de rappeler au Tribunal Arbitral les événements tragiques qui se sont produits en Bosnie-Herzégovine et les dommages très sérieux qu'elle a subi directement et indirectement à la suite de ces événements. Le Tribunal Arbitral exprime toute sa compréhension à cet égard, mais il doit également remarquer que ces événements ne sont pas en rapport avec le litige qui oppose les parties à cet arbitrage et qu'ils ne pourront par conséquent en aucune manière influencer sa décision. Celle-ci sera exclusivement fondée sur l'analyse de la relation contractuelle entre les parties, des faits qui la concernent et des droits et obligations qui en découlent, en application de la loi que les parties ont choisi pour le règlement de leurs différends.

### B. LA REPUBLIQUE DEMOCRATIQUE DU CONGO

62. La **République Démocratique du Congo (RDC)**, la Défenderesse n°1, est le même Etat que celui dénommé « République du Zaïre » au moment où l'Accord de Crédit et le contrat concernant le projet « *Katana-Goma* » ont été signés avec ENERGOINVEST. En effet, le nom de République Démocratique du Congo était le nom initialement attribué à ce pays en juin 1960 lorsque le Congo Belge a été proclamé un Etat indépendant, mais à la suite de la prise de pouvoir par le Général Mobutu en 1970 le nom a été changé en « République du Zaïre ». Lorsque le Président Mobutu a été renversé en mai 1997 son successeur le Président Laurent Kabila a redonné au pays son ancien nom de République Démocratique du Congo.

63. Par conséquent, si le Tribunal Arbitral fait en cette sentence référence à la République du Zaïre pour la période pertinente, cette référence doit en tout cas être entendue comme référence au même Etat que celui qui porte aujourd'hui le

nom de République Démocratique du Congo. Il ne se pose dans ce cas même pas un problème de succession d'Etats, comme on pourrait le rencontrer dans des situations différentes : il y a tout simplement un changement de nom du même sujet juridique.

64. Même si la RDC est un Etat ayant des ressources naturelles importantes, parmi lesquelles on compte son potentiel hydroélectrique, des facteurs tels que l'instabilité politique, les mouvements de rébellion et l'infiltration dans le pays de forces militaires de pays voisins, tels le Rwanda et l'Uganda, ont lourdement pesé sur l'économie du pays.

Le Tribunal Arbitral apprécie les difficultés financières qui peuvent en découler pour la RDC mais, de la même façon qu'on l'a dit par rapport à la situation économique d'ENERGOINVEST, il s'agit là d'événements dépourvus de tout rapport avec la situation factuelle et juridique des relations contractuelles entre les parties au présent arbitrage et le jugement de ce Tribunal doit en faire abstraction.

## C. LA SOCIETE NATIONALE D'ELECTRICITE

65. La **Société Nationale d'Electricité (S.N.EL)**, la Défenderesse n°2, est une « Société d'Etat », comme on peut le lire sur son papier à lettre (voir les nombreux documents provenants de S.N.EL qui ont été produits par l'une ou l'autre des parties). Bien que dotée d'autonomie juridique, il s'agit donc d'une société fondée par l'Etat en 1970 et qui appartient à celui-ci à 100%.

En particulier, il s'agit de l'organisation étatique responsable pour la génération, la transmission et la distribution de l'énergie électrique dans le pays.

66. Il est donc tout à fait logique, tel qu'on le dit dans l'Accord de Crédit du 2 avril 1980, que la réalisation du projet « *Katana-Goma* » ait été confiée par l'Etat à la S.N.EL et il est également logique que celle-ci ait ensuite conclu le

Contrat du 6 décembre 1980 avec ENERGOINVEST. Dans ce dernier Contrat, dans lequel ENERGOINVEST est le « Contractant », la S.N.EL est qualifiée de « Maître de l'Oeuvre », et il est prévu que « la propriété de la fourniture » soit transférée du « Contractant » au « Maître de l'Oeuvre » par effet de la réception provisoire des travaux.

## IV - JURIDICTION DU TRIBUNAL ARBITRAL

67. Les parties étant « *prima facie* » liées par une clause d'arbitrage visant le Règlement de la CCI, la Cour Internationale d'Arbitrage de la CCI a décidé lors de sa séance du 18 mai 2001 de mettre en route la procédure d'arbitrage conformément à l'article 6(2) du Règlement.

68. La clause en question, à laquelle ENERGOINVEST a fait référence dans sa Demande d'Arbitrage, est celle incorporée dans l'Accord de Crédit à l'article 6 (voir le paragraphe 18 de la présente sentence).

69. Toujours en conformité avec l'article 6(2) du Règlement, ainsi qu'avec le point D-1 de l'Acte de Mission, il appartient maintenant au Tribunal de se prononcer sur sa juridiction, ce qui doit être fait séparément pour la RDC (Défenderesse n°1) et pour la S.N.EL. (Défenderesse n°2).

### A. EN CE QUI CONCERNE LA DEFENDERESSE N°1

70. L'Accord de Crédit ayant été dûment signé par les représentants du Conseil Exécutif de la RDC, la RDC en est l'une des parties.

71. La clause d'arbitrage incorporée dans l'Accord de Crédit ne pose aucun problème d'interprétation. Elle manifeste très clairement la volonté des parties de se soumettre à la juridiction arbitrale de la CCI :

« [...] le *différend ou litige sera soumis au Conseil d'Arbitrage désigné suivant le règlement de conciliation et d'arbitrage de la Chambre de Commerce Internationale de Paris.* »

72. Ladite clause prévoit que le différend ou litige « *sera préalablement soumis à un règlement amiable entre les parties.* » Même s'il s'agissait là d'une condition au recours à l'arbitrage, il est certain qu'une telle condition est remplie. Au cours des dernières années, ENERGOINVEST a non seulement multiplié ses efforts pour obtenir le paiement de ses créances, soit directement, soit par l'intermédiaire de M. Gavrankapetanovic (directeur financier du projet « *Katana-Goma* » à cette époque, voir sa déclaration écrite annexée au Mémoire en Demande) mais de plus, des négociations entre les parties ont eu lieu à Paris en septembre 2001 et ce n'est qu'après l'échec de ces négociations que les conseils d'ENERGOINVEST ont demandé au Secrétariat de la Cour la mise en route de la procédure d'arbitrage (voir lettre de la Demanderesse du 31 octobre 2001).

73. L'unique problème devant encore être examiné afin d'écarter tout doute au sujet de la juridiction du présent Tribunal Arbitral par rapport à la RDC est celui d'une éventuelle immunité de la RDC en raison de sa qualité d'Etat souverain et ceci malgré le fait qu'une telle exception n'ait pas été soulevée dans la procédure arbitrale.

74. La Défenderesse n°1 ne s'est manifestée dans cette procédure qu'à deux reprises :

- le 3 août 2001, par une lettre adressée à la Cour Internationale d'Arbitrage de la CCI, et pour connaissance au conseil de la Demanderesse, dans laquelle le Ministre de Justice et Garde des Sceaux

a fait connaître que son Ministère avait la compétence pour représenter l'Etat congolais dans la procédure d'arbitrage et a proposé d'avoir des négociations avec la Demanderesse afin de rechercher un règlement amiable du litige;

- le 8 juin 2002, lorsque le Ministre de Justice et Garde des Sceaux a signé et renvoyé à la Cour l'Acte de Mission, ce dont la Cour a informé les parties dans sa communication du 14 juin 2002.

75. Les deux actes mentionnés ci-dessus confirment (s'il le fallait) que la Défenderesse n°1 a bien connu l'existence de la Demande d'Arbitrage introduite contre elle par la Demanderesse et qu'elle a été constamment informée du déroulement de la procédure arbitrale. Toutes les communications faites aux parties par le Secrétariat de la Cour, de même que tous les Ordres et toutes les communications du Tribunal Arbitral lui ont été dûment notifiées.

76. Même si les deux actes en question ne comportent pas par eux-mêmes une acceptation de la juridiction du Tribunal Arbitral, une telle acceptation est explicite dans la clause d'arbitrage que la RDC a librement signée. La volonté de la RDC de soumettre à la juridiction arbitrale de la CCI les éventuels litiges découlant de l'Accord de Crédit est là sans équivoque et elle implique la renonciation à se prévaloir d'un éventuel privilège d'immunité souveraine.

77. Le principe selon lequel l'acceptation d'une clause arbitrale par un Etat est valide et contraignante est un principe largement affirmé par la doctrine aussi bien que par la jurisprudence. En voici quelques exemples :
- Craig, Park and Paulsson – International Chamber of Commerce Arbitration – 3rd edition – para. 8.13, p. 122 : *« It is not necessary for States or their emanations to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly*

rare that a State or a State entity even raises the defense of sovereign immunity before an arbitral tribunal[1]. "

Redfern and Hunter – Law and Practice of International Commercial Arbitration – p. 319: *"During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted[2]. "*

Fouchard, Gaillard, Goldman – Traité de l'arbitrage commercial international – para. 642, p. 404 : « *La compétence des arbitres pour connaître des litiges que les Etats ou les organismes d'Etat jouissant de l'immunité ont accepté de leur soumettre ne fait aucun doute. Il est constant en effet que les bénéficiaires de l'immunité de juridiction peuvent renoncer à cette immunité. Or la convention d'arbitrage, qui vient contredire directement l'immunité, s'analyse nécessairement comme une renonciation par l'Etat ou l'organisme étatique concerné à son immunité de juridiction.* »

Sentence CCI – Affaire n° 2321 en 1974 – Recueil de sentences arbitrales CCI 1974-1985, p. 10 : « *The principle of pacta sunt servanda is generally acknowledged in international law [...] A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law[3]. "*

---

[1] Traduction libre : « Afin de se soumettre à la juridiction arbitrale, il n'est pas nécessaire pour les Etats ou leurs émanations de renoncer à l'immunité souveraine dont ils pourraient se prévaloir dans des contextes différents pour invalider leur soumission à une juridiction arbitrale. Une convention d'arbitrage est suffisamment contraignante par elle-même. Il est de plus en plus rare qu'un Etat ou une entité étatique soulève l'exception de l'immunité souveraine devant un tribunal arbitral. »

[2] Traduction libre : « Au cours d'une procédure arbitrale à laquelle un Etat est partie, la distinction entre immunité absolue et immunité limitée devrait être insignifiante. L'arbitrage peut procéder valablement uniquement sur la base du fait que l'Etat est convenu d'avoir recours à l'arbitrage; un tel accord est généralement considéré avoir valeur de renonciation à l'immunité, qu'elle soit absolue ou limitée. »

[3] Traduction libre : « Le principe *pacta sunt servanda* est généralement reconnu en droit international [...] Un Etat souverain doit être suffisamment souverain pour pouvoir assumer des obligations aussi bien en droit international qu'en droit national. »

Dans le même sens : la sentence arbitrale CCI dans l'affaire n°1526 en 1968, Clunet 1974, 915 avec note de Yves Derains, ainsi que la sentence CCI dans l'affaire n° 1939 en 1971, Rev. Arb 1973, 122.

78. On peut ajouter que dans le cas d'espèce, l'exception de souveraineté de l'Etat n'entre pas en ligne de compte, parce que l'Accord de Crédit sur lequel la Demanderesse fonde sa demande est sans aucun doute un contrat de droit privé qui aurait pu être conclu par n'importe quel particulier.

79. Par un principe adopté dans les arbitrages internationaux, l'immunité de l'Etat n'est pas une règle absolue. Il faut distinguer entre les actes que l'on appelle *« jure imperii »*, c'est-à-dire les actes accomplis par l'Etat dans l'exercice de sa souveraineté, et les actes que l'on appelle *« jure gestionis »*, c'est-à-dire les actes accomplis par l'Etat dans le domaine du droit privé et qui sont de ceux qui pourraient être accompli par n'importe quel sujet privé. En d'autres termes, même si l'on peut admettre que les actions d'un Etat ont toujours une finalité d'intérêt public, le critère n'est pas pris du but de ces actes, mais de leur nature, afin de savoir s'ils relèvent de ce pouvoir souverain dont seulement l'Etat dispose ou s'il s'agit d'actes que tout particulier pourrait accomplir.

80. Ce principe de souveraineté « limitée » et la distinction entre actes *« jure imperii »* et actes *« jure gestionis »* sur laquelle il est fondé ont été constamment reconnus et appliqués en droit suisse, qui est le droit auquel les parties se sont soumises d'un commun accord (article 6 de l'Accord de Crédit). L'application du droit suisse a été confirmée également dans l'Acte de Mission que toutes les parties ont signé sans réserves. De plus, il s'agit de la *lex fori*, puisque le siège de l'arbitrage est en Suisse et cette localisation a été, elle aussi, librement choisie par accord des parties dans leur contrat.

81. A titre d'exemple, on peut rappeler un cas similaire qui a été jugé par le Tribunal fédéral suisse (ci-après « TF ») en 1989. Un Etat d'Amérique du Sud avait alors, dans le but de financer deux contrats de développement industriel, garanti aux deux syndicats des banques demanderesses le remboursement des fonds engagés. Il était indéniable pour le TF que l'Etat avait agi comme un particulier et que son engagement ne différait pas de l'engagement commercial qu'aurait pu prendre un quelconque particulier[4].

82. La Suisse est d'ailleurs l'un des pays à avoir ratifié la Convention Européenne sur l'Immunité des Etats de 1972[5] et cette Convention prévoit justement à son art.12(1) qu'un Etat ne peut pas invoquer l'immunité de juridiction arbitrale lorsqu'il a signé une convention d'arbitrage concernant des disputes en matière civile ou commerciale.

83. Finalement, il faut souligner que le droit de la RDC ne pourrait en aucun cas être pris en compte dans l'appréciation de la nature disponible des rapports de droit soumis à l'arbitrage ou, plus en général, en matière d'arbitrabilité du litige ainsi qu'au sujet de la capacité d'un Etat d'être partie à l'arbitrage. En effet, l'article 177 alinéa 2 de la LDIP (Loi fédérale Suisse du 18 décembre 1987 sur le droit international privé) dispose : « *Si une partie à la convention d'arbitrage est un Etat, une entreprise dominée ou une organisation contrôlée par lui, cette partie ne peut invoquer son propre droit pour contester l'arbitrabilité d'un litige ou sa capacité d'être partie à un arbitrage* ».

---

[4] ATF 124 III 382, cons. 4.
Dans le même sens :
Arrêt du Tribunal Fédéral Suisse du 20 décembre 1947 (ATF 73 III 158);
Arrêt du Tribunal Fédéral Suisse du 15 novembre 1978 (ATF 104 Ia 367);
Arrêt du Tribunal Fédéral Suisse du 21 mars 1984 (ATF 110 Ia 43);

[5] RS 0.273.1

**Pour toutes ces raisons, le Tribunal statue qu'il a juridiction par rapport à la République Démocratique du Congo.**

## B – EN CE QUI CONCERNE LA DÉFENDERESSE N°2

84. La Défenderesse n°2 a expressément contesté la juridiction du Tribunal Arbitral en se fondant sur une série d'arguments que l'on peut résumer comme suit :

- o L'Accord de Crédit n'est, malgré l'utilisation impropre qui y est faite des termes « Prêteur» et « Emprunteur », pas un contrat de « prêt », parce qu'il n'y a pas eu transfert d'argent d'une partie à l'autre et qu'en plus, le montant de ce qu'on appelle « prêt » n'y était pas déterminé. Par conséquent, si l'on interprète cet acte non pas de manière strictement grammaticale, mais en recherchant la volonté réelle des parties, on s'aperçoit qu'il s'agit tout simplement de « *l'aménagement contractuel des modalités de paiement de la dette résultant de l'exécution d'un contrat de construction à intervenir* ».

- o Après la signature de l'Accord de Crédit, les parties ont effectivement signé le contrat du 9 décembre 1980 pour la réalisation du projet « *Katana-Goma* » et celui-ci est le contrat principal. L'Accord de Crédit qui était devenu caduc entre temps a été intégré dans ce contrat.

- o L'Accord de Crédit n'a donc ni autonomie substantielle ni juridique et il doit être considéré comme une partie du contrat du 9 décembre 1980.

- o En tout cas, les dispositions du contrat du 9 décembre 1980 doivent prévaloir sur celles de l'Accord de Crédit.

- o Puisque le contrat du 9 décembre 1980 contient une clause d'arbitrage qui n'est pas une clause d'arbitrage CCI, et que cette clause doit prévaloir sur celle de l'Accord de Crédit, le Tribunal

Arbitral constitué conformément au Règlement d'arbitrage CCI n'a pas juridiction. La clause d'arbitrage de l'article 9.2 du contrat du 9 décembre 1980 est la suivante :

« *Toutes contestations relatives à l'interprétation ou à l'exécution des obligations dérivant du Contrat, seront soumises à trois arbitres, désignés, délibérant et statuant comme spécifié ci-après.*

*La partie la plus diligente notifiera par lettre recommandée avec accusé de réception, à l'autre partie le nom de son arbitre.*

*La partie à laquelle la notification aura été faite disposera d'un délai de trente jours à dater de la réception de la lettre de notification pour désigner son propre arbitre.*

*Après la désignation d'un second arbitre, les deux arbitres procèderont dans la quinzaine de la désignation à la désignation d'un troisième arbitre avec lequel ils formeront le collège arbitral. S'ils ne peuvent se mettre d'accord sur cette désignation, le troisième arbitre sera désigné par le Président de la Chambre de Commerce Internationale à Paris.*

*Le Collège arbitral aura son siège à Zurich, et le droit matériel suisse sera appliqué.*

*Le Collège arbitral sera dispensé de l'observation de tout délai et de toute formalité de procédure sauf celle qui serait éventuellement prévue dans le compromis arbitral.*

*Toutefois, les dispositions prévues par la loi de la République du Zaïre et de la Yougoslavie pour l'exécution de la sentence arbitrale devront être observées. A moins qu'il n'en soit convenu autrement, la sentence sera rendue dans les deux mois de la constitution du collège arbitral.*

*Les frais d'arbitrage, y compris les émoluments des arbitres, seront à la charge de la partie succombant, à moins qu'il n'en*

*soit décidé autrement par la sentence arbitrale et pour des motifs qui devront y être spécialement indiqués.*

*Sans déroger aux délais pour l'introduction des réclamations, les parties contractantes doivent, sous peine de forclusion, formuler par écrit toute demande d'arbitrage se rapportant au Contrat au plus tard un an après la date à laquelle la réception provisoire de l'ensemble des travaux a été faite. Les parties ne sont admises à introduire ultérieurement des demandes d'application de clauses arbitrales qu'en ce qui concerne exclusivement des faits postérieurs à la réception provisoire. Ces réclamations doivent, sous peine de forclusion, être introduites au plus tard à la date à laquelle la réception définitive de l'ensemble des travaux a été faite. »*

o  Enfin et de toute manière, le Tribunal Arbitral n'a pas juridiction par rapport à la S.N.EL, parce que cette dernière n'est partie ni à l'Accord de Crédit ni à la Convention de Rééchelonnement, et qu'elle n'a participé au contrat principal (contrat dit « technique » du 9 décembre 1980) qu'en tant que mandataire de la RDC.

Le Tribunal Arbitral va procéder ci-après à l'examen de tous les arguments susmentionnés.

85. Le Tribunal Arbitral s'accorde avec les parties sur le point de dire que les contrats établis entre elles ne sont pas des chefs-d'œuvre en ce qui concerne le vocabulaire employé pour désigner le rôle des parties et/ou pour formuler leurs obligations respectives. Il est donc logique et légitime que l'on ait recours à la recherche de leur volonté réelle, ce qui d'ailleurs est conforme au principe établi en droit suisse à l'article 18 du Code des Obligations :

*« Pour apprécier la forme et les clauses d'un contrat, il y a lieu de rechercher la réelle et commune intention des parties, sans s'arrêter aux expressions ou*

*dénominations inexactes dont elles ont pu se servir, soit par erreur, soit pour déguiser la nature véritable de la convention. »*

86. La République du Zaïre était désireuse de moderniser ses infrastructures et avait en particulier « [...] *jugé nécessaire de construire* [...] *une ligne de transport d'énergie électrique de haute tension de 110 KV allant de Bukavu jusqu'à Goma en passant par Katana, y compris deux postes de transformation ainsi que des postes de distribution pour le réseau moyenne tension dans la ville de Goma* [...] ». Ceci est exprimé dans le préambule de l'Accord de Crédit, où l'on dit également que « *pour y parvenir* » la République du Zaïre avait besoin « [...] *de la coopération bilatérale et multilatérale.* » Cette situation est typique de beaucoup de pays qui s'apprêtent à réaliser des projets d'intérêt public de grande envergure. Il faut dans ce cas non seulement trouver le fournisseur d'équipements et de services qui possède l'expertise technique nécessaire, mais il faut aussi trouver le financement. Les deux piliers de la réalisation de tels projets sont : un contrat de crédit pour le financement du projet et un contrat que l'on peut qualifier de « technique », qui règle notamment les études techniques, les fournitures d'équipements et la supervision des travaux et des montages.

87. La particularité de la relation contractuelle entre la RDC et la S.N.EL d'une part et ENERGOINVEST d'autre part, consiste dans le fait qu'un seul sujet (ENERGOINVEST) remplit les deux fonctions de bailleur de fonds et de contractant technique pour les études, les livraisons et les services. C'est là la raison qui conduit la Défenderesse n°2 à dire que finalement, l'Accord de Crédit n'est rien d'autre que l'aménagement des conditions de paiement des fournitures et services dont au Contrat technique. Mais cet argument est faux : l'identité du sujet ne change rien à l'autonomie substantielle et juridique des deux contrats.

88. Les parties ont certainement voulu donner une autonomie juridique à l'Accord de Crédit dont la nature comportait déjà une autonomie substantielle par rapport à la réalisation du projet auquel le financement serait destiné. C'est pour cette raison qu'elles ont signé un Accord de Crédit qui porte exclusivement sur les conditions du financement. Si elles avaient uniquement voulu aménager les modalités de paiement des livraisons et des services nécessaires pour la réalisation du projet, on ne comprend pas pourquoi elles ne l'auraient pas fait au sein du même contrat que celui qui concerne telles livraisons et services. L'aménagement dont la Défenderesse parle et qui ne serait selon elle pas un prêt, consisterait en effet tout simplement dans la concession d'une facilité de paiement. Si tel était le cas, il aurait été logique que la durée du délai accordé et les termes et conditions dans lesquelles les paiements devaient se faire constituent la clause de paiement du contrat qui a pour objet les livraisons, les travaux et les services nécessaires à réaliser le projet, d'autant plus que ce contrat contient évidemment aussi les prix à payer.

89. Dans le cas présent au contraire, nous avons d'abord un Accord de Crédit qui comporte d'un côté l'engagement d'une partie à financer 85% de la valeur totale d'un projet dont le montant n'est qu'estimé, ne pouvant pas encore être connu dans sa réalité et de l'autre côté l'engagement de l'autre partie à un remboursement dont les conditions sont très minutieusement détaillées. Nous avons ensuite un contrat de fourniture d'études, équipements et services dont le chapitre 8 règle les questions de « *Prix et Paiement* ».

90. Il est clair qu'il y a un rapport entre la clause de paiement du contrat (en réalité la clause incorporée dans les « marchés particuliers ») et les conditions de l'Accord de Crédit, puisque pour 85% de la valeur à payer, l'argent que l'on utilise est celui « prêté » par ENERGOINVEST et que l'on devra lui rembourser conformément aux conditions de l'Accord de Crédit, mais les deux rapports contractuels restent autonomes. Comme on peut le lire dans les conditions de paiements des « marchés particuliers », 85% du prix contractuel

sont payés « [...] *par remboursement du crédit* [...] *sur la base et sous les conditions de l'Accord de Crédit.*»

91. Que l'Accord de Crédit soit, en droit suisse, qualifié de contrat de prêt ou de contrat *« sui generis »*, ainsi que les parties l'ont débattu entre elles, n'a aucune importance, puisque les conséquences juridiques restent les mêmes. Le transfert physique d'argent du « prêteur » à « l'emprunteur » n'est pas un élément essentiel du prêt. On peut se trouver en présence d'un prêt même dans le cas d'une partie qui, comme l'a fait ENERGOINVEST, s'engage à anticiper de sa poche 85% de la valeur d'équipements et de services destinés à la réalisation d'un certain projet d'une autre partie et que cette dernière s'engage de son côté à lui rembourser ces débourses dans un certain laps de temps et à certaines conditions. Le litige dont ce Tribunal Arbitral doit juger porte justement sur l'obligation de remboursement et il n'est pas nécessaire de savoir si un tel remboursement est dû dans le cadre d'un contrat de prêt typique ou dans le cadre d'un contrat *« sui generis »*. Il s'agit en tout cas d'un contrat qui prévoit d'un côté une obligation de financement et de l'autre côté une obligation de remboursement et ce contrat est tout à fait autonome par rapport à l'autre contrat concernant la réalisation du projet auquel le financement est destiné.

92. Il est également sans importance qu'au moment de la conclusion d'un tel accord financier le montant exact du financement ne soit pas encore connu des parties. Leurs engagements respectifs (au financement d'un côté et au remboursement de l'autre) sont de toute manière très bien définis, lorsque l'on dit qu'il s'agit de 85% du montant qui serait effectivement nécessaire *« pour l'achèvement complet du projet »* (article 1.3 de l'Accord de Crédit), dont la valeur estimée à ce moment se chiffre à 15,18 millions de USS (article 1.1 de l'Accord de Crédit).

93. L'autonomie substantielle et juridique de l'Accord de Crédit ne peut pas être mise en doute par le simple fait que l'introduction au Contrat signé le 9 décembre 1980 est la suivante :

« *Attendu que le Transport d'Energie Electrique dans la région du KIVU, le projet KATANA-GOMA a fait l'objet :*

- *d'un accord de Crédit, signé à Kinshasa le 2 avril 1980 entre le Conseil Exécutif de la République du Zaïre, représenté par le Département de l'Energie et le Département des Finances et la société Energoinvest*

  *le présent Contrat a été établi.*

  *Ce Contrat comprend :*

- *L'Accord de Crédit signé en date du 2.4.1980*

- *Les présentes Conditions Générales*

- *Les marchés particuliers n°1, 2, 3, 4 et 5 »*

Cette formulation ne signifie pas, au contraire de ce que prétend la Défenderesse n°2, que l'Accord de Crédit est privé de valeur autonome et que ses conditions se trouvent être subordonnées à celles du contrat dans lequel il est incorporé.

Comme la Défenderesse n°2 l'a dit et comme le dit l'article 18 CO, il ne faut pas s'arrêter aux expressions ou dénominations inexactes dont les parties ont pu se servir.

Le Tribunal considère que, par le document du 9 décembre 1980 appelé « Contrat », les parties ont en réalité tout simplement voulu rassembler en un seul ensemble tous les documents contractuels destinés à la réalisation du projet. Elles l'ont vraisemblablement fait pour des raisons pratiques, c'est-à-dire pour pouvoir disposer d'un seul document réunissant tous les accords contractuels; mais l'autonomie de chacun de ces accords n'est pas mise en cause, chacun ayant son propre objet, en particulier si l'on considère l'Accord de Crédit par rapport aux accords et marchés particuliers qui concernent les aspects techniques de la réalisation du projet.

94. Au moment de la signature de l'Accord de Crédit qui prévoyait la conclusion à venir d'un Contrat dit « *technique* », on avait stipulé que ce dernier devait être annexé à l'Accord de Crédit (article 2.1). Au contraire, au moment de la signature de ce contrat (que l'on ne qualifie plus de « technique »), au lieu de l'annexer à l'Accord de Crédit, on a préféré le configurer comme un ensemble de documents contractuels, y inclus l'Accord de Crédit. Il s'agit d'un arrangement formel qui ne change rien à la substance des dispositions. Que le Contrat « Technique » soit annexé à l'Accord de Crédit ou que ce dernier devienne l'un des éléments d'un ensemble d'accords contractuels, on est toujours en présence de contrats séparés et autonomes. Entre autres, si on a regard au vocabulaire des parties, on peut constater que parmi les documents contractuels ressemblés dans ce document unique signé le 9 décembre 1980, il y a aussi un « *Contrat Technique* », dont on trouve la définition à l'article 1.1.a. des Conditions Générales. Il s'agit de « *L'ensemble des documents faisant partie des marchés particuliers 1, 2, 3, 4 et 5 .*»

95. La raison pour laquelle l'Accord de Crédit signé le 2 avril 1980 est en première position parmi les documents rassemblés dans le Contrat du 9 décembre 1980 est évidente : il s'agit de l'accord destiné à procurer les moyens financiers qui sont nécessaires à la réalisation du projet. Cependant, son intégration au contrat n'a pas eu pour effet de le priver de sa valeur. Au contraire, il a été repris tel quel, avec ses signatures qui en font un document contractuel bien autonome et on a continué de s'y référer comme à « *l'Accord de Crédit signé en date 2.4.1980.* »

96. Ainsi qu'on l'a déjà dit plusieurs fois, la réalisation du projet «*Katana-Goma* », conformément à ce qui est la pratique internationale pour ce genre de projets, exigeait deux choses : qu'il y ait un contrat pour régler son financement (ce que l'on a fait par l'Accord de Crédit) et qu'il y ait un deuxième contrat pour régler notamment les questions des études techniques, des livraisons d'équipements et de la supervision des travaux et des montages.

Il est évident que les deux sont interdépendants puisque le premier est exclusivement destiné au financement de l'objet du deuxième. C'est pour cette raison que les parties ont prévu à l'article 7.2 de l'Accord de Crédit que celui-ci deviendrait caduc si le Contrat Technique n'était pas conclu dans les 6 mois suivant sa signature. De toute évidence, il s'agit là d'une clause établie dans l'intérêt d'ENERGOINVEST, dont l'engagement au financement du projet ne pouvait pas rester valable pour une durée indéfinie. Toutefois, le fait que le Contrat Technique n'ait pas été conclu dans le délai prévu ne signifie pas, comme le soutient la Défenderesse n°2, que l'Accord de Crédit avait été déjà frappé de caducité et que les parties lui ont donné un nouvel effet juridique seulement *« par son intégration au contrat technique. »*

97. Les parties ont tout simplement renoncé à se prévaloir de la clause de caducité de l'Accord de Crédit. Elles y ont renoncé par actes concluants, ce qui est tout à fait suffisant. Une renonciation formelle par écrit n'était ni demandée ni nécessaire. La disposition de l'article 7.2 dont il est question est une condition résolutoire établie surtout, sinon exclusivement, dans l'intérêt d'ENERGOINVEST. Cette dernière ne l'a pas fait valoir et la S.N.EL non plus. La S.N.EL ne peut pas l'invoquer aujourd'hui. Son argument selon lequel l'Accord de Crédit du 2 avril 1980, avec son éventuelle autonomie juridique, aurait disparu et que seul subsisterait aujourd'hui le Contrat du 9 décembre 1980 dans lequel les stipulations de l'Accord de Crédit ont été intégrées, mais subordonnées aux autres stipulations du même Contrat, est un argument sans fondement.

98. A l'appui de sa thèse selon laquelle l'Accord de Crédit est subordonné au Contrat du 9 décembre 1980, dans lequel il aurait été intégré, la Défenderesse n°2 se réfère en particulier, à l'article 1.3 de ce Contrat, dont le texte est le suivant :

*« Art. 1.3 – DOCUMENTS DU MARCHÉ*

*1.3.1. Les documents du Marché se composent de :*

a) *le présent document intitulé « Contrat » constitué lui-même par :*

    *a.1. l'accord de crédit*

    *a.2. les Conditions Générales et leurs Annexes*

b) *Marchés Particuliers*

c) *Etudes*

d) *Avenants éventuels aux Marchés Particuliers dûment signés par les Parties.*

*1.3.2. Les Avenants du Marché sont à interpréter les uns en fonction des autres. En cas de divergence ou contradiction entre les stipulations des Conditions Générales, des Marchés Particuliers, de leurs Avenants et de l'Accord de Crédit, ces documents prévalent l'un sur l'autre dans l'ordre inverse de leur énumération suivant 1.3.1.*

*En cas de divergence entre les Avenants, l'Avenant portant la date la plus récente prévaudra. »*

Lorsqu'elle se réfère à cet article du Contrat, le raisonnement de la Défenderesse n° 2 est le suivant : puisque l'Accord de Crédit n'a pas d'autonomie et puisque, en cas de divergence, les Conditions Générales du Contrat doivent prévaloir sur celles de l'Accord de Crédit, la Clause Arbitrale du Contrat (article 9.2), qui n'est pas la même que celle qui est insérée dans l'Accord de Crédit (article 6), et qui n'est pas une clause d'arbitrage CCI, doit prévaloir sur celle de l'Accord de Crédit. Partant, le Tribunal Arbitral n'a pas juridiction pour juger de la présente affaire.

99. Les arguments de la Défenderesse n°2 ne sont pas défendables, et ce pour deux raisons :

- Premièrement, parce que comme on l'a déjà dit, l'Accord de Crédit est un contrat autonome qui n'a jamais perdu son autonomie substantielle et juridique;

- Deuxièmement, parce qu'il n'y a pas de conflit entre la clause arbitrale de l'Accord de Crédit et la clause arbitrale du Contrat dit « technique ». Il s'agit de deux clauses arbitrales séparées, chacune d'elles est destinée

à établir de quelle manière vont être réglés les litiges qui pourraient se produire entre les parties par rapport à l'un ou à l'autre de ces deux contrats. La clause d'arbitrage de l'Accord de Crédit du 2 avril 1980 concerne les litiges découlant de cet Accord. La clause d'arbitrage du Contrat du 9 décembre 1980 concerne à l'évidence les litiges découlant du contrat dit « technique ». Que celui-ci soit du domaine d'application de cette clause d'arbitrage est confirmé, entre autres, par le paragraphe final de celle-ci, qui établit la forclusion des réclamations et de l'arbitrage « [...] *au plus tard un an après la date à laquelle la réception provisoire de l'ensemble des travaux a été faite* », ou si les litiges concernaient exclusivement des faits postérieurs à la réception provisoire, la forclusion des réclamations et de l'arbitrage « [...] *au plus tard à la date à laquelle la réception définitive de l'ensemble des travaux a été faite* .»

Une telle disposition n'aurait pas de sens si elle devait s'appliquer à des litiges concernant l'Accord de Crédit en exécution duquel le remboursement du prêt s'étale sur plusieurs années (8 ans pour le capital avec la première échéance à 48 mois dès la signature de l'Accord et 10 ans pour les intérêts avec la première échéance à 30 mois dès la signature de l'Accord), sans aucun rapport avec la réception des travaux.

Un conflit éventuel entre les deux clauses arbitrales ne pourrait théoriquement se présenter que si l'on était en présence d'un litige qui porte simultanément sur l'Accord de Crédit et sur le Contrat dit « Technique ». Mais le litige soumis au Tribunal Arbitral porte uniquement sur l'Accord de Crédit, et il n'y a donc pas de conflit. Dès lors, la clause arbitrale de l'Accord de Crédit s'applique.

100. Tout doute au sujet de cette conclusion est définitivement écarté par la Convention de Rééchelonnement signée par les parties le 31 mai 1986. Non seulement cette Convention se réfère à l'Accord de Crédit signé le 2 avril 1980,

mais son article 7 prévoit expressément que: « *La présente convention fait partie intégrante de l'accord de crédit du 02 avril 1980 et toutes les clauses y insérées restent valables.* » A noter que la date de signature de cette Convention est postérieure à la réception définitive de l'ouvrage, ce qui signifie qu'elle intervient à une date à laquelle tout arbitrage serait forclos si la clause d'arbitrage du Contrat du 9 décembre 1980 était applicable. Il y a donc là la confirmation :

- que l'Accord de Crédit est autonome par rapport au Contrat Technique;
- que l'Accord de Crédit n'a jamais été considéré caduc;
- que même si par impossible on admettait que la clause d'arbitrage du Contrat du 9 décembre 1980 l'emporte sur celle de l'Accord de Crédit, cette prévalence ne serait plus valable suite à la Convention de Rééchelonnement qui aurait ressuscité l'Accord de Crédit dans sa teneur originale et ceci serait tout à fait en accord avec la thèse de la Défenderesse n°2 selon laquelle les accords postérieurs doivent prévaloir sur les accords antérieurs.

101. Le dernier argument avancé par la Défenderesse n°2 pour contester la juridiction du Tribunal Arbitral consiste à dire qu'elle n'est pas partie à l'Accord de Crédit et que par conséquent, elle n'est pas liée par la clause arbitrale de cet Accord.

102. Il est vrai que l'Accord est formellement intervenu entre « Le Conseil Exécutif de la République du Zaïre » d'une part et « ENERGOINVEST » d'autre part, mais il est également indéniable que la S.N.EL a elle aussi signé cet Accord. Pourquoi l'a-t-elle signé ? Selon sa défense, elle l'aurait signé « [...] *à l'effet de marquer son acceptation de prendre en charge la partie technique de la construction* [...] » et encore parce que l'Accord prévoit « [...] *que le prêteur émette des traites tirées sur la S.N.EL. et avalisées par le Conseil Exécutif du Zaïre.* » Cela semble plus que suffisant au Tribunal pour affirmer que la signature de la S.N.EL comporte au moins son acceptation de

certaines obligations de l'Accord qui la concernent directement, y inclus (ce qui n'est pas de moindre importance) les obligations qui ont pour objet les modalités du remboursement du prêt. Dans la suite de cette sentence, le Tribunal aura l'occasion de revenir sur le problème de la position de la S.N.EL dans le cadre de l'Accord de Crédit. Pour le moment, la signature par la S.N.EL de l'Accord de Crédit qui contient la clause d'arbitrage et constitue la base des demandes de la Demanderesse, paraît suffisante au Tribunal aux fins d'établir sa juridiction, ce d'autant plus que cette signature n'est ni le fruit du hasard ni le fait d'un témoin qui ne serait pas impliqué dans la substance de l'Accord. Tel que la S.N.EL le reconnaît, il s'agit d'une signature qui confirme son acceptation de certaines obligations établies dans l'Accord et qui la concernent directement.

**Pour toutes ces raisons, le Tribunal statue qu'il a juridiction par rapport à la S.N.EL.**

## NOTE

Ayant décidé :

- que l'Accord de Crédit du 2 avril 1980 est juridiquement autonome;
- que la clause arbitrale applicable est celle de l'Accord de Crédit et non pas celle du Contrat du 9 décembre 1980;
- que les forclusions prévues à la clause d'arbitrage du Contrat du 9 décembre 1980 ne pourraient se rapporter qu'à des réclamations nées dans le cadre du Contrat Technique et non pas à des réclamations nées dans le cadre de l'Accord de Crédit;

le Tribunal Arbitral n'aura pas besoin de prendre en considération l'exception de forclusion avancée par la Défenderesse n°2, dont la présupposition était que la clause d'arbitrage du Contrat du 9 décembre 1980 soit applicable.

## V - DROIT DE LA DEMANDERESSE AU PAIEMENT DES SOMMES RECLAMEES

103. Dans les conclusions qu'elle a formulées lors de l'audience de plaidoiries précédant la clôture des débats, la Demanderesse a confirmé les conclusions de son Mémoire du 28 juin 2002 dans lesquelles elle a réclamé le paiement d' « *un montant de 11,725,845.37 dollars au titre du capital, plus les intérêts au taux contractuel de 9% courant à partir de la date d'échéance de chaque versement et jusqu'à ce que le paiement complet soit effectué.* »

104. Lors de la même audience et conformément d'ailleurs à ce qui était déjà dit dans le Mémoire du 28 juin 2002, la Demanderesse a précisé que le montant de US$ 11,725,845.37 résultait de l'addition du montant de US$ 11,179,266.71 que le Ministère des Finances de la RDC avait reconnu devoir payer dans sa lettre du 4 mars 1991 (doc. n°7 annexé à la Demande d'Arbitrage), au montant de US$ 546,578.60 qui correspond aux intérêts de retard « *à partir de mars 1991 seulement* » (voir calculs de la Demanderesse en page 36 de son mémoire). Puisque le résultat correct de cette addition est de US.11,725,845.31, on en déduit que l'indication d'un montant de US$ 11,725,845.37 dans les conclusions de la Demanderesse n'est que le fruit d'une simple faute d'impression.

105. La lettre du 4 mars 1991 mentionnée ci-dessus indique en effet un total des « *arriérés dus à la société ENERGOINVEST* » se chiffrant à US$ 17,079,405.83, mais ce montant se réfère aux deux projets, celui de « *Katana-Goma* », qui fait l'objet de cet arbitrage, et celui de « *Mobayi* », qui fait l'objet d'un arbitrage séparé. Dans des tableaux annexés à ladite lettre on donne la répartition des créances par rapport à chacun des projets. Celui qui nous intéresse est le tableau intitulé « ACCORD DE CREDIT DU 02 AVRIL 1980 (PROJET LHT KATANA-GOMA) ». Ce tableau, qui tient compte des accords entre les parties lors de la Convention de Rééchelonnement, comprend les

montants dus pour capital et intérêts jusqu'à l'échéance du 2 octobre 1992. Le
« Grand Total Général » indiqué est de US$ 11,179,262.36, mais il y a là une
petite faute. La somme des amortissements de base pour l'échéance du 2 avril
1990 (US$ 1,346,543.13 pour le capital et US$ 161,589.17 pour les intérêts)
est erronément chiffrée à US$ 1,508,128.30 au lieu de US$ 1,508,132.30. La
correction de ce chiffre porte le « Grand Total Général » à US$ 11,179,266.36.
La Défenderesse indique le montant de US$ 11,179,266.30 (voir note de bas de
page n°17 de son Mémoire du 28 juin 2002), mais elle commet elle aussi une
petite erreur en page 21 dudit mémoire lorsque, par rapport à l'échéance du 2
avril 1990, elle indique le montant de US$ 576,964.30 comme étant le résultat
de l'addition de US$ 489,157.23 en capital et US$ 87,807.08 en intérêt, alors
que le résultat exact est de US$ 576,964.31.

Dans ses conclusions, comme on l'a dit, la Demanderesse indique le chiffre de
US$ 11,179,266.71 comme étant le montant corrigé reconnu par le Ministère
des Finances. Cette affirmation n'est pas exacte non plus. Le chiffre indiqué est
le résultat d'un calcul fait par la Demanderesse elle-même au paragraphe 97
(page 36) de son mémoire. Si, au contraire, on veut s'en tenir au chiffre que le
Ministère des Finances a reconnu dans sa lettre du 4 mars 1991, le chiffre exact
(après la petite correction que l'on a indiquée ci-dessus) est de US$
11,179,266.36.

106. Puisque la Demanderesse a basé sa demande sur la reconnaissance de
dette de la lettre du Ministère des Finances du 4 mars 1991 et lors des
plaidoiries, a confirmé vouloir se tenir, comme base de sa créance (sauf les
intérêts qu'on y doit ajouter), au montant reconnu dans ladite lettre, c'est donc
le montant de US$ 11,179,266.36 qui sera retenu par le Tribunal Arbitral.

107. Il convient ici de rappeler les conditions pour le remboursement du
financement, telles qu'elles ont été stipulées entre les parties à l'Accord de
Crédit du 2 avril 1980.

A partir de la date de la signature de l'Accord, des intérêts dits « intercalaires » au taux de 6% par an étaient prévus pour une période de 24 mois (article 4.1).

Au bout de 24 mois, les intérêts ainsi calculés devaient être ajoutés au montant financé et de cette manière, capitalisés (article 4.2.).

Sur le montant ainsi formé et qui aurait dû être remboursé en 8 ans par 16 tranches semestrielles dont la première arrivait à échéance à 48 mois dès la signature de l'Accord de Crédit, un intérêt de 6% par an était dû et était à payer sur 10 ans, en 20 tranches semestrielles, dont la première venait à échéance 30 mois dès la signature de l'Accord de Crédit (article 4.3).

Les parties avaient enfin convenu que d'éventuels défauts de paiement auraient entraîné, à la charge du débiteur, une pénalisation de l'ordre de 50% de l'intérêt principal, ce qui signifie que le taux de l'intérêt serait passé de 6% à 9% par an (article 4.4).

108. ENERGOINVEST s'était engagée à financer 85% de la valeur en devise étrangère du projet (article 1.1 de l'Accord de Crédit) et même si la valeur estimée au début était de 15,18 millions de US dollars (même article 1.1) l'engagement d'ENERGOINVEST était « [...] *d'élever le montant du crédit pour l'achèvement complet du projet* » (article 1.3). En effet, déjà au moment de l'émission de la première série des traites qu'ENERGOINVEST a envoyées à la S.N.EL et que cette dernière lui a retournées dûment acceptées et avalisées (voir doc. n°3 annexé à la Demande d'Arbitrage), le montant du financement (total des traites pour le capital) était supérieur à 18 millions de US$, et finalement, après qu'une série additionnelle de traites ait été émise, acceptée et avalisée en mai 1986, suite à « *la dernière mise à jour du montant du contrat* » (doc. n°6 annexé à la Demande d'Arbitrage), le montant du financement de la part d'ENERGOINVEST s'élève à US$ 21.544.690,21, tel que reconnu dans la lettre de la S.N.EL au Commissaire d'Etat aux Finances et Budget en date du 1er avril 1985 (doc. n°4 annexé à la Demande d'Arbitrage), ainsi que dans la lettre de la Banque du Zaïre à ENERGOINVEST en date du 9 juin 1986 (doc. n°19 annexé au Mémoire du 28 juin 2002).

109. Suite à la défaillance des débitrices, la *Convention de Rééchelonnement* signée entre les parties le 31 mai 1986 porte sur un total de US$ 11,691,047,94 (voir doc. n°2 annexé à la Demande d'Arbitrage, ainsi que la lettre de la Banque du Zaïre du 9 juin 1986 à ENERGOINVEST, doc. n°20 annexé au Mémoire du 28 juin 2002). Il faut toutefois noter que ce montant comprend différentes catégories de dettes par rapport auxquelles les conditions de rééchelonnement ne sont pas les mêmes. En effet, la somme de US$ 11,691,047.94 se compose de :

  - US$ 2,549,063.16 : il s'agit d'une somme due à titre d'acompte sur la valeur du marché. Par conséquent, cette somme n'entre pas dans le financement des 85% de ladite valeur et on ne peut pas lui appliquer les conditions de remboursement de l'*Accord de Crédit*. La *Convention de Rééchelonnement* établit seulement de nouveaux délais de paiement, sans intérêts.

  - US$ 3,272,098.00 : il s'agit d'intérêts échus et à échoir jusqu'au 31 décembre 1986. Pour cette somme également la *Convention de Rééchelonnement* établit de nouveaux délais de paiement sans intérêts.

  - US$ 5,869,886.78 : il s'agit du capital à rembourser échu ou à échoir jusqu'au 31 décembre 1986. Dans ce cas le rééchelonnement comporte des intérêts au taux de 6% par an à compter du 2 octobre 1986.

L'échéancier résultant de la *Convention de Rééchelonnement* est annexé à la *Convention* même (voir doc. n°2-D annexé au Mémoire du 28 juin 2002).

Les échéances en capital et intérêts prévues par l'*Accord de Crédit* et postérieures au 1er janvier 1987 ne sont pas affectées par la *Convention de Rééchelonnement*.

110. Si l'on considère les conditions de l'*Accord de Crédit* et celles de la *Convention de Rééchelonnement* que l'on vient d'évoquer d'une part et la situation réelle des paiements effectués, des retards intervenus et des paiements échus et jamais effectués d'autre part, l'on comprend facilement qu'il soit très

complexe d'effectuer le calcul des créances de la Demanderesse. Les calculs que la Demanderesse a présentés aux paragraphes 88-89-90-91-92-93-94-95-96 et 97 de son Mémoire du 28 juin 2002, même s'ils n'ont pas été contestés par la Défenderesse n°2, demanderait une vérification comptable. Le Tribunal Arbitral n'aura cependant pas besoin d'y procéder parce que, dans ses conclusions, la Demanderesse a déclaré fonder sa demande non pas sur ses propres calculs ou sur une reconstruction de la situation de ses créances découlant de l'Accord de Crédit et de la Convention de Rééchelonnement à faire par un expert comptable, mais exclusivement sur la reconnaissance de dette contenue dans la lettre du Ministère des Finances de la RDC du 4 mars 1991 et que la Défenderesse n°2 ne conteste pas.

111. La reconnaissance de dette est connue en droit suisse (article 17 CO). Pour être valable, elle doit être communiquée au créancier, ce qui est le cas puisqu'une copie de la lettre du 4 mars 1991 a été officiellement transmise à ENERGOINVEST.

112. On peut donc affirmer que la Demanderesse est titulaire d'une créance de US$ 11,179,266.36, tel qu'on l'a déterminé aux paragraphes 104 et 105 ci-dessus. Toutefois, les conclusions de la Demanderesse portent sur un total de US$ 11,725,845.37 parce que la Demanderesse ajoute au dit montant reconnu par le Ministère des Finances (et erronément chiffré par la Demanderesse à US$ 11,179,266.71) le montant de US$ 546,578.60 qui correspond à des intérêts de retard dont elle a réclamé le paiement par sa lettre du 22 février 1991 (voir doc. n° 43 annexé au Mémoire du 28 juin 2002). Ces intérêts de retard ont également été reconnus par le Ministère des Finances dans la même lettre, au point B-3 d'une annexe à la lettre intitulé « Récapitulation des créances d'Energoinvest Yougoslavie relatives aux travaux effectués sur Mobayi et Katana-Goma .» Ils sont compris dans le montant de US$ 903,387.13. Ainsi que l'explique la Demanderesse, la raison en est que dans ce cas le Ministère n'a pas indiqué la répartition de ces « *intérêts de retard*

*contractuel* » entre le projet « *Katana-Goma* » et le projet « *Mobayi* ». Cette explication paraît logique et satisfaisante.

En tout cas, puisque le montant réclamé par la Demanderesse dans cet arbitrage est inférieur au montant que le Ministère des Finances reconnaît devoir payer pour « *intérêts de retard contractuel* », qu'il n'y a pas eu de contestation à la demande de paiement du 22 février 1991, et qu'il n'y a pas de contestation de la part de la Défenderesse n°2, le chiffre indiqué par la Demanderesse à ce titre peut être accepté en tant que créance reconnue.

113. Pour le calcul des intérêts, il faudra tenir compte de la nature différente des deux montants : celui de US$ 546,578.60 ne peut pas être ajouté à celui de US$ 11,179,266.36 pour obtenir le total de US$ 11,725,844.96. La Demanderesse ne peut donc pas réclamer le paiement d'intérêts au taux contractuel de pénalisation de 9% par an sur ce dernier montant.

Ce problème sera considéré ultérieurement et d'une manière séparée dans une autre Section de cette sentence.

A présent, une fois qu'on a établi les créances de la Demanderesse, il est temps de voir qui est (ou qui sont) le(s) débitrice(s).

## VI - ENGAGEMENT DE LA RDC

114. L'engagement de la RDC ne fait aucun doute. La République du Zaïre est indéniablement partie à l'Accord de Crédit du 2 avril 1980, dans lequel elle apparaît en qualité de « Emprunteur ». Qu'il s'agisse d'un contrat de « prêt » typique ou d'un contrat « *sui generis* » ne fait, ainsi qu'il a déjà été dit, pas de différence. Le sujet qui reçoit le financement est directement obligé de le rembourser dans les termes et aux conditions convenues.

115. On a également déjà dit (voir la Section IV-A de cette sentence) que la RDC ne peut pas se prévaloir de son immunité étatique. Suite à son acceptation de la clause arbitrale incorporée dans l'Accord de Crédit, elle n'a plus

d'exception face à la juridiction arbitrale, et elle n'en dispose pas non plus face à l'Accord de Crédit en tant que tel et aux obligations qui en découlent, parce qu'il s'agit d'un contrat commercial que l'Etat a librement négocié et accepté dans l'exercice d'une activité de droit privé (*« jure gestionis »*) et non pas dans l'exercice de son pouvoir souverain (*« jure imperii »*).

116. La RDC est également partie à la Convention de Rééchelonnement. La négociation même d'une telle Convention confirme que l'Etat était bien conscient de son devoir de répondre aux obligations de l'Accord de Crédit.

117. Finalement, la lettre du Ministère des Finances du 4 mars 1991, à laquelle il est fait référence plusieurs fois dans cette sentence, n'est pas seulement une reconnaissance de dette et par là une reconnaissance de la défaillance de l'Etat dans ses obligations contractuelles, mais elle est aussi une confirmation additionnelle de l'engagement de l'Etat vis-à-vis d'ENERGOINVEST, puisqu'elle se termine par le souhait du Ministre des Finances adressé *« au Citoyen Premier Ministre, au Citoyen Secrétaire d'Etat aux Finances et au Citoyen Gouverneur de la Banque du Zaïre »* afin que, *« par débit du compte général du Trésor »*, un paiement mensuel de un million de dollars US soit effectué en faveur d'ENERGOINVEST *« [...] à partir du 1er janvier 1991 et jusqu'à l'apuration complète des arriérés et la couverture totale des échéances régulières convenues [...] »*.

118. La S.N.EL elle-même, qui (on ne doit pas l'oublier) est une « Société d'Etat », ne conteste pas l'engagement de la RDC. Au contraire : elle soutient que seule la RDC est engagée à la dette, ce que nous allons voir dans la Section suivante.

## VII - ENGAGEMENT DE LA S.N.EL.

119. Ce Tribunal a déjà décidé de sa juridiction par rapport à la S.N.EL (voir Section IV-B de cette sentence).

120. Il faut maintenant considérer la conclusion subsidiaire de la Défenderesse n°2, selon laquelle si le Tribunal se déclarait compétent, il devrait alors juger que la S.N.EL n'est pas débitrice de l'obligation contractée par l'Etat et doit par conséquent être mise hors de cause.

121. Les arguments de la Défenderesse n°2 à l'appui d'une telle conclusion subsidiaire sont, en bref, les suivants :

- o Le projet « *Katana-Goma* » est un ouvrage public à la charge du budget de l'Etat et la S.N.EL est pour sa part tout simplement un intermédiaire chargé d'apporter à l'Etat sa collaboration technique dans le cadre de la construction de l'ouvrage;
- o La S.N.EL n'est pas partie à l'Accord de Crédit. Sa signature de cet Accord est tout simplement une *«contre signature afin qu'elle n'en ignore. »*;
- o La S.N.EL n'est pas partie à la Convention de Rééchelonnement;
- o La S.N.EL n'est pas partie au Contrat de construction du 9 décembre 1980, auquel elle participe seulement en qualité de « *mandataire de la République* »;
- o La S.N.EL n'est pas obligée par l'acceptation des traites, parce qu'il s'agit d'un « *tirage pour compte* », dont la particularité supplémentaire, dans notre cas, est que « *la S.N.EL est à la fois le tireur pour compte et le tiré.* »

Le Tribunal Arbitral va analyser ci-après chacun de ces arguments.

**A)- Le projet « *Katana-Goma* » est un ouvrage public.**

122. Le Tribunal Arbitral est tout à fait persuadé que le projet « *Katana-Goma* » est un ouvrage public qui doit être pris en charge par le budget de l'Etat.

Le préambule à l'Accord de Crédit indique clairement qu'il s'agit d'un projet que la République du Zaïre « *pays jeune et en pleine croissance économique* » a décidé d'entreprendre afin de « *moderniser ses infrastructures.* »

La lettre de la S.N.EL du 1er avril 1985, adressée au Commissaire d'Etat aux Mines et Energie et pour information au Commissaire d'Etat au Plan, au Commissaire d'Etat aux Finances et Budget et au Gouverneur de la Banque du Zaïre (doc. n°4 annexé à la Demande d'Arbitrage) est un rapport sur l'état d'avancement des travaux qui apparaît très positif (on y dit : « *l'inauguration du projet pourrait intervenir au courant de la seconde quinzaine du mois d'avril 1985 et serait patronnée par le Président Fondateur* »), mais aussi et surtout sur l'état des paiements dus à ENERGOINVEST qui lui apparaît au contraire très pénible. On peut entre autres lire dans cette lettre que « *la provision nécessaire* » pour effectuer un certain paiement « *avait été fournie par le Trésor Public à la demande de la S.N.EL en date du 4 août 1982* », mais qu'« *à court de devises à l'époque, la Banque du Zaïre a dû attendre le 2 février 1984 pour effectuer un premier paiement* » (et il s'agissait seulement d'un paiement partiel). On y lit encore, en référence au solde dû à ENERGOINVEST (US$ 2,549,063.16), la phrase suivante : « *il va de soi, à mon sens, que la charge de la couverture de ce solde incombe au Conseil Exécutif, initiateur et seul financier du projet par le truchement de son budget d'investissement* ».

Une Ordonnance du Président-Fondateur de la République du Zaïre en date du 24 mars 1984 portant aménagement du budget de l'Etat (doc. n°3 annexé au Mémoire en Défense de la S.N.EL) indique qu'un certain montant de Zaïres a été ajouté « *aux crédits de paiement du projet Ligne Katana-Goma.* »

La lettre du Ministre des Finances du 4 mars 1991 (que l'on a mentionnée plusieurs fois dans cette sentence) et qui est adressée au Gouverneur de la Banque du Zaïre, avec copie pour information au Premier Ministre et au

Secrétaire d'Etat aux Finances, en demandant qu'un paiement mensuel d'un million de dollars US soit effectué en faveur d'ENERGOINVEST à partir du 1er janvier 1991, et ce jusqu'au solde des arriérés et à la couverture totale des échéances régulières convenues, suggère que ce paiement soit fait « *par débit du compte général du Trésor* ».

123. Toutefois, la constatation que le projet « *Katana-Goma* » est un ouvrage d'intérêt public devant être pris en charge par le budget de l'Etat ne signifie pas que l'on doive exclure un engagement contractuel de la S.N.EL vis-à-vis d'ENERGOINVEST pour le remboursement à cette dernière du financement accordé.

On ne doit pas confondre le problème du financement du projet au niveau interne de la République du Zaïre avec le problème bien distinct du remboursement de ce financement extérieur accordé par ENERGOINVEST en vertu de l'Accord de Crédit du 2 avril 1980.

C'est justement cette confusion qui induit la Défenderesse en erreur. Estimant ne pas devoir financer le projet, elle prétend ne pas être débitrice des créances réclamées par ENERGOINVEST. Il n'y a cependant pas de connexion nécessaire entre ces deux éléments. La responsabilité pour le financement à l'intérieur du pays est totalement indépendante de l'engagement envers un prêteur étranger. Il est de surcroît compréhensible et logique qu'un prêteur étranger, évidemment soucieux de garantir au mieux le remboursement du prêt, cherche à avoir en face de soi en qualité de responsables solidaires du remboursement, non seulement l'Etat bénéficiaire du crédit, mais aussi le sujet par l'intermédiaire duquel l'Etat réalise le projet et qui, de plus, sera le propriétaire et le bénéficiaire de l'ouvrage.

Que cette hypothèse, en soi très logique, corresponde ou non à la réalité de notre cas d'espèce, nous le verrons dans les développements qui suivent. Pour le moment, il est suffisant d'affirmer que la nature publique de l'ouvrage et sa prise en charge par le budget de l'Etat ne sont pas des facteurs suffisants pour exclure la responsabilité de la S.N.EL envers ENERGOINVEST.

### B) La S.N.EL est-elle partie ou non à l'Accord de Crédit du 2 avril 1980 ?

124. Le Tribunal Arbitral a déjà considéré ce problème par rapport à sa propre juridiction vis-à-vis de la S.N.EL et la conclusion a été positive : la S.N.EL est partie à l'Accord de Crédit (voir les paragraphes n°100 et 101 de la présente sentence).

125. La thèse de la S.N.EL selon laquelle sa signature à côté de celles des représentants de l'Etat zaïrois et d'ENERGOINVEST aurait seulement la signification d'une prise de connaissance ne peut pas être suivie. Elle ne correspond ni au contenu de l'Accord de Crédit ni à celle qui semble avoir été la volonté des parties qui ont négocié et conclu cet accord.

126. Dans le préambule de l'accord, le Comité Exécutif du Zaïre dit vouloir réaliser le projet « *par l'intermédiaire de la S.N.EL* », et il est établi que la S.N.EL est justement la société d'Etat responsable pour la génération, la transmission et la distribution de l'énergie électrique. Dans le langage d'un Etat qui a décidé la réalisation d'un certain ouvrage d'intérêt public, l'expression « *par l'intermédiaire de...* » ne signifie pas qu'il veuille être juridiquement représenté par cet exécutant. Il s'agit plutôt d'une décision administrative par laquelle la réalisation de l'ouvrage est confiée par l'Etat à un sujet qu'il considère comme étant le plus adapté aux besoins, surtout lorsque ce sujet est une organisation qui lui appartient à 100% et qui a été créée par lui justement pour ce type de projet et pour ce genre d'activité.

127. Conformément au préambule de l'Accord de Crédit, la S.N.EL s'est directement engagée à stipuler le Contrat Technique avec ENERGOINVEST. Il est vrai qu'à l'article 2.1 de l'Accord on dit : « *Ainsi qu'il a été exposé au Préambule, le PRETEUR et l'EMPRUNTEUR concluront un Contrat Technique*[...] », ce qui pourrait engendrer des doutes puisque la qualité

d'Emprunteur est attribuée à l'Etat. Néanmoins, ainsi qu'on l'a déjà remarqué, les dénominations et expressions utilisées par les parties ne sont pas toujours exactes et il faut les interpréter par rapport à leur volonté réelle. Or il est certain que la S.N.EL en sa qualité de « Maître de l'Oeuvre » est bien la cocontractante d'ENERGOINVEST dans le Contrat Technique.

128. Il est encore prévu à l'Accord de Crédit que «*pour obtenir le remboursement du crédit* » des traites soient tirées par ENERGOINVEST « *sur la S.N.EL.* », qui s'engage à les accepter et à les faire avaliser par le Conseil Exécutif du Zaïre (article 4.5). Rien mieux que cela ne pourrait configurer l'engagement direct de S.N.EL envers ENERGOINVEST par rapport au remboursement du crédit.

129. Enfin, la S.N.EL a confirmé sa participation à l'Accord de Crédit ainsi que son engagement envers ENERGOINVEST par le comportement qu'elle a adopté lors de l'exécution de l'Accord. En effet, le paiement à ENERGOINVEST de 5% d'acompte sur la valeur du marché (obligation prévue à l'article 3.1.1 de l'Accord) a été effectué par la S.N.EL (voir les doc. n°12-A, 16-A et 16-B annexés au Mémoire du 28 juin 2002) et l'ouverture de la lettre de crédit en faveur d'ENERGOINVEST pour 10% de la valeur du marché (obligation prévue à l'article 3.1.2 de l'Accord) a été également effectuée par la Banque du Zaïre sur ordre de la S.N.EL (voir doc. n°40-B annexé au Mémoire du 28 juin 2002). Inutile d'ajouter qu'il est sans importance ici de savoir si les fonds pour les paiements effectués ou ordonnés par la S.N.EL lui ont été mis à disposition ou non par l'Etat. Cela concerne uniquement la relation entre l'Etat et la S.N.EL et nullement la relation entre l'Etat et la S.N.EL d'une part, et ENERGOINVEST, de l'autre.

**C)- La S.N.EL est-elle partie à la Convention de Rééchelonnement ?**

130. La Convention de Rééchelonnement du 31 mai 1986 a été passée par le Conseil Exécutif de la République du Zaïre et par ENERGOINVEST, qui en sont les signataires. Il n'y a pas d'autres signatures au bas de cette Convention. Il semblerait donc, du moins d'un point de vue formel, que la S.N.EL n'y soit pas partie.

131. Tel qu'il ressort du procès-verbal du 29 mai 1986 (doc. n°46 annexé au Mémoire de Réplique du 4 octobre 2002), les représentants de la S.N.EL ont toutefois participé aux négociations précédant cette Convention.

132. De surcroît, la S.N.EL a appliqué la Convention de Rééchelonnement. En particulier, les nouvelles traites prévues par cette Convention ont été tirées par ENERGOINVEST sur la S.N.EL qui les a acceptées et retournées à ENERGOINVEST, avalisées par l'Etat (voir doc. n°5 annexé à la Demande d'Arbitrage).

133. On peut donc considérer la Convention de Rééchelonnement comme acceptée par la S.N.EL de par son comportement dans l'exécution de la Convention elle- même.

134. De toute manière, le Tribunal Arbitral estime insignifiant que la S.N.EL soit ou ne soit pas partie à la Convention de Rééchelonnement, dès lors qu'il est établi qu'elle est partie à l'Accord de Crédit. En effet, la Convention de Rééchelonnement ne fait qu'établir, au bénéfice des débiteurs, des conditions de remboursement plus favorables que celles de l'Accord de Crédit, que ce soit par l'établissement de nouvelles dates d'échéance des paiements à la place de celles déjà échues, par le renvoi de certaines échéances à venir ou encore par l'acceptation par ENERGOINVEST de ne pas appliquer le taux d'intérêt moratoire (9%) sur les échéances en arriéré et d'appliquer le taux d'intérêt contractuel de 6% sur les nouvelles échéances à partir du 2 octobre 1986.

Il serait étonnant que la S.N.EL, obligée de rembourser le financement par effet de l'Accord de Crédit qu'elle a signé, refuse les avantages de la Convention de Rééchelonnement seulement parce qu'elle ne l'a pas formellement signée !

**d)- La S.N.EL est-elle partie au Contrat du 9 décembre 1980 ?**

135. Le document qui a été signé par la S.N.EL et par ENERGOINVEST le 9 décembre 1980 n'est pas, au contraire de sa dénomination par les parties, un « contrat », mais un ensemble de plusieurs documents contractuels, chacun ayant son autonomie juridique : l'Accord de Crédit du 2 avril 1980, les Conditions Générales du Marché, et cinq Marchés Particuliers (voir ce qu'on a déjà dit à propos de l'autonomie de l'Accord de Crédit en particulier aux paragraphes 90, 91, 92, 93 de cette sentence).

136. Dès lors, il est insignifiant que la première page de ce document mentionne « *Le Conseil Exécutif de la République du Zaïre représenté dûment par S.N.EL. cette dernière désignée ci-après le 'Maître de l'Oeuvre', dont le siège est à Kinshasa 1, B.P.500, Boulevard du 30 juin, 49* » comme la partie cocontractante d'ENERGOINVEST.

On peut comprendre la participation de la S.N.EL en qualité de représentant de l'Etat zaïrois, parce que le document contient des actes contractuels tels l'Accord de Crédit du 2 avril 1980, auxquels l'Etat zaïrois est partie. Cependant, elle y participe sans doute aussi en son propre nom, là où, dans la partie dénommée « Conditions Générales », elle assume le rôle de « Maître de l'Oeuvre » et encore par rapport aux Marchés Particuliers, chacun desquels est un contrat autonome conclu entre la S.N.EL en sa qualité de « Maître de l'Oeuvre » et ENERGOINVEST en sa qualité de Contractant et enfin par rapport à l'ensemble des Marchés Particuliers qui constitue le « Contrat Technique » (voir la définition de « Contrat Technique » à l'article 1.1.a des Conditions Générales).

137. La signification donnée au terme « Parties » est précisée très clairement à l'article 1.1.h des Conditions Générales : « *Parties : désigne le Maître de l'Oeuvre et le Contractant.* »

La lettre « d » du même article mentionne encore : « *Maître de l'Oeuvre désigne la personne juridique sous la dénomination de S.N.EL qui emploie le Contractant pour l'exécution des Fournitures et Travaux. Cette définition s'étend aux successeurs, délégués ou concessionnaires légaux du Maître de l'Oeuvre.* »

Toujours au même article, à la lettre « g », le Contractant est défini comme suit : « *Contractant désigne le ou les personnes juridiques employées par le Maître de l'Oeuvre, groupées sous la dénomination de ENERGOINVEST, SARAJEVO, Yougoslavie, pour l'exécution des prestations objet du présent Contrat et comprend ses représentants personnels, successeurs et mandataires autorisés.* »

Quant à l'Etat, il trouve sa place dans le Contrat sous la désignation de « Maître de l'Ouvrage » qui est défini comme suit à la lettre « c » de l'article 1.1 : « *Maître de l'Ouvrage désigne le Conseil Exécutif de la République du Zaïre, représenté par le Département de l'Energie et le Département des Finances. Cette définition s'étend aux successeurs.* »

138. La S.N.EL n'est donc pas le représentant de l'Etat au sens strict du terme et par conséquent, la disposition de l'article 32 du CO invoquée par la Défenderesse n°2, selon laquelle : « *Les droits et les obligations dérivant d'un contrat fait au nom d'une autre personne par un représentant autorisé passent au représenté* » ne s'applique pas dans notre cas.

Il est vraisemblable que la S.N.EL ait agi en tant que mandataire de l'Etat, dans le sens où l'Etat lui avait confié la réalisation du projet.

Cependant, en tant que mandataire elle serait obligée de faire face aux obligations contractées avec un tiers, et elle aurait seulement droit au remboursement de la part du mandant des avances et frais occasionnés par

l'exécution régulière du mandat, ces frais comprenant toute diminution de fortune, dépenses ou obligations assumées envers des tiers (article 402 du CO).

139. De toute manière, la relation entre l'Etat et la S.N.EL ne nous importe pas ici.

Les réclamations de la Demanderesse étant fondées exclusivement sur l'Accord de Crédit, et dès lors que l'on a établi l'autonomie substantielle et juridique de cet Accord, il n'était pas nécessaire, aux fins de cet arbitrage, de déterminer si la S.N.EL est partie au contrat du 9 décembre 1980.

Nous l'avons fait uniquement parce que la participation directe de la S.N.EL au Contrat dit « Technique », en qualité de « Maître de l'Oeuvre » est, contrairement aux arguments de la Défenderesse n°2, une confirmation ultérieure, s'il le fallait, de son engagement vis-à-vis d'ENERGOINVEST. Dans le Contrat « Technique » et dans chacun des contrats des Marchés Particuliers que la S.N.EL. a conclu (en tant que « Maître de l'Oeuvre ») avec ENERGOINVEST (en tant que « Contractant ») l'on retrouve les mêmes obligations que celles stipulées aux articles 3 et 4 de l'Accord de Crédit, y compris l'obligation de remboursement du financement procuré par ENERGOINVEST.

La clause insérée à ce propos dans chacun des Marchés Particuliers dispose textuellement : « *85% du prix contractuel de ce Contrat seront payés par le Maître de l'Oeuvre par remboursement du crédit au Contractant, au moyen des traites, sur la base et sous les conditions de l'Accord de Crédit* » (voir doc. n°1 annexé au Mémoire en Défense de la Défenderesse n°2). Aucun doute possible : le « Maître de l'Oeuvre » est bel et bien la S.N.EL.

**e)- La S.N.EL est-elle obligée par l'acceptation des traites ?**

140. Il suffit pour cela de se référer à l'art. 1018 du CO qui dispose : « *Par l'acceptation le tiré s'oblige à payer la lettre de change à l'échéance.* »

L'argument de la Défenderesse n°2 selon lequel nous serions en présence d'un « tirage pour compte », dans lequel la S.N.EL serait à la fois le tireur et le tiré est difficile à comprendre.

Le Tribunal n'a repéré aucun élément de preuve qui puisse justifier l'affirmation selon laquelle le tireur des traites dans cette affaire serait la S.N.EL. Au contraire, l'Accord de Crédit dit très clairement que « *le PRETEUR, pour obtenir le remboursement du crédit, émettra* » les traites, et « le PRETEUR », nous le savons bien, est ENERGOINVEST.

De plus, la preuve est faite que c'est exactement ce qui s'est passé dans la réalité. ENERGOINVEST a tiré les traites sur la S.N.EL et les lui a envoyées afin qu'elle les accepte et qu'elle procure l'aval de l'Etat. La S.N.EL a renvoyé à ENERGOINVEST les traites dûment acceptées par elle-même et avalisées par le Commissaire d'Etat aux Finances (voir les doc. nn° 3, 5, 6 15, 39 et 41 de la Demanderesse).

On ne voit pas en quoi consisterait le « tirage pour compte » dont parle la Défenderesse n°2, ni comment un tel « tirage pour compte », si par impossible il existait, pourrait libérer la S.N.EL de son obligation de payer, d'autant plus que les traites sont des papier-valeurs qui par leur nature sont « bedingungsfreindlich » (ne supportent pas de conditions)[*]

## VIII - SOLIDARITE

141. ENERGOINVEST demande que les deux Défenderesses soient condamnées conjointement et solidairement au paiement en sa faveur des sommes réclamées. Selon elle, l'Accord de Crédit montre clairement que l'Etat et sa société S.N.EL se sont engagées solidairement au remboursement du prêt

---

[*] Cfr. A. MEIER-HAYOZ/ H.C.VON DER CRONE, Wertpapierrecht, §7, n.13 ss. ; M. GRÜNINGER/B. HUNZIKER/G.ROTH, Commentaire bâlois ad art.991 CO, n.9)

qui leur était accordé par ENERGOINVEST, ce qui d'ailleurs correspond selon elle à la volonté et à l'intérêt d'ENERGOINVEST.

142. De plus, ENERGOINVEST estime que les deux Défenderesses avaient convenu d'unir leurs efforts pour la réalisation du projet en vue d'atteindre un but commun, ce qui, en conformité des articles 530 ss CO, est un comportement générateur d'une société simple qui implique une responsabilité conjointe et solidaire de ses membres (article 544 CO).

143. La S.N.EL s'oppose à ces arguments et affirme qu'il n'y a aucune responsabilité solidaire entre elle et l'Etat pour les raisons suivantes :

o   Aucune clause de l'Accord de Crédit ne l'engage à la dette;

o   La solidarité n'est pas présumée en droit suisse. Elle doit résulter d'une déclaration explicite, à défaut de quoi « *la solidarité n'existe que dans les cas prévus par la loi* » (article 143 CO);

o   La collaboration entre les Défenderesses ne saurait caractériser l'existence d'une société simple, puisque dans le cas d'espèce il n'y a pas eu de mise en commun d'apports par chacun des prétendus associés, que les parties ne sont pas sur un pied d'égalité face au projet et que leurs buts, même s'ils convergent, ne sont pas constitutifs d'un but commun.

144. L'article 1044 alinéa 1 du Code des Obligations prévoit que : « *Tous ceux qui ont tiré, accepté, endossé ou avalisé une lettre de change sont tenus solidairement envers le porteur.* » Les traites prévues pour le remboursement du prêt ont été acceptées par la S.N.EL et avalisées par la RDC, si bien que celles-ci sont solidairement responsables.

De plus, le Tribunal Arbitral observe que même si la solidarité n'est pas présumée en droit suisse, il n'est pas nécessaire pour autant que la volonté de s'engager solidairement résulte d'une déclaration (écrite) explicite. L'exclusion

de la présomption signifie simplement que le fait qu'une obligation soit prise en commun par une pluralité de sujets ne comporte pas automatiquement pour conséquence juridique la solidarité de ces sujets pour l'obligation en question. Toutefois, il n'est pas nécessaire que la volonté d'une pluralité de sujet de s'obliger solidairement soit expressément déclarée, étant suffisant qu'une telle volonté résulte tacitement d'autres manifestations (cf. ATF 116 II 712 ; ATF 49 III 205).

145. Le Tribunal Arbitral constate que la volonté de la République du Zaïre et de la S.N.EL de s'obliger solidairement résulte notamment :

- o   Du fait que dans l'Accord de Crédit la qualification d'« Emprunteur » est utilisée indifféremment pour l'Etat (dans la désignation des parties contractantes) comme pour la S.N.EL. (à l'article 2.1, au sujet de l'obligation de la S.N.EL. de conclure avec ENERGOINVEST le Contrat « Technique »);

- o   De la forme que les parties ont stipulée à l'Accord de Crédit pour le remboursement du prêt, c'est-à-dire l'émission de traites que la S.N.EL s'engage à accepter et que l'Etat s'engage à avaliser, qui est une confirmation de la solidarité de l'obligation contractée par l'Etat et la S.N.EL;

- o   Du fait que l'autorisation au transfert de devises pour le remboursement du prêt a été donnée par la Banque du Zaïre conjointement « *à la République du Zaïre et à la Société Nationale d'Electricité 'S.N.EL'* » (voir doc. n°19-A annexé au Mémoire du 28 juin 2002);

- o   Du fait que, par effet de la conclusion directe du Contrat « Technique » et des Marchés Particuliers, la S.N.EL, même si l'on fait abstraction de sa signature au bas de l'Accord de Crédit, a pris l'engagement du *remboursement du crédit* [...] *sur la base et sous les conditions de l'Accord de Crédit* » (voir clause de paiement des Marchés Particuliers), ce qui signifie que

son engagement est solidaire avec celui de l'Etat signataire principal de l'Accord de Crédit;

o Du fait que des paiements en exécution de l'obligation du remboursement du prêt ont été effectués par la S.N.EL;

o Du fait que la Convention de Rééchelonnement, même si elle a été signée par l'Etat et non par la S.N.EL, a certainement été négociée par l'Etat également dans l'intérêt de la S.N.EL, cette dernière ayant participé aux négociations et ayant exécuté la convention après la signature, ce qui confirme l'identité des intérêts et des engagements de l'Etat et de la S.N.EL. par rapport à la dette due à ENERGOINVEST;

o Du fait que le comportement de l'Etat et de la S.N.EL. par rapport au remboursement du financement octroyé par ENERGOINVEST justifie pleinement le fait que cette dernière les considère solidairement obligés, même sur la base des principes de la bonne foi et de la confiance, principes qui sont à la base du droit suisse des obligations.

146. Pour les raisons qui précèdent, le Tribunal Arbitral considère que l'obligation de deux Défenderesses concernant le paiement de la dette qu'elles ont conjointement contractée avec ENERGOINVEST est une obligation solidaire. Ceci étant établi, point n'est besoin d'analyser la thèse subsidiaire de la Demanderesse au sujet d'une éventuelle société simple entre l'Etat et la S.N.EL, thèse qui, à première vue, semble assez douteuse.

## IX - DEMANDE DE PAIEMENT DES INTÉRÊTS

147. Dans ses conclusions exposées dans son Mémoire du 28 juin 2002 et confirmées lors de l'audience de plaidoiries du 9 décembre 2002, la Demanderesse demande que les Défenderesses soient conjointement et

solidairement condamnées au paiement d'un montant de US$ 11,725,845.37 a titre du capital *« plus les intérêts au taux contractuel de 9% courant à partir de la date d'échéance de chaque versement et jusqu'à ce que le paiement complet soit effectué. »*

Elle demande aussi que les Défenderesses soient condamnées au paiement additionnel d'intérêts *« sur les montants octroyés, à un taux approprié. »*

148. Le Tribunal Arbitral a déjà affirmé dans cette sentence le droit de la Demanderesse au paiement de la somme de US$ 11,179,266.36 qui après correction d'une petite erreur de mathématics, est la somme que les débitrices par la voix du Ministre des Finances de la République du Zaïre, ont reconnu correspondre à des échéances non payées du remboursement du capital et des intérêts du financement octroyé par ENERGOINVEST en exécution de l'Accord de Crédit du 2 avril 1980 et de la Convention de Rééchelonnement du 31 mai 1986 (voir paragraphes 103 et 104 de la présente sentence).

149. Le Tribunal Arbitral a également affirmé le droit de la Demanderesse au ¡ aiement d'un montant de US$ 546,578.60 qui correspond à des intérêts qui lui sont dus et qu'elle a réclamés en relation avec des paiements que les Défenderesses ont effectué avec du retard (voir paragraphe 111 de la présente sentence).

150. Le Tribunal a déjà remarqué que la nature de la créance de US$ 11,179,266.36 n'est pas la même que celle de la créance de US$ 546,578.60 et que par conséquent, ces deux montants ne peuvent pas être additionnés afin d'aboutir à un total sur lequel les intérêts contractuels de retard au taux de 9% devraient être payés, comme le prétend la Demanderesse (voir paragraphe 112 de la présente sentence).



51. Le taux d'intérêt de 9% résulte de l'application de l'article 4.4 de Accord de Crédit, confirmé par l'article 7 de la Convention de

Rééchelonnement et consiste dans une majoration de l'ordre de 50% du taux d'intérêt de 6% par an fixé pour le remboursement du financement octroyé, à titre de pénalisation, en cas de défaut de paiement des tranches semestrielles de remboursement convenues entre les parties.

152. La somme de US$ 11,179,266,36 constitue le total des échéances par rapport auxquelles les débitrices sont défaillantes (voir lettre du Ministre des Finances de la République du Zaïre du 4 mars 1991). Il est donc tout à fait justifié qu'un intérêt au taux de 9% soit appliqué au montant en question à compter de la date de chacune des échéances non payées qui composent ce montant et jusqu'à ce que le paiement soit effectué.

153. Au contraire, la somme de US$ 546,578,60 constitue le total des intérêts déjà calculés au taux de 9%, qui devaient être payés et qui n'ont pas été payés par rapport à des paiements qui ont été déjà effectués avant la date du 4 mars 1991 (date de la lettre du Ministère mentionnée ci-dessus), mais qui s'avèrent être en retard par rapport aux échéances convenues. Il s'agit donc sans doute d'une créance d'ENERGOINVEST, créance qui est d'ailleurs reconnue par le gouvernement dans la même lettre du 4 mars 1991, comme on l'a déjà dit (voir paragraphe 111 de la présente sentence). Néanmoins, l'intérêt que l'on peut réclamer sur cette créance est seulement l'intérêt moratoire au taux de 5% (article 104 CO) à compter de la date de la Demande d'Arbitrage (article 105 CO). La CCI ayant reçu la Demande d'Arbitrage le 4 mars 2001, le Tribunal Arbitral décide que c'est à partir de cette date que les intérêts moratoires sont à calculer.

154. La Demanderesse demande de plus que des intérêts « *à un taux approprié* » soient payés « *sur les montants octroyés* ».
Si, comme il paraît, une telle demande concerne des intérêts qui devraient s'ajouter à ceux dont on vient de parler aux paragraphes 151 et 152 ci-dessus, elle n'est pas justifiée. En effet :

- les intérêts qui doivent être payés sur la somme de US$ 11,179,266.36 sont les intérêts contractuels avec la majoration de 50% à titre de pénalisation et ces intérêts continuent de courir jusqu'à ce que la dette soit entièrement payée;
- seul l'intérêt moratoire au taux de 5% est à payer sur la somme de US$ 546,578,60 et ce à compter de la date de la Demande d'Arbitrage et jusqu'à satisfaction totale de cette dette.

## X - FRAIS DE L'ARBITRAGE

155. Le Tribunal Arbitral est libre dans sa décision concernant les frais de l'arbitrage (article 31(3) du Règlement).

156. Malgré un tel pouvoir discrétionnaire lui permettant de prendre en considération toute une série de circonstances qui dans le cas d'espèce, pourraient justifier une allocation des frais s'écartant du principe selon lequel les frais sont à mettre à la charge de la partie qui succombe, ce dernier principe demeure le plus généralement appliqué dans les arbitrages de commerce international et il est certainement le plus logique, puisque la nécessité pour une partie d'avoir recours à une procédure d'arbitrage afin d'obtenir la reconnaissance de ses droits ne doit pas constituer pour elle une pénalisation, suite aux frais qu'une telle procédure entraîne.

157. Le Tribunal n'a aucune raison de s'écarter dudit principe dans le présent arbitrage.

158. Même si l'on pouvait prendre en compte le fait que plusieurs questions débattues par les parties et ayant demandé une décision de la part du Tribunal

trouvent leur origine dans une mauvaise rédaction des contrats, on doit également considérer que d'une part, les deux parties sont responsables de cette mauvaise rédaction en égale mesure et d'autre part, que les parties étaient au clair quant à leur accord, c'est-à-dire au but de leurs engagements, ce qui signifie que la partie défaillante a été de mauvaise foi dans certaines de ses défenses.

159. La non-participation de la RDC à la procédure arbitrale, alors qu'elle avait pris part aux négociations qui ont échoué en septembre 2001 après l'introduction de la Demande d'Arbitrage et juste avant que la procédure ne soit mise en marche, ne saurait se justifier.

160. La participation tardive de la S.N.EL à la procédure (ce qui n'a pas manqué de la prolonger) et les nombreux arguments qu'elle a introduits à sa défense ont été finalement jugés sans fondement par le Tribunal.

161. Ainsi qu'on l'a déjà dit et bien qu'il les regrette profondément, le Tribunal n'est pas concerné par les éventuelles difficultés politiques ou économiques de la RDC de la même façon qu'il n'est pas concerné par les dommages subis par ENERGOINVEST suite aux événements politiques survenus en Bosnie-Herzégovine qu'il regrette en égale mesure. Il est concerné par un contrat de commerce international que l'une des parties, à l'évidence, n'a pas respecté. Personne ne dispute la créance d'ENERGOINVEST dans cette affaire, mais apparemment personne ne veut la payer : ni l'Etat qui est resté absent de l'arbitrage, ni la S.N.EL qui y a pris part seulement pour affirmer, sans fondement, qu'elle ne serait pas débitrice. Personne n'a contesté que le projet qui a été financé et réalisé par ENERGOINVERST a été financé et réalisé à la parfaite satisfaction de la RDC et de la S.N.EL qui, depuis environ quinze ans déjà, bénéficient de l'ouvrage en question.

162. Pour ces raisons le Tribunal Arbitral décide que les frais de l'arbitrage doivent être entièrement payés conjointement et solidairement par les deux Défenderesses.

Ces frais comprennent :

- honoraires et frais des arbitres fixés par la Cour pour un montant de US$ 220,900.- ;

- frais administratifs se chiffrant à US$ 25,000.-;

- frais et honoraires de la défense d'ENERGOINVEST pour un montant de US$ 168,000.- demandé, que le Tribunal Arbitral considère adéquat et justifié.

Pour toutes les raisons qui précèdent

## LE TRIBUNAL ARBITRAL STATUE A L'UNANIMITE

1. **Le Tribunal Arbitral a juridiction par rapport à la République Démocratique du Congo (Défenderesse n°1)**

2. **Le Tribunal Arbitral a juridiction par rapport à la Société Nationale d'Électricité, S.N.EL (Défenderesse n°2).**

3. **Les deux Défenderesses sont condamnées conjointement et solidairement à payer en faveur de la Demanderesse la somme de US$ 11,725,844.96 .**

4. **Les deux Défenderesses sont condamnées conjointement et solidairement à payer en faveur de la Demanderesse des intérêts comme suit :**

   o **Intérêts au taux de 9% par an sur la somme de US$ 11,179,266.36 à calculer sur la valeur de chaque tranche de paiement échue dont se compose ladite somme, à compter de l'échéance respective et jusqu'au paiement complet;**

    ○  Intérêts au taux de 5% par an sur la somme de US\$ 546,578.60 à compter du 4 mars 2001 (date d'introduction de la Demande d'Arbitrage) et jusqu'au paiement complet.

5.  Le Tribunal Arbitral condamne les deux Défenderesses conjointement et solidairement à payer les frais de l'arbitrage, soit :

US\$ 25,000.- à titre de frais administratifs de la Cour;

US\$ 220,900.- à titre de frais et honoraires des Arbitres;

US\$ 168,000.- à titre de remboursement des frais de défense de la Demanderesse

Lieu de l'arbitrage : Zurich

Le 30 avril 2003

### LE TRIBUNAL ARBITRAL

Avv. Renato Roncaglia, Président

Dr. Marc Ronca, Co-Arbitre

Dr. Mohamed T. Abu-Samra, Co-Arbitre