UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ENERGOINVEST DD, ) | CIV. _____ ( ) |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| DEMOCRATIC REPUBLIC ) | |
| OF CONGO and SOCIETE NATIONALE ) | |
| D'ELECTRICITE (S.N.E.L.), ) | |
| ) | |
| Respondents. ) | |

## AFFIDAVIT OF SUSANNA MITTON

I, Susanna Mitton, as a principal of LanguageWorks, pursuant to 28 U.S.C. §
1746, hereby certify under penalty of perjury as follows:

1.      The attached translations of the "Accord de Credit," the "Convention de
Reechelonnement" and the "Award" of the International Court of Arbitration are accurate, true
and correct translations of those French language documents.

I certify under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct. Executed on this 12th day of June, 2003.

_____
(signature)

**FILED**

**JUN 1 7 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

03- 1314

## CREDIT AGREEMENT

BY AND BETWEEN THE UNDERSIGNED

The Executive Council of the Republic of Zaire, represented by the Department of Energy and the Department of Finance,
hereinafter referred to as "THE BORROWER",

PARTY OF THE FIRST PART,

AND

The ENERGOINVEST, J.N.A. 20 Company, SARAJEVO, Yugoslavia, represented by the Chairman of its Business Committee,
hereinafter referred to as "THE LENDER",

PARTY OF THE SECOND PART.

WHEREAS:

Zaire, a young country in a state of economic growth, has decided to update its infrastructure, which it intends to accomplish, in particular, through bilateral and multilateral cooperation.

In this respect, the Executive Council of Zaire, having deemed it necessary to construct, through the intermediary of the S.N.EL. (Société Nationale d'Electricité), a high-voltage 110 kW electric power transmission line extending from BUKAVU to GOMA and passing through KATANA, including two transformer stations and several distribution substations for the medium-voltage network in the city of GOMA, will receive credit from ENERGOINVEST, a Yugoslavian company, subject to the specific conditions and guarantees defined in the present Credit Agreement.

[signatures/initials on all pages]

To carry out this investment, the BORROWER undertakes to subrogate the Société Nationale d'Electricité (S.N.EL.).

Moreover, in order to ensure optimal performance of the obligations arising from this Agreement, ENERGOINVEST and the S.N.EL. shall enter into a Technical Contract, which shall be attached hereto and shall address issues such as advance planning, the supply of equipment and the supervision of the set-up of the technical operations.

<u>THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:</u>

<u>Article 1.</u>

1.1     By this Credit Agreement, the LENDER undertakes to finance 85% of the total estimated amount of the contract in foreign currencies, i.e. approximately 15.18 million US dollars, to carry out the investment.

The amount is expressed in US dollars at a parity exchange rate of 1 US$ = 0.7347 DTS. The equipment shall be delivered CIF African port.

1.2     In general, the equipment includes:

1.2.1     the equipment for constructing the transmission line and the two transformer stations, given that the new line will connect KATANA and GOMA and that the transformer stations will be installed at KATANA and GOMA

1.2.2     the equipment needed to re-build the existing line—currently 70 kW—between BUKAVU and KATANA, and to increase the voltage to 110 kW

1.2.3     the equipment for the medium-voltage distribution network in the city of GOMA

1.2.4     the advance planning relative to points 1.2.1, 1.2.2 and 1.2.3

1.2.5     the supervision of the set-up of the operations

1.3     In the event that the credit totaling 15.18 million US dollars referred to in point 1.1 is insufficient to cover points 1.2.1, 1.2.2, 1.2.3, 1.2.4 and 1.2.5, the LENDER undertakes to increase the credit amount to carry out the project in full.

Article 2.

2.1     As indicated in the Recitals, the LENDER and the BORROWER shall enter into a Technical Contract, which shall be attached to this Credit Agreement.

2.2     The Technical Contract shall define in detail the total amount of the investment, the duration of the work, the conditions relative to the advance planning to be carried out, the equipment to be supplied and the supervision of the set-up.

2.3     The payments to be made under this Credit Agreement and the Technical Contract shall be expressed in US dollars for the foreign portion and in zaires (local currency) for the Zairian portion.

2.4     All payments stipulated in this Credit Agreement and in the Technical Contract in favor of the LENDER shall be made through the intermediary of the BANQUE DU ZAIRE and the PRIVREDNA BANKA, SARAJEVO.

Article 3.

3.1     By signing this Credit Agreement, the BORROWER assumes the following obligations vis-à-vis the LENDER with regard to payment of the materials provided by the latter:

    3.1.1   To make an advance payment equivalent to 5% of the total estimated amount of the contract by transferring the amount to the LENDER within 30 days of the signing of the Technical Contract.

    3.1.2.  To open a documentary letter of credit in favor of the LENDER in an amount equivalent to 10% of the total estimated amount, which shall be established in the Technical Contract. The documentary credit shall be payable on the basis of the deliveries made. The documentary letter of credit thus defined shall be confirmed, irrevocable, transferable, divisible and opened within three months of the signing of the Technical Contract. The documentary credit shall be paid within 30 days of the shipment date upon presentation of the shipping documents.

- 4 -

    3.1.3   The payments of the advance and of the documentary credit referred to in points 3.1.1 and 3.1.2 above shall be made to the LENDER's account at the PRIVREDNA BANKA, SARAJEVO by a top-rated foreign bank approved by the LENDER.

    3.1.4   Within 30 days of the signing of the Technical Contract, the LENDER shall obtain from the BANQUE DU ZAIRE the transfer guarantee covering the full amount of the credit granted by virtue of this Credit Agreement.

3.2    To ensure the proper performance of the obligations stipulated in the Technical Contract, the LENDER shall, at the time of the 5% payment referred to in point 1.1, issue a bank guarantee in an amount equivalent to this advance payment in favor of the BORROWER. This bank guarantee shall expire once the value of the equipment delivered reaches the amount of the advance payment.

Article 4.

4.1    The amount of the financing granted by virtue of this Credit Agreement (Art. 1.1) shall bear interest during construction at an annual rate of 6%, calculated on an actual days basis, for 24 months following the date on which this Agreement is signed.

4.2    At the end of 24 months, the interest thus calculated shall be added to the amount financed and capitalized. The resulting capital shall be repaid in eight years and in 16 semi-annual installments, with the payment of the first installment due 48 months after the Credit Agreement is signed.

4.3    The resulting amount as specified in point 4.2 shall bear interest at an annual rate of 6%, calculated on an actual days basis, the repayment of which shall be spread out over 10 years and made in 20 semi-annual installments. The first installment payment shall be due in the 30th month following the signing of the Credit Agreement.

4.4    Failure by the BORROWER to pay a semi-annual installment during all the repayment periods and by the due date shall result in a penalty equivalent to 50% of the primary interest.

4.5     To obtain repayment of the credit, the LENDER shall, once the advance payment stipulated in point 3.1.1 has been paid, issue 20 bills of exchange for the interest and 16 bills of exchange for the principal, which shall be drawn on the S.N.EL. and endorsed by the Executive Council of Zaire for the S.N.EL.

In accordance with regulations pertaining to international payments, the BANQUE DU ZAIRE shall guarantee the transfers on the due dates.

4.6     A payment schedule shall be drawn up by the signatories or by their respective banks to formalize the payments according to the due dates.

4.7     The LENDER may freely endorse the instruments, encash them or use them as a security deposit. The BORROWER may under no circumstances refuse to pay the bills on the established due dates.


Article 5.

Any charges (taxes, fees and misc. expenses) which are taxable in the Republic of Zaire on the principal amount of the investment or on the interest resulting from this Credit Agreement shall be borne exclusively by the BORROWER or the S.N.EL.


Article 6.

Any dispute or disagreement arising from this Credit Agreement shall be subject to a prior amicable settlement between the parties.

In the absence of an amicable and satisfactory solution, the dispute or disagreement shall be submitted to the designated Arbitration Board in accordance with the conciliation and arbitration rules of the International Chamber of Commerce of Paris. To settle the conflict, the Arbitration Board shall hold a session in ZURICH and Swiss substantive law shall apply.


Article 7.

7.1     This Credit Agreement shall take effect after being signed by the LENDER and the BORROWER and after approval by the Competent Authorities of Yugoslavia within 60 days of the signing thereof.

7.2     If, within six months of the signing of the Credit Agreement, the Technical Contract has not been performed, the terms of this Credit Agreement shall be considered null and void.

7.3     This Credit Agreement is drawn up in French and in ten original copies.

Executed in Kinshasa on APRIL 2, 1980

For the LENDER

THE CHAIRMAN OF THE BUSINESS COMMITTEE

[signature]

DRAGUTIN KOSOVAC

[stamp:] ENERGOINVEST SARAJEVO

[illegible]

YUGOSLAVIA

For S.N.EL.

THE GENERAL DEPUTY CHAIRMAN

[signature]

MUNGA Libindo

[stamp:] SOCIETE NATIONALE

D'ELECTRICITE

S.N.EL.

GENERAL MANAGEMENT

For the Executive Council

Department of Energy

STATE COMMISSIONER,

[signature]

MANANGA [illegible]

Department of Finance

STATE  COMMISSIONER,

[signature]

NAMVISI ma KOYI

[illegible stamp]

RESCHEDULING AGREEMENT

BETWEEN:   The Executive Council of the Republic of Zaire,

hereinafter referred to as "the Executive Council"

represented by the State Commissioner of Finance, Budget and Money Matters;

AND:   The ENERGOINVEST Company

Bratstva Jedinstva

71000 SARAJEVO

YUGOSLAVIA

Given the credit agreement signed on April 2, 1980 between the ENERGOINVEST Company and the Executive Council of Zaire regarding the financing of the BUKAVU – KATANA - GOMA high-voltage electric power transmission line;

Whereas certain due dates of said Credit Agreement have far exceeded the agreed-upon terms;

Whereas ENERGOINVEST is willing to respond favorably to the request for rescheduling of the payments in arrears as of December 31, 1985 and those payable in 1986 by virtue of the Statement of Principle of the Kinshasa Club regarding the conditions for rescheduling debts not covered by the Paris and London Clubs, and in particular the comparability of the rescheduling terms;

It is hereby agreed as follows:

- 2 -

**Article 1:**    ENERGOINVEST grants to the Republic of Zaire the rescheduling of the amounts of payment in arrears as of December 31, 1985 and the amounts past due and payable in 1986.

The total amount rescheduled is US$ 11,691,047.94, which represents:

- US$ 2,549,063.16 for the overdue advance payment on the credit agreement
- US$ 3,272,098.00 for overdue interest and interest accruing to December 31, 1986
- US$ 5,869,886.78 for principal past due and payable up to December 31, 1986

**Article 2:**    The principal amount rescheduled, namely US$ 5,869,886.78, shall have an annual interest rate of 6%, calculated from October 2, 1986.

**Article 3:**    The terms of this rescheduling are defined in a full payment schedule which is attached to this agreement and forms an integral part thereof.

The payment schedule lists the due dates and the amounts payable on said dates.

**Article 4:**    The old promissory notes relating to the consolidated due dates shall be replaced by new promissory notes for the rescheduled principal and interest, as defined in the payment schedule referred to in Article 3.

**Article 5:**    The due dates specified in the credit agreement subsequent to January 1, 1987 are not affected by this agreement.

**Article 6:**    ENERGOINVEST shall obtain from the Banque du Zaire the transfer guarantee for the total amount of the rescheduling, as set forth in Article 1.

- 3 -

Article 7:    This agreement forms an integral part of the credit agreement of April 2, 1980 and all the clauses inserted therein remain valid.

It shall become effective, however, subject to the following three conditions:

1)    the receipt by ENERGOINVEST from the Banque du Zaire of the guarantee referred to in Article 6.

2)    the provision to ENERGOINVEST of the new signed and endorsed promissory notes, as provided by Article 4.5 of the aforementioned credit agreement.

3)    the return by ENERGOINVEST of the old promissory notes.

In witness whereof, the contracting parties, acting through their duly authorized representatives, have signed this agreement.

Executed in Kinshasa on

FOR ENERGOINVEST                        FOR THE EXECUTIVE COUNCIL
                                        OF THE REPUBLIC OF ZAIRE,

[signature]                             [signature]
                                        The State Commissioner of
                                        Finance and Budget

                                        Djambalek Lom O itonaonc

05/31/1986

PAYMENT SCHEDULE

(in US$)

| DATE | AMOUNT | INTEREST | TOTAL |
|------|--------|----------|-------|
| May 15, 1986 | 424,843.86 | - | 424,843.86 |
| June 15, 1986 | 424,843.86 | - | 424,843.86 |
| June 30, 1986 | 1,636,049.00 | - | 1,636,049.00 |
| July 15, 1986 | 424,843.86 | - | 424,843.86 |
| August 15, 1986 | 424,843.86 | - | 424,843.86 |
| September 15, 1986 | 424,843.86 | - | 424,843.86 |
| October 15, 1986 | 424,843.86 | - | 424,843.86 |
| January 31, 1987 | 272,674.83 | - | 272,674.83 |
| February 28, 1987 | 272,674.83 | - | 272,674.83 |
| March 31, 1987 | 272,674.83 | - | 272,674.83 |
| April 2, 1987 | 489,157.25 | 175,614.14 | 664,771.39 |
| April 30, 1987 | 272,674.83 | - | 272,674.83 |
| May 31, 1987 | 272,674.83 | - | 272,674.83 |
| June 30, 1987 | 272,674.85 | - | 272,674.85 |
| October 2, 1987 | 489,157.23 | 161,864.14 | 651,021.37 |
| April 2, 1988 | 489,157.23 | 146,345.12 | 635,502.35 |
| October 2, 1988 | 489,157.23 | 132,434.30 | 621,591.53 |
| April 2, 1989 | 489,157.23 | 117,076.10 | 606,233.33 |
| October 2, 1989 | 489,157.23 | 103,004.45 | 592,161.68 |
| April 2, 1990 | 489,157.23 | 87,807.08 | 576,964.31 |
| October 2, 1990 | 489,157.23 | 73,124.60 | 562,281.83 |
| April 2, 1991 | 489,157.23 | 58,538.05 | 547,695.28 |
| October 2, 1991 | 489,157.23 | 44,144.77 | 533,302.00 |
| April 2, 1992 | 489,157.23 | 29,269.03 | 518,426.26 |
| October 2, 1992 | 489,157.23 | 14,714.92 | 503,872.15 |
| | 11,691,047.94 | 1,143,936.70 | 12,834,984.64 |

05/31/1986

[see original for page in English]

# INTERNATIONAL COURT OF ARBITRATION

## CASE No. 11441/KGA

### ENERGOINVEST DD

**(Bosnia-Herzegovina)**

vs.

## 1. DEMOCRATIC REPUBLIC OF THE CONGO
**(Formerly Republic of Zaire)**

**(Dem. Rep. of Congo)**

## 2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)

**(Dem. Rep. of Congo)**

This document is an original of the award handed down in accordance with the Regulations of the ICC International Court of Arbitration.

1

INTERNATIONAL COURT OF ARBITRATION
OF THE
INTERNATIONAL CHAMBER OF COMMERCE

### CASE No. 11441/KGA

**ENERGOINVEST DD**
Hamdije Cemerlica 2, 71000 Sarajevo (Bosnia-Herzegovina)
represented by Attys. Brenno Brunoni and Andrea Molino, "Spiess Brunoni Pedrazzini Molino," Via Pioda 14, CH 6900 Lugano (Switzerland), as well as by Attys. Danforth Newcombe, Peter Griffin, and Barbara Diggs, "Shearman & Sterling," 114 Av. des Champs-Elysées, F 75008 Paris (France)

-Claimant-

versus

**1. DEMOCRATIC REPUBLIC OF THE CONGO**
(formerly Republic of Zaire)
in the person of H.E., the Minister of Justice and Guardian of the Seals of the Democratic Republic of the Congo, Palais de Justice, Place de l'Independence, Kinshasa-Gombe (Democratic Republic of the Congo), not appearing

-Respondent No. 1-

and

**2. SOCIETE NATIONALE D'ELECTRICITE (S.N.EL.)**
2831 Avenue de la Justice, Kinshasa-Gombe (Democratic Republic of the Congo)
represented by Attys. Daniel Fauquet and Didier Joseph, "CSM Bureau Francis Lefebvre," 1-3 Villa Emile Bergerat, F 92522 Neuilly-sur-Seine, Cedex, Paris (France)

-Respondent No. 2-

---

**FINAL AWARD**

---

## Contents

| | | |
|---|---|---|
| I. | The Facts | 3 |
| II. | The Arbitration Proceeding | 6 |
| III. | The Parties | 17 |
| | A. Energoinvest | 17 |
| | B. The Democratic Republic of the Congo | 18 |
| | C. Société Nationale d'Electricité | 19 |
| IV. | Jurisdiction of the Court of Arbitration | 20 |
| | A. Insofar as Respondent No. 1 is concerned | 20 |
| | B. Insofar as Respondent No. 2 is concerned | 26 |
| V. | Claimant's right to payment of the amounts claimed | 39 |
| VI. | The Undertaking of the DRC | 44 |
| VII. | The Undertaking of S.N.EL | 45 |
| | A.  The *"Katana-Goma"* project is a public work | 46 |
| | B.  Is S.N.EL. a party to the Credit Agreement of April 2, 1980? | 49 |
| | C.  Is S.N.EL. a party to the Rescheduling Agreement? | 50 |
| | D.  Is S.N.EL. a party to the Contract dated December 9, 1989? | 52 |
| | E.  Is S.N.EL. bound by the acceptance of bills? | 54 |
| VIII. | Severalty | 55 |
| IX. | Claim for payment of interest | 58 |
| X. | Arbitration costs | 61 |

## I – THE FACTS

1. On April 2, 1980, the claimant company, ENERGOINVEST, and the Executive Council of the Republic of Zaire (now the Democratic Republic of the Congo), represented by the Department of Energy and the Department of Finance, executed a contract known as the "Credit Agreement," where the ENERGOINVEST company is styled as "Lender" and the Executive Council of the Republic of Zaire is styled as "Borrower."

2. By means of this contract, the Lender agreed to finance 85% of the total amount in foreign currency of the government contract for the purpose of the construction of a high-tension electric transmission line going from Bukavu to Goma, passing through Katana (the project known as "*Katana-Goma*").

3. The recitations of the Agreement clearly indicated that it involved a project of national interest for the Zairian Government. In fact, we read in these recitations:

*"Zaire, a young country in the midst of economic growth, has decided to modernize its infrastructure, something it plans to achieve in particular through bilateral and multilateral cooperation.*

*"For this purpose, having deemed it necessary to build a 110 KV high-tension electricity transmission line going from BUKAVU to GOMA, passing through KATANA, including two transformation stations, as well as distribution stations for the medium-tension network in the city of GOMA, through S.N.EL., Société Nationale d'Electricité, the Executive Council of Zaire will benefit from credit from ENERGOINVEST, a Yugoslavian Company, under the specific conditions and guaranties specified in the present Credit Agreement."*

4. The goal of ENERGOINVEST in the granting of such credit is to acquire the contract. In fact, the Credit Agreement provides that a contract

(referred to as the *"Technical Contract"*) is to be signed by and between S.N.EL, under a mandate from the Zairian Government to make the investment, and ENERGOINVEST, in order to settle *"matters including the studies, the supplying of equipment, and the supervision of the assembling of technical projects."* This contract was to be attached to the Credit Agreement (see last paragraph of the recitations to the Credit Agreement).

5. The Credit Agreement also provided that it shall be deemed as void *"if within a time period of 6 months after signing [. . ...] the Technical Contract has not been executed . . ."* (Article 7.2)

6. The Credit Agreement bears the signature not only of ENERGOINVEST, party of the first part, and of the Government Commissioner of the Department of Energy, as well as of the Government Commissioner of the Department of Finance, as representatives of the Executive Council of the Republic of Zaire, party of the second part, but also that of S.N.EL.

7. On December 9, 1980, S.N.EL. and ENERGOINVEST executed a contract including the Credit Agreement of April 2, 1980, the "General Conditions" for the government contract, and five Individual Government Contracts which, taken together, are deemed to constitute the "Technical Contract."

8. The amount of the financing by ENERGOINVEST (that is, 85% of the cost of the project) was initially estimated at "[. . .] *around 15.18 million US dollars* [. . .]" (Article 1.1 of the Credit Agreement), but ENERGOINVEST had also assumed the undertaking "[. . .] *to increase the amount of the credit for full completion of the project* [. . .]," in the event that the US$15.18 million credit provided was not enough (Article 1.3 of the Credit Agreement). In reality, in accordance with the letter dated April 1, 1985, from the S.N.EL. to the Government Commissioner of Finance and Budget (Exhibit No. 4, attached to the Arbitration Claim), subsequent to the combined effects of world inflation on the cost of maritime freight and of

the application of contractual price revision formulas, the project financing by ENERGOINVEST reached the amount of US$21,544,690.21.

9. The Credit Agreement not only provided the conditions for the financing and the interest that this financing would accrue and which was to be added to the principal, but also the conditions and due dates according to which it was to be repaid. In particular, it provided that in order to obtain repayment of the credit, the Lender had to issue 36 bills (20 for interest and 16 for principal) drawn on S.N.EL. and for which the Executive Council of Zaire undertook to provide its endorsement for S.N.EL. (Article 4.5 of the Credit Agreement).

10. The bills were regularly issued, accepted, and endorsed.

11. Subsequent to the Borrower's default on payment within the due dates agreed, a "Rescheduling Agreement" was signed on May 31, 1986, by and between ENERGOINVEST and the Executive Council of the Republic of Zaire.

12. Pursuant to this Agreement, in accordance with the latest adjustment of the contract amount, new bills replaced the former ones in connection with debts due that had been subject to rescheduling. These new bills were also accepted by S.N.EL. and approved by the Government Commissioner of Finance, Budget, and Portfolio of the Republic of Zaire. The due dates for the Credit Agreement subsequent to the date of the rescheduling, that is, as of January 1, 1997, were not affected. The Rescheduling Agreement was considered as "[. . .] *an integral part of the Credit Agreement of April 2, 1980* [. . .]" and did not affect the validity of the latter's clauses (Article 7 of the Rescheduling Agreement).

13. Once again, the payment obligations were not observed. In a letter dated March 4, 1991, from the Ministry of Finance of the Republic of Zaire to the Governor of the Banque du Zaire (Exhibit No. 7, attached to the Motion for Arbitration), with copies to the Prime Minister, the Secretary of State for Finance, and ENERGOINVEST, the debt with ENERGOINVEST was acknowledged and it was requested that a monthly payment of US$1,000,000 be made to ENERGOINVEST starting January 1, 1991 "[. . .] *until full payment of these arrears and full coverage of the agreed regular due dates [(sic)]."*
Apparently no further payment was made after this date.

14. It is accordingly on the basis of the Credit Agreement, the Rescheduling Agreement, as well as the debt acknowledgement contained in the letter mentioned above, that on March 2, 2001, ENERGOINVEST filed its Motion for Arbitration against the Democratic Republic of the Congo and against S.N.EL.

15. There have not been and there are no claims concerning proper performance of the work (that is, the execution of the *"Katama-Goma"* project), the final acceptance of which took place on April 18, 1986.

## II – THE ARBITRATION PROCEDURE

16. On March 4, 2001, the ENERGOINVEST company (hereinafter "Energoinvest" or "Claimant") filed a Motion for Arbitration before the International Court of Arbitration of the International Chamber of Commerce against the Democratic Republic of the Congo (hereinafter "DRC" or "Respondent No. 1") and Société Nationale d'Electricité of the Democratic Republic of the Congo (hereinafter "S.N.EL." or "Respondent No. 2).

17. The Motion for Arbitration was based on the Credit Agreement dated April 2, 1980, on the Rescheduling Agreement dated May 31, 1986, and on the debt acknowledgement by the Ministry of Finance of the Republic of Zaire in its letter dated March 4, 1991. It was accompanied by a file containing seven documents, and the Claimant's arguments were that the two Respondents should be ordered jointly and severally to make payment to it in the amount of US$12,087,653.49, plus interest at the conventional rate of 9% a year, reckoned as of the date of each contractual due date, as well as to pay the arbitration costs, including the costs of its defense.

18. The arbitration clause invoked by the Claimant is the one under Article 6 of the Credit Agreement, which is worded in the following manner:

*"Any disagreement or dispute deriving from the present Credit Agreement shall previously be submitted for an amicable settlement between the parties.*

*Absent such an amicable and satisfying solution, the disagreement or dispute shall be submitted before a Court of Arbitration appointed in accordance with the conciliation and arbitration regulations of the International Chamber of Commerce in Paris. For the settlement of the conflict, the Court of Arbitration shall sit in ZURICH and Swiss substantive law shall apply."*

19. In its request, the Claimant mentioned that a similar contract between the same parties was signed on March 4, 1986, for the financing of hydroelectric equipment in Mobayi and other electric power transportation works (*"Mobayi"* project) and that the Respondents were also in default with regard to this second contract. Since this default was the subject of a concurrent but separate arbitration proceeding, registered at the ICC International Court of Arbitration under No. 11442/KGA, the Claimant initially requested the joinder of the two arbitration proceedings.

20. Neither of the two Respondents responded to the Motion for Arbitration within the time period set for them by the Court pursuant to the Regulations.

21. On May 7, 2001, the Court's Secretariat informed the parties that absent the submission of any response by the Respondents within the time period that had been set for them, the case was going to be submitted to the Court at one of its upcoming sessions, in order for it to decide on whether to get the arbitration proceeding underway in accordance with Article 6(2) of the Regulations. In the same notice, the parties' attention was drawn to Article 6(3) of the Regulations, pursuant to which: *"If one of the parties refuses or refrains from taking part in the arbitration or at any stage thereof, the arbitration shall take place notwithstanding this refusal or this abstention."*

22. During its session on May 18, 2001, the International Court of Arbitration adopted the following decisions:

   – not to join this case to case 11442/KGA;

   – to get the procedure underway in accordance with Article 6(2) of the Regulations (all while considering the apparent *"prima facie"* existence of an arbitration agreement between the parties regarding the Regulations, except that it would be up to the Court to rule on its own competence);

   – submit this case to a Court of Arbitration of three members;

   – confirm the appointment of attorney Marc Ronca, of the Law Firm of Schellenberg Wittmer of Zurich, Switzerland, in the capacity of co-arbitrator at the Claimant's suggestion;

   – grant the Respondents 15 days to jointly appoint a co-arbitrator, absent which a co-arbitrator shall be named by the court in their place and stead in accordance with Article 9(6) of the Regulations;

   – take the necessary measures for the appointment of the President of the Court of Arbitration;

   – set the advance for arbitration costs at US$300,000, subject to subsequent adjustments, all while inviting the parties to settle this

advance at the rate of US$150,000 to be borne by the Claimant and US$150,000 to be borne by the Respondents.

23. By means of a letter dated June 1, 2001, sent to the ICC International Court of Arbitration and for information to the Minister of Energy of Congo and to the Claimant's Board, S.N.EL. made its wish known to find a negotiated solution to the dispute, while expressing the opinion that the ICC International Court of Arbitration would not be competent to decide on the case, since "*Recourse to settlement through conciliation and arbitration by the International Chamber of Commerce does not imply the parties' acknowledgement as a matter of law of the competence of the International Court of Arbitration or the institution of a Court of Arbitration by the aforesaid Court.*"

24. By means of a letter dated August 3, 2001, sent to the ICC International Court of Arbitration and for cognizance to the Claimant's Board, the Minister of Justice and Guardian of the Seals of the Democratic Republic of the Congo made it known that his Ministry has the jurisdiction to represent the Congolese Government in the arbitration proceeding and proposed having discussions with the Claimant in order to search for an amicable settlement of the dispute.

25. By means of a letter dated October 31, 2001, the Claimant informed the ICC International Court of Arbitration that the negotiations aimed at an out-of-court agreement had in fact taken place in Paris, but that they had unfortunately failed. Consequently, it requested the continuation of the arbitration proceeding.

26. On November 23, 2001, the Court's Secretariat informed the parties that given that the Respondents had not proceeded with the joint appointment of a co-arbitrator, the Court had decided to name attorney Mohamed Abu-Samra, of Khartoum, Republic of Sudan, as co-arbitrator, in the place

and stead of the defaulting Respondents, this in accordance with Article 9(6) of the Regulations.

27. On December 18, 2001, the Court's Secretariat informed the parties that during its session on December 14, 2001, the Court had named attorney Renato Roncaglia of Geneva, Switzerland, as President of the Court of Arbitration, upon the nomination of the Italian National Committee and that, in this manner, the Court of Arbitration was entirely formed and that the case file had been sent to it. It was indicated in this letter that the place of arbitration would be Zurich, as chosen by the parties in the arbitration clause.

28. On January 29, 2002, the Court of Arbitration sent the parties a draft Terms of Reference, drafted on the basis of documents, in accordance with Article 18 of the Regulations, and invited them to send in their comments and suggestions within a time period of 15 days.

29. The Claimant submitted certain comments dated February 13, 2002, while the two Respondents did not send any comment to the Court of Arbitration. Nevertheless, on January 30, 2002, S.N.EL. sent a letter (almost certainly written prior to the receipt of the draft Terms of Reference) to the Court of Arbitration. In this letter, S.N.EL. did not give any answer to the Claimant on the substance of the case but simply limited itself to requesting the joinder of this proceeding with the other arbitral proceeding between the same parties (entered at the ICC Court under No. 11442/KGA), as well as to wishing that the Court would schedule hearings that the parties could attend.

30. By its Order dated February 21, 2002, the Court of Arbitration informed the parties that it was not possible for it to rule on the motion for joinder of the two arbitration proceedings, since Respondent No. 1 had not stated its agreement on this matter. At the same time, the Court of Arbitration sent the parties the

final draft of the Terms of Reference and invited them to sign it and return it prior to March 20, 2002.

31. Only the Claimant signed the Terms of Reference within the time period mentioned above.

32. Meanwhile, since the Respondents had not paid their part of the advance for arbitration costs, the entirety of the aforesaid advance (i.e., US$300,000) was paid by the Claimant, as the Court's Secretariat duly noted to it in its notice dated March 18, 2002.

33. On April 17, 2002, the Terms of Reference signed by the Claimant and by the Court of Arbitration were sent to the Court for approval in accordance with Article 18(3) of the Regulations.

34. The Terms of Reference were approved by the Court during its session on May 17, 2002, and they were subsequently sent by the Court's Secretariat to the Respondents with the invitation for them to sign it.

35. By an Order dated May 23, 2002, the Court of Arbitration granted the parties a time period until June 28, 2002 in order for the Claimant to set forth its claim and complete its submissions as it had requested, and for the Respondents to respond to the Motion for Arbitration, something that they had not yet done. In the same Order, an additional time period until July 26, 2002 was granted to the Claimant for a possible reply to the answer by the Respondents (if any such answer was submitted), and the Respondents were granted until August 23, 2002, for a counterclaim to the possible reply by the Claimant. After this, the Court of Arbitration made reservation for setting a procedural hearing in Zurich in order to give the parties the opportunity to better illustrate their respective submissions and thus to decide, after a hearing of the parties, on the possible admission of other means

of proof, as well as more generally on the follow-up to be given to the proceeding.

36. By means of a letter dated May 28, 2002, Respondent No. 2 sent the Court of Arbitration a copy of the Terms of Reference duly signed by it, and it served notice of its intention to take part in the arbitral proceeding if a hearing for the parties to appear was set by the Court of Arbitration and notice thereof was served on it at least 30 days in advance, accompanied by an invitation personally addressed to the signer of the letter, Mr. Alphonse Muyumba Kelenge, Chairman of the Provisional Management Committee of S.N.EL., as well as to Mr. Loliki M'Bembe, head of the S.N.EL. Legal Division.

37. On June 14, 2002, the Court's Secretariat informed the parties of the receipt of the Terms of Reference signed by Respondent No. 1.

38. In this manner and albeit in successive stages, the Terms of Reference were finally signed by all of the parties.

39. Meanwhile, the Court of Arbitration adopted a provisional timetable for the arbitral proceeding and informed the parties, as well as the Court's Secretariat thereof (notice dated May 3, 2002). The latter sent the provisional timetable to the Court during its session on May 31, 2002 (notice dated May 31, 2002).

40. The Claimant submitted its Statement of Claim, accompanied by a file including 45 documents, as well as the written statements made by the three witnesses, within the time period stipulated by the Order dated May 23, 2002 (i.e., as stated, prior to June 28, 2002).

41. In this claim, ENERGOINVEST's pleadings are set forth as follows:

*"In conclusion, the Claimant requests an award from the Court of Arbitration:*

    i)   *ordering the Respondents to pay the Claimant, jointly and severally, the amount of 11,725,845.37 dollars as principal (subject to subsequent increases), plus interest at the contractual rate of 9%, accruing as of the due date of each installment and until full payment is made;*

    ii)  *ordering the Respondents to pay, jointly and severally, to the Claimant the costs for the arbitration proceeding (including attorneys' fees, internal costs, experts' fees, and other accessory expenses);*

    iii) *plus interest on the amounts granted at an appropriate rate;*

    iv) *being entitled to any other claim that the Court deems appropriate in favor of Energoinvest."*

42.    The two Respondents did not submit any response to the Motion for Arbitration within the time period set by the Order dated May 23, 2002. Nevertheless, taking into account the letter from S.N.EL. dated May 28, 2002, where it wished for a hearing to be called, the Court of Arbitration, by an Order dated July 3, 2002, set a hearing between the parties on September 12, 2001 [*sic*], at 10:00 a.m. in Zurich, at the headquarters of the Law Firm of Schellenberg Wittmer.

43. By a letter dated July 12, 2002, addressed to the Court of Arbitration, S.N.EL. justified itself for not having filed a reply to the Motion for Arbitration, saying that it thought that it had to wait for the claim to be better specified and for the submission of documents to be completed and that, furthermore, it had encountered comprehension difficulties due to the fact that the claim, as well as certain documents, were in the English language. For these reasons, it requested that it be granted a new deadline.

44. By an Order dated July 18, 2002, the Court of Arbitration decided that it could not grant a new deadline to S.N.EL, a deadline which would not in any manner change the fact that it did not make its reply to the Motion for Arbitration known until the hearing on September 12, 2002, a hearing which was set, among other things, precisely to *"give the Respondents an additional chance to express themselves and to actively take part in the proceeding."*

45. By means of the same Order, the Court drew the parties' attention to paragraph G-3 of the Terms of Reference, pursuant to which:

*"The arbitration language shall be the French language.*

*The Claimant shall be authorized to utilize the English language in its submissions, but in this case, if the Respondents so request, it must provide the Respondents with a certified translation into the French language.*

*The documents produced by the parties and the originals of which are drafted in a language other than the French language or the English language must be accompanied by a certified translation into the French language."*

The Claimant was invited to abide by this provision, which it did in fact do in sending S.N.EL. a translation into French of the proceedings and documents previously submitted in the English language.

46. On July 22, 2002, the Court's Secretariat informed the Court of Arbitration and the parties of the receipt of a letter whereby Attys. Didier Joseph and Daniel Fauquet of the law firm of CMS Bureau Francis Lefebvre in Paris served notice of their having assumed representation of Respondent No. 2 and requested a time period of two months to respond to the Motion for Arbitration.

47. In the same notice, the Court's Secretariat also took note that the Claimant's representation is now being handled not only by Attys. Brenno Brunoni and Andrea Molino, of the law firm of Spiess Brunoni Pedrazzini Molino in Lugano, Switzerland, as indicated in the Motion

for Arbitration, but also by Attys. Danforth Newcomb, Peter Griffin, and Barbara Diggs of the law firm of Shearman & Sterling in Paris.

48. By an order dated July 26, 2002, the Court of Arbitration upheld its previous Order dated July 18, 2002.

49. On September 12, 2002 a hearing was held in Zurich in which the Counsels of the Claimant and the Counsels of Respondent No. 2 took part. Respondent No. 1 took no part in the hearing in any manner.

On that occasion, Counsels of Respondent No. 2 submitted to the Court, and to Claimant's Counsels, a brief along with six documents.

Throughout the hearing, both the parties who were present had the opportunity to make their respective arguments and to discuss what would happen next in the proceeding. At the end of the hearing and with the agreement of the parties, the Court decided:

- to grant the Claimant an extension until October 4, 2002, for submission of its reply to the brief by Respondent No. 2;

- to grant Respondent No. 2 a later extension until October 25, 2002, for submission of its reply;

- to grant both parties a later extension until November 5, 2002, to inform the Court of Arbitration whether a continuance of the preliminary investigation of the case was possibly desirable, the reasons for said continuance, and the means;

- to schedule a hearing for the case in Paris on December 9 and 10, 2002, in the absence of a request for continuance of the case.

50. On October 4, 2002, Claimant presented its reply to the brief, along with four documents.

51. On October 25, 2002, Respondent No. 2 presented its reply along with ten documents.

52. None of the parties requested a continuance of the case.

53. The hearing to plead the case in the presence of the Court of Arbitration was held as scheduled on December 9 and 10, 2002, at the headquarters of International Court of Arbitration of the ICC in Paris, with the participation of:

- Attorneys Andrea Molino, Peter Griffin, and Susy Pedrinis for the Claimant;
- Attorney Didier Joseph for Respondent No. 2;
- Mr. Loliki Mbembe, head of the Legal Division of the S.N.EL.

No one attended on behalf of Respondent No. 1.

54. As no preliminary matters were raised, Counsels of the parties who were presented arguments and counterarguments. They also remitted to the Court a written summary of their written arguments and conclusions.

55. In particular, Respondent No. 2 stated that, aside from any questioning of, reason for, or argument against its defense, said Respondent did not contest either the amounts demanded by Claimant, or the deadlines of the dates after which interest was being claimed (see Brief of December 13, 2002).

56. At the end of the hearing, the Court declared the proceedings closed pursuant to Article 22 (1) of the Regulations, and on December 13, 2002, it sent the parties and the Court Secretariat the record of the hearing. None of the parties made any comments on this subject.

## III – THE PARTIES

### A. ENERGOINVEST

57. The **ENERGOINVEST** company, Claimant, is an engineering company established in 1951, whose corporate headquarters are in Sarajevo (Bosnia-Herzegovina).

58. The documentation that the Claimant presented regarding its business shows that it is a well-known company with a proven international track record , acting in several engineering fields with a specialization in the electric power field, and specifically in the design and construction of electric power stations, high-voltage transmission lines, and electrical equipment.

59. It is not surprising that the Republic of Zaire, at the time it decided to invest in developing its hydroelectric resources and modernizing its infrastructure, including high-voltage electrical power transmission lines and power stations and the distribution of electric power, turned to ENERGOINVEST. This is even more so the case since ENERGOINVEST's proposition was not only very trustworthy from a technical point of view but was also undoubtedly very interesting to the Republic of Zaire from a financial point of view.

60. It must be emphasized that ENERGOINVEST fulfilled its contractual obligations without fault since the Respondents in no way contest that the *Katama-Goma* project was indeed finished by ENERGOINVEST to the former's satisfaction, as is proved by the final acceptance of works on April 18, 1986 (see letter from the S.N.EL. of May 9, 1986, Doc. No. 18-A, appendix to the statement of case), and did so despite the problems with repayment of the

loan, which had already cropped up during execution of the works and which are the reason for this arbitration proceeding.

61. In their statements and some of the documents that it has produced, Claimant did not forego pointing out to the Court of Arbitration the tragic events which occurred in Bosnia-Herzegovina and the very bad losses that it incurred directly and indirectly in the wake of these events. The Court of Arbitration expresses its sympathy in this regard, but it must also point out that these events are not related to the dispute which bring the parties to arbitration and that, consequently, they must in no way influence the court's decision. The decision shall be based exclusively on the analysis of the contractual relationship between the parties, the facts relating thereto, and the rights and obligations arising therefrom, in application of the law that the parties have chosen to resolve their differences.

## B. DEMOCRATIC REPUBLIC OF THE CONGO

62. The **Democratic Republic of the Congo (DRC)**, Respondent No. 1, is the same State as the one named "Republic of Zaire" at the time the Credit Agreement and the contract for the *Katama-Goma* project were signed with ENERGOINVEST. Indeed, the name of Democratic Republic of the Congo was the name initially given to this country in June 1960 when the Belgian Congo was proclaimed an independent State, but after General Mobutu seized power in 1970, the name was changed to "Republic of Zaire." When President Mobutu was overthrown in May 1977, his successor, President Laurent Kabila, gave the country back its former name Democratic Republic of the Congo.

63. Consequently, should the Court of Arbitration refer to the Republic of Zaire in this award for the relevant period of time, the reference should in all cases be understood as a reference to the same State which today has the name

Democratic Republic of the Congo. In this case, there is not even the problem of the succession of states, as might be found under different circumstances; there has merely been a change of name of the same legal entity.

64. Even though the DRC is a State with major natural resources, among which is its hydroelectric potential, factors such as political instability, rebel movements, and infiltration of the country by military forces from neighboring countries such as Rwanda and Uganda have weighed heavily on the country's economy.

The Court of Arbitration understands the financial difficulties that can result for the DRC due to this, but, in the same way as was said with regard to ENERGOINVEST's economic situation, these events are devoid of any relationship with the factual and legal situation of the contractual relations between the parties at this arbitration, and the findings of this court must set them aside.

## C. THE SOCIÉTÉ NATIONALE D'ELECTRICITÉ
### [THE NATIONAL ELECTRICITY COMPANY]

65. The **Société Nationale d'Electricité (S.N.EL.)**, Respondent No. 2, is a "State-owned Company" [*société d'Etat*], as can be seen on its letterhead (see the numerous documents from the S.N.EL. produced by both the parties). Though it has legal autonomy, it is a company founded by the State in 1970 and which is wholly owned by it.

In particular, it is the state organization that is responsible for the generation, transmission, and the distribution of electric power in the country.

66. It is, therefore, completely logical, as set forth in the Credit Agreement of April 2, 1980, that the execution of the *Katan-Goma* project was entrusted by the State to S.N.EL., and it is also logical that the latter entered into the

December 6, 1980 Contract with ENERGOINVEST. In this Contract, in which ENERGOINVEST is called the "Principal," S.N.EL. is the "Project Manager," and the contract calls for the "ownership of the supply" [*sic*] to be transferred from the "Contractor" to the "Project Manager" upon the provisional acceptance of the works.

## IV – JURISDICTION OF THE COURT OF ARBITRATION

67. As the parties are bound *"prima facie"* by an arbitration clause pursuant to the ICC Regulations, the ICC's International Court of Arbitration decided in its session of May 18, 2001, to start the arbitration proceeding as set forth under Article 6(2) of the Regulations.

68. The clause in question, to which ENERGOINVEST refers in its Motion for Arbitration, is the one incorporated into the Credit Agreement in Article 6 (see paragraph 18 of this award).

69. Also pursuant to Article 6(2) of the Regulations, as well as to point D-1 of the Mission Act, it is now incumbent on the Court to make its jurisdictional ruling, which must be done separately for the DRC (Respondent No. 1) and for the S.N.EL. (Respondent No. 2).

### A. REGARDING RESPONDENT NO. 1

70. The Credit Agreement having been duly signed by the representatives of the Executive Council of the DRC, the DRC is one of the parties.

71. The arbitration clause incorporated into the Credit Agreement poses no problem of interpretation. It clearly shows the willingness of the parties to submit themselves to the arbitral jurisdiction of the ICC:

"[. . .] *the disagreement or dispute will be submitted to the designated Arbitration Council according to the rules for resolution and arbitration of the International Chamber of Commerce of Paris.*"

72. Said clause states that any disagreement or dispute [. . .]*" will be settled amicably first by the parties.*" Even if that is a condition for arbitration, it is certain that it was met. Over the years, ENERGOINVEST not only made constant efforts to obtain payment of debts, either directly through M. Gavrankapetanovic (finance director of the *Katama-Goma* project at the time, see his written statement attached to the brief), or through negotiations held between the parties in Paris in September 2001, and it was only after the failure of these negotiations that ENERGOINVEST's counsels requested the Secretariat of the Court to set the arbitration procedure in motion (see Claimant's letter of October 31, 2001).

73. The sole remaining issue that remains to be examined to eliminate any doubt regarding the jurisdiction of this Court of Arbitration regarding the DRC is the issue of the possible immunity of the DRC by reason of its capacity as a Sovereign State, even though such exception was not mentioned during the arbitration procedure.

74. Respondent No. 1 was only involved in this procedure on two occasions:

    — the first was on August 3, 2001, in a letter sent to the ICC's International Court of Arbitration and to make itself known to Claimant's counsel, in which the Minister of Justice [and Keeper of the Seals] stated

that his Ministry was competent to represent the Congolese State in the arbitration proceeding and offered to hold negotiations with the Claimant to seek an out-of-court settlement of the dispute.

– the second time was on June 8, 2002, when the Minister of Justice [and Keeper of the Seals] signed and sent back to the Court the Mission Act, about which the Court informed the parties in its letter dated June 14, 2002.

75. The two instruments referred to above confirm, should that be necessary, that Respondent No. 1 was well aware of the existence of the Motion for Arbitration presented against it by the Claimant, and that Respondent No. 1 was informed at all times of what was occurring in the arbitration procedure. Respondent No. 1 was duly notified of all the [written] communications to the parties from the Secretariat of the Court, as well as all the Orders and all the [written] communications of the Court of Arbitration.

76. Even if the two acts in question do not in themselves constitute acceptance of the jurisdiction of the Court of Arbitration, said acceptance is in any case explicit in the arbitration clause that the DRC signed of its own will. The willingness of the DRC to submit possible disputes arising from the Credit Agreement to the arbitration jurisdiction of the ICC is clearly there, and it implies the waiver of the possible privilege of sovereign immunity.

77. The principle according to which acceptance of an arbitration clause by a State is valid and binding is a principle which has been broadly asserted by the doctrine as well as by jurisprudence. Here are a few examples:

Craig, Park and Paulsson – International Chamber of Commerce Arbitration – 3rd edition – para. 8.13, pp. 122; "*It is not necessary for States or their emanation to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly*

*rare that a State or a State entity even raises the defense of sovereign immunity before a Court of Arbitration.*" [1]

Redfern and Hunter – <u>Law and Practice of International Commercial Arbitration</u> - p. 319: "*During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted.*" [2]

Fouchard, Gaillard, Goldman – <u>Traité de l'arbitrage commercial international</u> – para. 642. pg. 404: "*The competence of the arbitrators to hear disputes that States or bodies of States which enjoy immunity have agreed to submit to them is unquestionable. It is a constant, indeed, that the beneficiaries of jurisdictional immunity may waive this immunity. Now the arbitration agreement, which directly contradicts immunity, is necessarily to be analyzed as a waiver by the State or the state's body in question to its [right to] jurisdictional immunity.*"

ICC Award – Case No. 2321 in 1974 – Recueil de sentence arbitrales CCI 1974-1985, pg. 10: "*The principle of pacta sunt servanda is generally acknowledged in international law . . . A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law.*" [3]

---

[1] Loose Translation: [same in English as paragraph with the (1)] "It is not necessary for States or their emanation to waive whatever sovereign immunity they may be entitled to in other contexts in order to effect valid submission to arbitral jurisdiction. An agreement to arbitrate is sufficiently binding in and of itself. It is increasingly rare that a State or a State entity even raises the defense of sovereign immunity before a Court of Arbitration."

[2] Loose Translation: "During the course of arbitration proceedings to which a state is a party, the distinction between absolute and restricted immunity should be of no relevance. The arbitration can only proceed validly on the basis that the state concerned has agreed to arbitrate; and such an agreement is generally held to be a waiver of immunity, absolute or restricted."

[3] Loose Translation: "The principle of *pacta sunt servanda* is generally acknowledged in international law . . . A sovereign State must be sovereign enough to make a binding promise both under international law and municipal law."

Likewise: The ICC's award sentence in Case No. 1526 in 1968, Clunet 1974, 915, with a note by Yves Derains, as well as the ICC award in case No. 1939 in 1971, Rev. Arb. 1973, 122.

78. It may be added that, in the case in point, the sovereignty of the State does not come into play because the Credit Agreement on which the Claimant bases its claim is without doubt a contract of private law which could have been entered into by any private person.

79. From a principle taken for granted in international arbitration cases, State immunity is not an absolute rule. One must distinguish between acts called *"jure imperii,"* that is, acts carried out by the State in the exercise of its sovereignty, and acts that are called *"gestionis jure,"* that is, acts carried out by the State in the domain of private law and which could be done by any private person. In other words, even if one admits that the actions of a State always aim to be in the public's interest, the criterion to be considered does not regard the aim of the actions but the type of actions they are in order to determine whether they arise from this sovereign power, which only the State has, or whether these are acts that any private person could perform.

80. The principle that is known as the restricted sovereignty principle, and the distinction between *"jure imperii"* acts and *"jure gestionis"* acts on which it is founded, have had ongoing recognition and been enforced under Swiss law, which is the law the parties mutually agreed to submit themselves to (Article 6 on the Credit Agreement). The enforcement of Swiss law was also confirmed in the Mission Act, which all the parties signed without reservation. Furthermore, this is *lex fori* since the headquarters of the arbitration is in Switzerland, and this location was also freely agreed to by the parties in their contract.

81. By way of example, a similar case may be recalled, which was tried by the Federal Swiss Court (hereafter: "FC") in 1989. A State in South America had at the time guaranteed two Claimant bank syndicates the repayment of funds for the purposes of financing two industrial development contracts. It was undeniable to the FC that the State had acted as a private person and that its commitment was no different than a commercial commitment that any private person might have made [4].

82. Switzerland is one of the countries which ratified the European Convention of the Immunity of States of 1972,[55] and the Convention, in Article 12(1), states precisely that a State may not claim immunity of arbitral jurisdiction when an arbitration agreement concerning disputes in civil or commercial matters has been signed.

83. Lastly, it must be pointed out that the law of the DRC could not in any case be taken into account in understanding the available nature of the legal relationships submitted to arbitration, or, more generally, in matters of arbitrability of the dispute, as well as regarding the capacity of a State to be a party to arbitration. Indeed, Article 177, paragraph 2 of the FSA (Federal Swiss Law of December 18, 1987 on international private law) states: *"If a party to an arbitration agreement is a State, a company in which the State is majority owner or an organization controlled by said State, the party may not use its own law to context the arbitrability of a dispute or its capacity to be a party to an arbitration."*

---

[4] ATF 124 III, cons. 4.
In the same manner:
Judgment of the Swiss Federal Court of December 20, 1947 (ATF 73 III 158)
Judgment of the Swiss Federal Court of November 15, 1978 (ATF 104 1A 367)
Judgment of the Swiss Federal Court of March 21, 1984 (ATF 110 1A 43).
[5] RS 0.273.1

**For all of these reasons, the Court rules that it has jurisdiction with regard to the Democratic Republic of the Congo.**

## B – CONCERNING RESPONDENT NO. 2

84. Respondent No. 2 has expressly contested the jurisdiction of the Court of Arbitration, based on a series of arguments that can be summarized as follows:

- o   Despite the improper use made of the terms "Lender" and "Borrower," the Credit Agreement is not a "loan" contract, because there was no money transferred from one party to the other, and because moreover, the amount of what is being called a "loan" was not determined in this agreement. Therefore, if we interpret this document not in a strictly grammatical manner, but by seeking the real intent of the parties, we notice that it involves quite simply the *"contractual arrangement of the methods for paying the debt resulting from the execution of a construction contract to be entered into."*

- o   After signing the Credit Agreement, the Parties effectively signed the contract of December 9, 1980, for the completion of the *"Katana-Goma"* project, and this is the main contract. The Credit Agreement, which had ceased to be effective in the meantime, was incorporated into this contract.

- o   The Credit Agreement therefore has no material or legal autonomy, and must be considered as a part of the contract of December 9, 1980.

- o   In any case, the provisions of the contract of December 9, 1980, must govern over those of the Credit Agreement.

- o   Since the contract of December 9, 1980, contains an arbitration clause that is not an ICC arbitration clause, and since this clause must govern over the one in the Credit Agreement, the

Court of Arbitration set up in accordance with the ICC arbitration regulations has no jurisdiction. The arbitration clause of Article 9.2 of the contract of December 9, 1980, reads as follows:

*"All disputes related to the interpretation or to the execution of the obligations arising from the Contract will be submitted to three appointed arbitrators deliberating and ruling as specified hereinbelow.*

*The first party to take action will notify the other party of the name of its arbitrator by registered letter, return receipt requested. The party to which notice has been given will have thirty days from the date of receipt of the notification letter to appoint its own arbitrator.*

*After the second arbitrator is appointed, the two arbitrators will, within two weeks from the second appointment, appoint a third arbitrator with whom they will form the Arbitration Board. If they cannot agree on this appointment, the third arbitrator will be appointed by the President of the International Chamber of Commerce in Paris.*

*The Arbitration Board will sit in Zurich, and Swiss substantive law will be applied.*

*The Arbitration Board will be exempted from observing any time frame and any procedural formalities except for any that might be set forth in the arbitration settlement. However, the provisions set forth by the law of the Republic of Zaire and of Yugoslavia for the execution of the arbitration decision must be observed. Unless it is agreed otherwise, the decision will be rendered within two months following the constitution of the Arbitration Board.*

*The costs of the arbitration, including the arbitrators' fees, will be paid by the losing party,*

> *unless decided otherwise by the arbitration decision for reasons that must be specially indicated in this decision.*
>
> *Without derogating from the time frames for introducing claims, the contracting parties must, under penalty of being out of time, make any motion for arbitration related to the Contract, in writing, no later than one year after the date of provisional acceptance of the work. The parties are allowed to introduce a request to have arbitration clauses applied at a later date exclusively only with regard to facts posterior to provisional acceptance. These claims must, under penalty of being out of time, be introduced no later than the date on which final acceptance of all the work has been determined."*

o   Finally, and in any event, the Court of Arbitration does not have jurisdiction with respect to S.N.EL., since S.N.EL. is not party either to the Credit Agreement or to the Rescheduling Contract, and since it participated in the main contract (the so-called "technical" contract of December 9, 1980) only as the official representative of the DRC.

The Court of Arbitration will examine all the aforementioned arguments hereinbelow.

85. The Court of Arbitration agrees with the parties that the contracts established by and between them are not masterpieces with respect to the vocabulary used to designate the role of the parties and/or to formulate their respective obligations. It is therefore logical for us to seek their real intent, which furthermore conforms to the principle established in Swiss law in Article 18 of the Code of Obligations:

*"To assess the form and the clauses of a contract, it is necessary to seek the real and common intention of the*

parties, without wasting time worrying about the inaccurate expressions or designations they may have used either by error or to disguise the true nature of the agreement."

86. The Republic of Zaire wanted to modernize its infrastructure and had in particular *". . . deemed it necessary to build [. . .] a 110 KV high-voltage electrical power transport line from Bukavu to Goma by way of Katana, including two transformer stations and distribution stations for the medium-voltage system in the city of Goma [. . .]."* This is expressed in the preamble of the Credit Agreement, where it is also stated that "to succeed in doing this" the Republic of Zaire needed *"[. . .] bilateral and multilateral cooperation."* This situation is typical of many countries that are preparing to carry out large-scale public interest projects. It is necessary in this case not only to find the equipment and services supplier who has the technical expertise necessary, but also to find the funding. The two pillars for completing such projects are: a credit contract for the project funding and a contract that can be characterized as "technical" that more particularly deals with the engineering studies, equipment supplies, and the supervision of the work and erection operations.

87. The particularity of the contractual relationship between the DRC and S.N.EL. on the one hand, and ENERGOINVEST on the other, resides in the fact that a single subject (ENERGOINVEST) fulfills both the functions of moneylender and technical contracting party for the studies, deliveries, and services. This is what led Respondent No. 2 to state that, in the end, the Credit Agreement is nothing more than the arrangement of the payment terms for the supplies and services covered in the technical Contract. However, this argument is false: the identity of the subject changes nothing with respect to the substantive and legal autonomy of the two contracts.

88. The parties certainly wanted to given legal autonomy to the Credit Agreement, which already had substantive autonomy with respect to the completion of the project for which the funding was intended. It is for this reason that they signed a Credit Agreement that exclusively concerns the funding conditions. If they had merely wanted to arrange the payment terms for the deliveries and services necessary to carry out the project, we cannot understand why they would not have done so in the same contract as the one concerning such deliveries and services. The arrangement of which the Respondent speaks and that is, according to it, not a loan, in effect quite simply consists of the grant of a payment facility. If this were the case, it would have been logical for the length of the time frame granted and the terms and conditions in accordance with which the payments were to be made to constitute the payment clause of the contract covering the deliveries, the work, and the services necessary to carry out the project, all the more so since this contract apparently also contains the prices to be paid.

89. In this case, on the contrary, we have first of all a Credit Agreement that comprises, on the one hand, the commitment by one party to finance 85% of the total cost of the project, the amount of which is only estimated, as it could not yet be known in actuality, and, on the other hand, the commitment of the other party to repay in accordance with minutely detailed conditions. We then have a contract to supply studies, equipment, and services, whose Chapter 8 deals with the issues of "Price and Payment."

90. It is clear that there is a relationship between the payment clause of the Contract (in reality the clause incorporated into the "special contracts") and the conditions of the Credit Agreement, since for 85% of the amount to be paid, the money used is the money "loaned" by ENERGOINVEST and that must be repaid to it in accordance with the conditions of the Credit Agreement, but the two contractual relationships remain autonomous. As we can read in the payment terms for "special contracts," 85% of the contract price

is paid "*[. . .] by repayment of the credit [. . .] on the basis of and in accordance with the conditions of the Credit Agreement.*"

91. Whether the Credit Agreement is characterized as a Credit Agreement or as a *"sui generis"* contract in Swiss law, as the parties have argued among themselves, has no importance, since the legal consequences remain the same. The physical transfer of money from the "lender" to the "borrower" is not an essential element of the loan. We can be dealing with a loan even in the case of a party who, as ENERGOINVEST did, agrees to advance out of its pocket 85% of the cost of the equipment and services intended to carry out a certain project of another party, and this latter party agrees, for its part, to reimburse these expenditures within a certain period of time and under certain conditions. The dispute that this Court of Arbitration must judge in fact concerns the obligation to repay, and it is not necessary to know whether this repayment is owed as part of a typical Credit Agreement or in connection with a *"sui generis"* contract. In any event, what is involved here is a contract that sets forth an obligation to finance and an obligation to repay, and this contract is completely autonomous with respect to the other contract concerning the completion of the project for which the funding is intended.

92. It is also not important that at the time this financial agreement was entered into, the exact amount of funding was not yet known by the parties. Their respective commitments (to finance, on the one hand, and to repay, on the other) are, at any rate, very well-defined, since it is stated that this involves 85% of the amount that would effectively be necessary "to completely finish the project" (Article 1.3 of the Credit Agreement), whose estimated cost at that time amounted to 15.18 million USD (Article 1.1 of the Credit Agreement).

93. The substantive and legal autonomy of the Credit Agreement cannot be placed in doubt by the simple fact that the introduction to the Contract signed on December 9, 1980, reads as follows:

*"Whereas the Transportation of Electrical Power in the KIVU region, the KATANA-GOMA project, was the subject:*

-     *of a Credit Agreement signed in Kinshasa on April 2, 1980, by and between the Executive Council of the Republic of Zaire, represented by the Department of Energy and the Department of Finance, and the company Energoinvest,*

*this Contract was established.*

*This Contract includes:*

-     *The Credit Agreement signed on 04/02/1980*
-     *These General Conditions*
-     *The special contracts Nos. 1, 2, 3, 4 and 5"*

Contrary to what Respondent No. 2 claims, this wording does not mean that the Credit Agreement is devoid of autonomous value and that its conditions are subordinated to those of the contract into which it is incorporated.

As Respondent No. 2 has stated and as Article 18 CO states, we must not waste time worrying about the inaccurate expressions or designations that the parties may have used.

The Court deems that, by the document of December 9, 1980, called "Contract," the parties in reality quite simply wanted to combine all the contract documents intended for the completion of the project into a single consolidated document. They most likely did this for practical reasons, that is, to be able to have a single document combining all the contractual agreements; however, the autonomy of each of these agreements is not challenged, each having its own purpose, particularly if we consider the Credit Agreement with respect to the agreements and special contracts that concern the technical aspects of carrying out the project.

94. At the time the Credit Agreement, which set forth the future signing of a "technical" contract, was signed, it was stipulated that this technical Contract was to be appended to the Credit Agreement (Article 2.1). On the contrary, at the time this contract was signed (whether or not it is characterized as "technical"), instead of appending it to the Credit Agreement, the parties preferred to configure it as a set of contractual documents, including the Credit Agreement. This involves a formal arrangement that changes nothing with respect to the substance of the provisions. Whether the "Technical" Contract is appended to the Credit Agreement or whether this Credit Agreement becomes one of the elements of a set of contractual agreements, we are still dealing with separate and autonomous contracts. Among other things, if we look at the parties' vocabulary, we can see that among the contractual documents compiled in this single document signed on December 9, 1980, there is also a *"Technical Contract"* whose definition is found in Article 1.1.a of the General Conditions. This concerns *"The set of documents that are part of the special contracts 1, 2, 3, 4 and 5."*

95. The reason the Credit Agreement signed on April 2, 1980, is in first position among these documents collected in the Contract of December 9, 1980, is obvious: this is the agreement intended to procure the financial means necessary to carry out the project. However, its incorporation into the Contract did not deprive it of its value. On the contrary, it was reproduced as is, with its signatures that make it a clearly autonomous document, and it is continuously referred to as *"The Credit Agreement signed on April 20, 1980."*

96. As has already been said a number of times, the completion of the "Katana-Goma" project in accordance with international practice for this type of project required two things: a contract to deal with its funding (which was accomplished by the Credit Agreement) and a second contract to settle more particularly the issues of the engineering studies, equipment deliveries, and the supervision of the work and construction operations.

It is clear that the two are interdependent, since the first one is exclusively destined for the financing of the object of the second. This is why the parties provided (in Article 7.2 of the Credit Agreement) that this Credit Agreement would become null and void if the Technical Contract was not entered into within 6 months following the date it was signed. Clearly, this is a clause established in the interest of ENERGOINVEST, whose commitment to finance the project could not remain valid for an indefinite period. However, the fact that the Technical Contract was not entered into within the time frame set forth does not mean, as Respondent No. 2 maintains, that the Credit Agreement was already null and void and that the parties had given it new legal effect only "through its incorporation into the technical contract."

97. The parties quite simply waived invoking the lapse clause of the Credit Agreement. They waived this by conclusive acts, which is entirely sufficient. A formal waiver in writing was neither requested nor necessary. The provision of Article 7.2 in question is a condition subsequent established above all, if not exclusively, in the interest of ENERGOINVEST. ENERGOINVEST did not invoke it and neither did S.N.EL. S.N.EL. cannot invoke it now. Its argument that the Credit Agreement of April 2, 1980, with its potential legal autonomy, had disappeared and that all that subsists at present is the Contract of December 9, 1980, into which the stipulations of the Credit Agreement were incorporated but subordinated to the other stipulations of the same Contract, is an unfounded argument.

98. In support of its thesis that the Credit Agreement is subordinated to the Contract of December 9, 1980, into which it was purportedly incorporated, Respondent No. 2 refers in particular to Article 1.3 of this Contract, which reads as follows:

"*Art. 1.3 – CONTRACT DOCUMENTS*

*1.3.1. The contract documents consist of:*

*a) this document entitled "Contract," itself consisting of:*

 *a.1. the credit agreement*

 *a.2. the General Conditions and their Appendixes*

*b) Special Contracts*

*c) Studies*

*d) Any addenda to the Special Contracts duly signed by the Parties.*

1.3.2.  *The Addenda to the Contract are to be interpreted as a function of one another. In case of any discrepancy or contradiction between the stipulations of the General Conditions, the Special Contracts, their Addenda, and the Credit Agreement, these documents govern over one another in reverse order to their numbering in 1.3.1.*

 *In case of any discrepancy among the Addenda, the Addendum bearing the most recent date will govern."*

When it refers to this article of the Contract, Respondent No. 2's reasoning is as follows: since the Credit Agreement had no autonomy and since, in case of discrepancies, the General Conditions of the Contract must govern over those of the Credit Agreement, the Arbitration Clause of the Contract (Article 9.2), which is not the same as the one inserted in the Credit Agreement (Article 6) and which is not an ICC arbitration clause, must govern over the one in the Credit Agreement. Therefore, the Court of Arbitration has no jurisdiction to try this case.

99. The arguments of Respondent No. 2 are not defensible for two reasons:

 —  First, because as has already been said, the Credit Agreement is an autonomous contract that never lost its substantive and legal autonomy;

 —  Second, because there is no conflict between the arbitration clause of the Credit Agreement and the arbitration clause of the so-called "technical" contract. These are two separate arbitration clauses, each

of which is intended to establish how disputes that might arise between the parties in relation to either of these two contracts are going to be settled. The arbitration clause of the Credit Agreement of April 2, 1980, concerns disputes arising from this Agreement. The arbitration clause of the Contract of December 9, 1980, obviously concerns disputes arising from the so-called "technical" contract. That this technical contract is within the scope of application of this arbitration clause is confirmed by, among others, the final section of this clause, which establishes the time limit for claims and arbitration as *"[. . .] no later than one year after the date on which all the work was provisionally accepted,"* or, if the disputes exclusively concerned facts posterior to provisional acceptance, the time limit for claims and of arbitration is *"[. . .] no later than the date all the work receives final acceptance."*

This type of provision would have no sense if it were to apply to disputes concerning the Credit Agreement in execution of which the repayment of the loan was spread out over several years (8 years for the principal amount, with the first payment to be made 48 months from the date the Agreement was signed, and 10 years for the interest, with the first payment coming 30 months after the Agreement is signed), without any relation to acceptance of the work.

Any conflict between the two arbitration clauses could be raised in theory only if we were dealing with a dispute that concerns the Credit Agreement and the so-called "Technical" Contract simultaneously. However, the dispute submitted to the Court of Arbitration only concerns the Credit Agreement, and there is, therefore, no conflict. Therefore, the arbitration clause of the Credit Agreement is applicable.

100. Any doubt concerning this finding is definitively excluded by the Rescheduling Agreement signed by the parties on May 31, 1986. Not only does this Agreement refer to the Credit Agreement signed on April 2, 1980,

but its Article 7, expressly provides that: *"This agreement is an integral part of the credit agreement of April 2, 1980, and all the inserted clauses remain valid."* It should be noted that the date this Agreement was signed was after the final acceptance of the work, which means that it occurred on a date on which any arbitration would be time-barred if the arbitration clause of the Contract of December 9, 1980, were applicable. This text therefore confirms:

- that the Credit Agreement is autonomous with respect to the Technical Contract;
- that the Credit Agreement was never considered to have lapsed;
- that even if, by some remote chance, we were to admit that the arbitration clause of the Contract of December 9, 1980, governs over the arbitration clause of the Credit Agreement, this prevalence would no longer be valid following the Rescheduling Agreement that revived the Credit Agreement in its original wording, and this would be completely in keeping with the thesis of Respondent No. 2 that the posterior agreements must prevail over the prior agreements.

101. The last argument advanced by Respondent No. 2 to dispute the jurisdiction of the Court of Arbitration consists in saying that it is not a party to the Credit Agreement and that therefore it is not bound by the arbitration clause of this Agreement.

102. It is true that the Agreement was formally entered into by and between "The Executive Council of the Republic of Zaire," on the one hand and "ENERGOINVEST" on the other; however, it is also undeniable that S.N.EL. also signed this Agreement. Why did it sign it? According to its defense, it signed it *"[. . .] to mark its acceptance of its assumption of the technical part of the construction [. . .]"* and because the Agreement provides that *"[. . .] the lender issue drafts drawn on S.N.EL. and endorsed by the Executive Council of Zaire."* This seems more than sufficient to the Court to affirm that S.N.EL.'s signing of the contract constitutes at least its

acceptance of certain obligations of the Agreement that concern it directly, including (which is no less important) the obligations related to the methods for repaying the loan. In the rest of this decision, the Court will have the opportunity to return to the problem of S.N.EL. in connection with the Credit Agreement. For the time being, S.N.EL.'s signing of the Credit Agreement, which contains the arbitration clause and constitutes the basis for the Claimant's petitions, seems sufficient to the Court for the purposes of establishing its jurisdiction, especially since this signature is neither the result of chance nor the act of a witness who would not be implicated in the substance of the Agreement. As recognized by S.N.EL., this is a signature that confirms its acceptance of certain obligations established by the Agreement and that concern it directly.

**For all of these reasons, the Court rules that it has jurisdiction with respect to S.N.EL.**

## NOTE

Having decided:

- that the Credit Agreement of April 2, 1980, is legally autonomous;
- that the applicable arbitration clause is the clause of the Credit Agreement and not the clause of the Contract of December 9, 1980;
- that the time limits set forth in the arbitration clause of the Contract of December 9, 1980, could relate only to claims arising from the Technical Contract and not to claims arising from the Credit Agreement;

the Court of Arbitration will not need to take into consideration the objection related to time limits raised by Respondent No. 2, whose presupposition was that the arbitration clause of the Contract of December 9, 1980, was applicable.

## V – CLAIMANT'S RIGHT TO PAYMENT OF THE CLAIMED AMOUNTS

103. In the conclusions it presented during the plea hearing before the closing arguments, the Claimant confirmed the conclusions of its Brief of June 28, 2002, in which it claimed payment of *"a total of US$11,725,845.37 in principal, plus interest at the contractual rate of 9% calculated from the due date of each payment until actual payment is made."*

104. During the same hearing and also in accordance with what had already been noted in the Brief of June 28, 2002, the Claimant explained that the total of US$11,725,845.37 was the result of adding the sum of US$11,179,266.71, which the DRC Finance Minister had acknowledged must be paid in his letter of March 4, 1991 (Exhibit No. 7 attached to the Arbitration Request), to the sum of US$546,578.60, corresponding to delinquent interest *"as of March 1991 only"* (see Claimant's calculations on page 36 of its Brief). Since the correct result of this addition is US$11,725,845.31, it may be deduced that the indicated total of US$11,725,845.37 in the Claimant's conclusions was merely the result of a typographical error.

105. The aforementioned letter of March 4, 1991, indicates, in fact, a total *"arrears due to ENERGOINVEST"* of US$17,079,405.83, but this amount corresponds to both projects, *"Katana-Goma,"* which is the subject of this arbitration, and *"Mobayi,"* which is subject to a separate arbitration proceeding. The tables attached to such letter provide the distribution of the amounts owed for each such project. The table of concern to us is the one entitled "CREDIT AGREEMENT OF APRIL 2, 1980 (LHT KATANA-GOMA PROJECT)." This table, which takes into account the agreements between the parties during the Rescheduling Convention, includes the

amounts due as principal and interest up to the due date of October 2, 1992. The "Overall Grand Total" that is shown is US$11,179,262.36, but it contains a small error. The sum of the base amortization payments for the due date of April 2, 1990 (US$1,346,543.13 in principal and US$161,589.17 in interest) is erroneously figured at US$1,508,128.30, rather than US$1,508,132.30. Correcting this figure brings the "Overall Grand Total" to US$11,179,266.36. The Respondent notes the total of US$11,179,266.30 (see footnote on page 17 of its Brief of June 28, 2002), but it also makes a small error on page 21 of that Brief when, with respect to the April 2, 1990, due date, it shows a total of US$576,964.30 as being the result of adding US$489,157.23 in principal and US$87,807.08 in interest, while the correct result is US$576,964.31.

In its conclusions, as noted above, the Claimant indicated a total of US$11,179,266.71 as being the corrected amount acknowledged by the Finance Minister. This statement is also inaccurate. The aforementioned figure is the result of a calculation made by the Claimant itself in paragraph 97 (page 36) of its Brief. If, on the other hand, we were to apply the figure the Finance Minister acknowledged in his letter of March 4, 1991, the correct number (after making the slight adjustment noted above) is US$11,179,266.36.

106. Since the Claimant based its claim on the acknowledgement of debt in the letter from the Finance Minister dated March 4, 1991, and during the pleadings, it confirmed that it wished to apply the sum acknowledged by such letter as the basis for its receivable (except interest to be added thereto), which is therefore the total of US$11,179,266.36, to be applied by the Court of Arbitration.

107. Here it is appropriate to note the conditions for repayment of the financing, as stipulated between the parties to the Credit Agreement of April 2, 1980.

As of the signing date of the Agreement, interest known as "interim" interest at the rate of 6% per year, stipulated for a period of 24 months (Article 4.1).

After 24 months, the interest thus calculated must be added to the amount financed, and capitalized in this way (Article 4.2).

To the amount thus calculated, which is to be repaid over 8 years in 16 semiannual installments, with the first payment due 48 months after the signing of the Credit Agreement, interest of 6% per year applied and was to be paid over 10 years in 20 semiannual installments, the first of which was due 30 months after the signing of the Credit Agreement (Article 4.3).

Finally, the parties agreed that any payment defaults would result in a penalty, to be assumed by the debtor, on the order of 50% of the primary interest, meaning that the interest rate would rise from 6% to 9% per year (Article 4.4).


108. ENERGOINVEST committed to finance 85% of the foreign currency value of the project (Article 1.1 of the Credit Agreement), and even if the estimated value at the beginning was 15.18 million US dollars (same Article 1.1), ENERGOINVEST's commitment was "[. . .] *to increase the value of the loan for final completion of the project*" (Article 1.3). In effect, even at the time of the issuance of the first series of treaties that ENERGOINVEST sent to the S.N.EL., which the latter returned thereto duly accepted and guaranteed (see Exhibit No. 3 attached to the Arbitration Request), the value of the financing (total value of the principal treaties) exceeded 18 million US$, and finally, after an additional series of treaties had been issued, accepted, and guaranteed in May 1986, following "*the final update of the contractual value*," (Exhibit No. 6 attached to the Arbitration Request), total financing by ENERGOINVEST was US$21,544,690.21, as acknowledged in the letter from the S.N.EL. to the State Finance and Budget Commissioner on April 1, 1985 (Exhibit No. 4 attached to the Motion for Arbitration), as well as the letter from Banque du Zaire to ENERGOINVEST dated June 9, 1986 (Exhibit No. 19 attached to the Brief of June 28, 2002).

109. After the debtors' default, the Rescheduling Convention signed between the parties on May 31, 1986, applied to a total of US$11,691,047.94 (see Exhibit No. 2 attached to the Motion for Arbitration, as well as the letter from Banque du Zaire of June 9, 1986, to ENERGOINVEST, Exhibit No. 20 attached to the Brief of June 28, 2002). It is necessary, however, to note that this amount includes various categories of debt for which the rescheduling conditions are not the same. Indeed, the total of US$11,691,047.94 consists of:

— US$2,549,063.16: This is an amount due as down payment on the value of the contract. As a result, this sum is not included in the financing of the 85% of that amount, and it cannot be applied to the repayment conditions of the Credit Agreement. The Rescheduling Convention only establishes new payment periods, without interest.

— US$3,272,098.00: This is interest due and payable up to December 31, 1986. For this amount also, the Rescheduling Convention establishes new payment periods without interest.

— US$5,869,886.78: This is principal to be repaid, due or becoming due by December 31, 1986. In this case, the rescheduling applies interest at a rate of 6% per year as of October 2, 1986.

The payment schedule resulting from the Rescheduling Convention is attached to the same Convention (see Exhibit No. 2-D attached to the Brief of June 28, 2002).

The payments of principal and interest provided for by the Credit Agreement and subsequent to January 1, 1987, are not affected by the Rescheduling Convention.

110. In considering the conditions of the Credit Agreement and those of the Rescheduling Convention just cited, on the one hand, and the actual status of payments made, delays that have occurred, and payments due but never made, on the other hand, it may be easily seen that it is extremely

complicated to calculate the amounts owed to the Claimant. The calculations the Claimant presented in paragraphs 88, 89, 90, 91, 92, 93, 94, 95, 96, and 97 of its Brief of June 28, 2002, even if not disputed by Respondent No. 2, would require an accounting audit. There is no need for the Court of Arbitration to perform one, however, because in its conclusions, the Claimant stated that it bases its claim not on its own calculations or on a reconstruction of its receivables situation resulting from the Credit Agreement and the Rescheduling Convention to be carried out by an accountant, but rather solely on the debt acknowledgement contained in the letter from the DRC Finance Ministry dated March 4, 1991, which Respondent No. 2 does not dispute.

111. The debt acknowledgement is recognized under Swiss law (Article 17 CO). To be valid, it must be communicated to the creditor, which has occurred, since a copy of the letter of March 4, 1991, has been officially forwarded to ENERGOINVEST.

112. It may therefore be stated that the Claimant holds a receivable of US$11,179,266.36, as calculated in paragraphs 104 and 105 above. However, the Claimant's conclusions apply to a total of US$11,725,845.37, because the Claimant adds to the amount acknowledged by the Finance Ministry (and erroneously figured by the Claimant at US$11,179,266.71) the sum of US$546,578.60, which corresponds to delinquent interest it is claiming through its letter of February 22, 1991 (see Exhibit No. 43 attached to the Brief of June 28, 2002). This delinquent interest was also acknowledged by the Finance Ministry in the same letter, in point B-3 of an appendix to the letter entitled "Recapitulation of the Energoinvest Yugoslavie receivables corresponding to work carried out at Mobayi and Katana-Goma." It is included in the total of US$903,387.13. As explained by the Claimant, the reason is that in this case, the Ministry did not indicate the distribution of this "*contractual delinquent interest*"

between the "*Katana-Goma*" project and the "*Mobayi*" project. This explanation seemed logical and satisfactory.

In any event, since the amount claimed by the Claimant in this arbitration is less than the amount the Finance Ministry acknowledges owing for "*contractual delinquent interest*," and there has been no dispute as to the request for payment of February 22, 1991, and no dispute by Respondent No. 2, the figure indicated by the Claimant in this regard may be accepted as an acknowledged receivable.

113. To calculate interest, it is necessary to take into account the different nature of the two sums: the US$546,578.60 cannot be added to the US$11,179,266.36 to obtain a total of US$11,725,844.96. The Claimant therefore cannot claim payment of interest at the contractual penalty rate of 9% per year on this latter amount.

This problem will be considered subsequently and separately in another section of this opinion.

Now that the Claimant's receivables have been established, it is time to see who is (or are) the debtor(s).

## VI – DRC COMMITMENT

114. There is no doubt as to the DRC's commitment. The Republic of Zaire is undeniably party to the Credit Agreement of April 2, 1980, in which it appeared in its capacity as "Borrower." Whether it is a typical "loan" agreement or a "*sui generis*" agreement makes no difference, as already noted. The recipient of the financing is directly obligated to repay it under the agreed-upon terms and conditions.

115. It has also already been stated (see Section IV-A of this opinion) that the DRC cannot rely on its sovereign immunity. Pursuant to its acceptance of the arbitration clause incorporated into the Credit Agreement, it has no further

exception to make against the arbitration jurisdiction, nor against the Credit Agreement as such and the obligations deriving therefrom, because it is a commercial agreement the State freely negotiated and accepted in the exercise of an activity subject to private law ("*jure gestionis*"), not in the exercise of its sovereign authority ("*jure imperii*").

116. The DRC is also party to the Rescheduling Convention. The very negotiation of such a Convention confirms that the State was well aware of its duty to address the obligations of the Credit Agreement.

117. Finally, the letter from the Finance Ministry of March 4, 1991, to which reference has been made several times in this opinion, is not merely an acknowledgement of debt and therefore a recognition of the State's default on its contractual obligations, but is also an additional confirmation of the State's commitment to ENERGOINVEST, since it ends with the Finance Minister's request "*to Citizen Prime Minister, Citizen Secretary of State for Finance and Citizen Governor of the Banque du Zaire*" to "*debit from the general Treasury account*" a monthly payment of one million US dollars in favor of ENERGOINVEST "[. . .] *beginning January 1, 1991, and until complete discharge of the arrears and complete coverage of the agreed-upon regular payments* [. . .]."

118. The S.N.EL. itself, which (it must not be forgotten) is a "State-Owned Enterprise," does not dispute the DRC's commitment. On the contrary: it maintains that the DRC alone incurred the debt, as we shall see in the following section.


**VII – LIABILITY OF S.N.EL.**

119. This Court has decided on its jurisdiction with respect to S.N.EL. (see Section IV-B of this award).

120. We must now consider the subsidiary pleading of Respondent No. 2, according to which, if the Court has declared itself as having jurisdiction, it should then adjudge that S.N.EL. is not liable for the obligation contracted by the State and must consequently be exonerated.

121. The arguments of Respondent No. 2 in support of that subsidiary pleading are briefly as follows:

- o   The *"Katana-Goma"* project is a public work charged to the budget of the State and S.N.EL. is, for its part, merely an intermediary in charge of giving the State its technical cooperation in connection with the construction of the project.

- o   S.N.EL. is not a party to the Credit Agreement. Its signing of that Agreement is simply a *"countersignature so that it will be apprised"*;

- o   S.N.EL. is not a party to the Rescheduling Agreement;

- o   S.N.EL. is not a party to the Construction Contract dated December 9, 1980, in which it participates only as *"agent of the Republic"*;

- o   S.N.EL. is not bound by the acceptance of the drafts, because it is a *"drawing on behalf,"* the additional special feature of which, in our case, is that *"S.N.EL. is both the drawer on behalf and the drawee at the same time."*

The Court of Arbitration will analyze each of these arguments hereinafter.

**A) The *"Katana-Goma"* project is a public work.**

122. The Court of Arbitration is entirely persuaded that the *"Katana-Goma"* project is a public work that must be assumed by the budget of the State.

The preamble to the Credit Agreement clearly indicate that it is a project that the Republic of Zaire, *"a young country in the midst of economic growth,"* has decided to undertake *"to modernize its infrastructure."*

The letter from S.N.EL. dated April 1, 1985, addressed to the State Commissioner for Mines and Energy and for information to the State Commission for Planning, State Commissioner for Finance and Budget, and the Governor of the Banque du Zaire (Doc. No. 4 appended to the Motion for Arbitration), is a report on the state of advancement of the work, which appears very positive (it states: *"[T]he start of the project could occur during the second two weeks of April 1985 and would be sponsored by the Founding President"),* but also and especially on the statement of payments owed to ENERGOINVEST, which on the contrary seems to be very harsh. Among other things, that letter states that *"the necessary provision"* for making a certain payment *"had been furnished by the Public Treasury at the request of S.N.EL. on August 4, 1982,"* but that *"at the currency rate at the time, the Banque du Zaire was forced to wait until February 2, 1984, to make a first payment"* (and it was only a partial payment). That letter also states, in reference to the balance owed to ENERGOINVEST (US$2,549,063.16), the following sentence: "[I]t goes without saying, to my mind, that the burden of covering that balance falls to the Executive Council, which is the initiator and sole financier of the project through its investment budget."

An Order from the Founding President of the Republic of Zaire dated March 24, 1984, making an adjustment in the budget of the State (Doc. No. 3 appended to the Statement in Defense of S.N.EL.), indicates that a certain amount of zaires has been added *"to the payment credits of the Katana-Goma Line project."*

The letter from the Minister of Finances dated March 4, 1991 (which has been mentioned several times in this award), and which is addressed to the Governor of the Banque du Zaire, with a copy for information to the Prime Minister and to the Secretary of State for Finances, requesting that a

monthly payment of one million US dollars be made to ENERGOINVEST starting on January 1, 1991, up to the balance of the arrears and total coverage of the agreed-upon regular installments, suggests that such payment be made *"by debiting the general account of the Treasury."*

123. However, the finding that the *"Katana-Goma"* project is a work in the public interest that must be assumed by the budget of the State does not mean that we must rule out a contractual undertaking of S.N.EL. toward ENERGOINVEST to repay the agreed-upon financing to it.

We must not confuse the problem of the financing of the project inside the Republic of Zaire with the very separate problem of the repayment of that outside financing granted by ENERGOINVEST under the Credit Agreement dated April 2, 1980.

It is precisely that confusion that is misleading the Respondent. Believing that it does not have to finance the project, it claims not to be liable for the receivables claimed by ENERGOINVEST. However, there is no necessary connection between those two things. The liability for the financing inside the country is entirely independent from the liability toward a foreign lender. Moreover, it is understandable and logical for a foreign lender – who is obviously concerned about guaranteeing the repayment of the loan as best as possible – to want to have opposite it, in the capacity of parties jointly and severally liable for repayment, not only the State that is the beneficiary of the credit, but also the party through which the State is executing the project and which, moreover, will be the owner and beneficiary of the project.

We will see whether or not that hypothesis (which is in itself very logical) corresponds to the reality of our case at issue here, in the following discussions. For now, it is enough to say that the public nature of the project and its assumption by the budget of the State are not sufficient factors for ruling out S.N.EL.'s liability toward ENERGOINVEST.

**B) Is S.N.EL. a party to the Credit Agreement dated April 2, 1980?**

124. The Court of Arbitration has already considered this problem as to its own jurisdiction with respect to S.N.EL. and the conclusion was positive: S.N.EL. is a party to the Credit Agreement (see paragraphs Nos. 100 and 101 of this award).

125. S.N.EL.'s argument – according to which its signature next to the signatures of the representatives of the State of Zaire and ENERGOINVEST signified only acknowledgment of being apprised – cannot be followed. It corresponds neither to the contents of the Credit Agreement nor to the agreement that seems to have been the intent of the parties that negotiated and signed that agreement.

126. In the preamble to the agreement, the Executive Committee of Zaire says that it wishes to execute the project *"through S.N.EL.,"* and it is established that S.N.EL. is precisely the State company responsible for the generation, transmission, and distribution of electrical energy. In the language of a State that has decided to execute a certain project in the public interest, the term *"through"* does not mean that it wishes to be legally represented by that executing party. Rather, it is an administrative decision by which the State entrusts the execution of the project to a party that it considers as being the best suited to its needs, especially when that party is an organization that is wholly owned by it and that was created by it precisely for that type of project and for that type of activity.

127. Pursuant to the preamble of the Credit Agreement, S.N.EL. agreed directly to stipulate the Technical Contract with ENERGOINVEST. It is true that Article 2.1 of the Agreement states: *"As stated in the preamble, LENDER and BORROWER will enter into a Technical Contract [. . . ],"* which could cast doubt since the capacity of Borrower is attributable to the State.

Nevertheless, as has already been noted, the names and expressions used by the parties are not always accurate and they must be interpreted with respect to their actual intent. Yet it is certain that S.N.EL., in its capacity as "Prime Contractor," is indeed the counterpart of ENERGOINVEST in the Technical Contract.

128. The Credit Agreement further provides that, *"to obtain the repayment of the credit," drafts will be drawn by ENERGOINVEST "on S.N.EL.,"* which agrees to accept them and to have them co-signed by the Executive Council of Zaire (Article 4.5). There is nothing better that could configure the direct liability of S.N.EL. toward ENERGOINVEST for repayment of the credit.

129. Lastly, S.N.EL. confirmed its participation in the Credit Agreement and its liability toward ENERGOINVEST by the behavior that it adopted when the Agreement was being performed. Indeed, the down payment to ENERGOINVEST of 5% toward the value of the contract (obligation stipulated in Article 3.1.1 of the Agreement) was made by S.N.EL. (see Docs. Nos. 12-A, 16-A and 16-B, which are appended to the Brief dated June 28, 2002), and the opening of the letter of credit in favor of ENERGOINVEST for 10% of the value of the contract (obligation stipulated in Article 3.1.2 of the Agreement) was also done by the Banque du Zaire upon orders from S.N.EL. (see Doc. No. 40-B, which is appended to the Brief dated June 28, 2002). It is pointless to add that it is unimportant here to know whether or not the funds for the payments made or ordered by S.N.EL. had been provided to it by the State. That concerns only the relationship between the State and S.N.EL. and not at all the relationship between the State and S.N.EL., on the one hand, and ENERGOINVEST, on the other hand.

**C) Is S.N.EL. a party to the Rescheduling Agreement?**

130. The Rescheduling Agreement dated May 31, 1986, was signed by the Executive Council of Zaire and by ENERGOINVEST, which are the signatories of it. There are no other signatures at the bottom of that Agreement. Therefore, it would seem, at least from a formal viewpoint, that S.N.EL. is not a party to it.

131. However, as indicated in the minutes dated May 29, 1986 (Doc. no. 46, which is appended to the Brief in Reply dated October 4, 2002), the representatives of S.N.EL. participated in the negotiations preceding that Agreement.

132. Moreover, S.N.EL. applied the Rescheduling Agreement. Specifically, the new drafts stipulated by that Agreement were drawn by ENERGOINVEST on S.N.EL., which accepted them and returned them to ENERGOINVEST, co-signed by the State (see Doc. No. 5, which is appended to the Motion for Arbitration).

133. Therefore, the Rescheduling Agreement can be considered as accepted by S.N.EL., based on its behavior in the performance of the Agreement itself.

134. In any event, the Court of Arbitration considers it insignificant whether S.N.EL. was or was not a party to the Credit Agreement. Indeed, all the Rescheduling Agreement does is establish, in favor of the debtors, repayment conditions more favorable than the repayment conditions of the Credit Agreement, either by establishing new due dates for payments instead of the ones already elapsed, by the postponement of certain future due dates, or by ENERGOINVEST's agreement not to apply the penalty interest rate (9%) to installments in arrears, but to apply the contractual interest rate of 6% the new installments as of October 2, 1986.

It would be surprising if S.N.EL., being required to repay the financing by effect of the Credit Agreement that it signed, refused the benefits of the Rescheduling Agreement solely because it did not formally sign it!

**D) Is S.N.EL. a party to the Contract dated December 9, 1980?**

135. The document that was signed by S.N.EL. and ENERGOINVEST on December 9, 1980, is not, contrary to the name given it by the parties, a *"contract"* but a collection of several contractual documents, each having its own legal autonomy: the Credit Agreement dated April 2, 1980, the General Conditions of the Contract, and five Special Contracts (see what has already been stated about the autonomy of the Credit Agreement, particularly paragraphs 90, 91, 92, and 93 of this award).

136. Hence it is insignificant that the first page of that document indicates *"The Executive Council of the Republic of Zaire, duly represented by S.N.EL., hereinafter 'Prime Contractor,' whose registered office is at Kinshasa 1, PO Box 500, Boulevard du 30 juin, 49"* as ENERGOINVEST's counterpart.

We can understand S.N.EL.'s participation as representative of the State of Zaire, because the document contains contractual instruments such as the Credit Agreement dated April 2, 1980, to which the State of Zaire is a party. However, it is no doubt also participating in that [document] in its own name, where, in the part called "General Conditions," it assumes the role of "Prime Contractor," and with respect to the Special Contracts, each of which is an autonomous contract signed between S.N.EL. in its capacity as "Prime Contractor" and ENERGOINVEST in its capacity as Contractor, and lastly with respect to all of the Special Contracts that constitute the "Technical Contract" (see the definition of "Technical Contract" in Article 1.1.a of the General Conditions).

137. The meaning given to the term "Parties" is specified very clearly in Article 1.1.h of the General Conditions: *"Parties: designates the Prime Contractor and the Contractor."*

Letter "d" of the same article further states: *"Prime Contractor shall designate the legal entity under the name of S.N.EL. that employs the Contractor for execution of the Supplies and Work. That definition extends to the successors, representatives, or legal licensees of the Prime Contractor."*

Still in the same article, in letter "g," the Contractor is defined as follows: *"Contractor shall designate the legal entity(ies) employed by the Prime Contractor, grouped under the name ENERGOINVEST SARAJEVO, Yugoslavia, for performance of the services covered under this Contract and includes its personal representatives, successors, and authorized agents."*

As for the State, it finds its place in the Contract under the designation "Contracting Authority," which is defined as follows in letter "c" of Article 1.1: *"Contracting Authority shall designate the Executive Council of the Republic of Zaire, represented by the Department of Energy and the Department of Finance. This definition shall extend to the successors."*

138. Therefore, S.N.EL. is not the representative of the State in the strict sense of the term, and consequently, the provision of Article 32 of the CO invoked by Respondent No. 2, according to which: *"The rights and obligations deriving from a contract made in the name of another person by an authorized representative shall pass to the principal,"* does not apply in our case.

It is probable that S.N.EL. acted as agent of the State, in the sense that the State had entrusted it with the execution of the project.

However, as agent, it would be forced to perform the obligations contracted with a third party, and it would be entitled to repayment only, from the principal, of the advances and expenses occasioned by proper execution of the mandate, those expenses including any diminution of

assets, expenses, or obligations assumed toward third parties (Article 402 of the CO).

139. At any rate, the relationship between the State and S.N.EL. is not important to us here.

Because the claims of the Respondent are based exclusively on the Credit Agreement, and hence we have established the substantive and legal autonomy of that Agreement, it was not necessary, for the purposes of this arbitration, to determine whether S.N.EL. is a party to the contract dated December 9, 1980.

We have done so only because S.N.EL.'s direct participation in the so-called "Technical" Contract, in the capacity of "Prime Contractor," is, contrary to the arguments of Respondent No. 2, a subsequent confirmation, were it required, of its liability toward ENERGOINVEST. In the "Technical" Contract, and in each of the Special Contracts that S.N.EL. signed (as "Prime Contractor") with ENERGOINVEST (as "Contractor"), we find the same obligations as those stipulated in Articles 3 and 4 of the Credit Agreement, including the obligation to repay the financing furnished by ENERGOINVEST.

The clause to that effect that was inserted into each of the Special Contracts provides literally: *"85% of the contractual price of this Contract will be paid by the Prime Contractor by repaying the credit to the Contractor, using drafts, on the basis and under the conditions of the Credit Agreement"* (see Doc. No. 1, which is appended to the Statement in Defense of Respondent No. 2). No possible doubt: the "Prime Contractor" is indeed S.N.EL.

### E) Is S.N.EL. bound by the acceptance of the drafts?

140. For that, we need only refer to Article 1018 of the CO, which provides: *"By the acceptance, the drawee agrees to pay the bill of exchange at maturity."*

The argument of Respondent No. 2, according to which what we have here is a "drawing on behalf" in which S.N.EL. is both the drawer and the drawee, is difficult to understand.

The Court has not identified any evidence that might justify the statement to the effect that the drawer of the drafts in this case is S.N.EL. On the contrary, the Credit Agreement says very clearly that *"to obtain the repayment of the credit, LENDER shall issue"* the drafts, and *"LENDER,"* as we well know, is ENERGOINVEST.

Moreover, it is proven that that is precisely what happened in actuality. ENERGOINVEST drew the drafts on S.N.EL. and sent them to it so that it would accept them and so that it would obtain the co-signature of the State. S.N.EL. sent ENERGOINVEST the drafts duly accepted by it and co-signed by the State Commissioner for Finances (see Doc. Nos. 3, 5, 6, 15, 39, and 41 of the Respondent).

We fail to see what the "drawing on behalf" mentioned by Respondent No. 2 consists of, or how such a "drawing on behalf," if it (against all possibility) existed, could release S.N.EL. from its obligation to pay, especially since drafts are paper securities that, by their very nature, are "bedingungsfreindlich" (are not subject to any conditions)[*]

## VIII - JOINT AND SEVERAL LIABILITY

141. ENERGOINVEST is asking that the two Respondents be jointly and severally ordered to pay it the amounts claimed. According to it, the Credit Agreement clearly shows that the Government and the S.N.EL. jointly committed to repay the loan that was given them by ENERGOINVEST, which, moreover, corresponds to the intention and interest of ENERGOINVEST.

---

[*] See A. MEIER-HAYOZ/H.C. VON DER CRONE, Wertpapierrecht, §7, No. 13 et seq.; M. GRÜNINGER/B. HUNZIKER/G. ROTH, Basel Commentary on Article 991 of the CO, No. 9.

142. Furthermore, ENERGOINVEST believes that the two Respondents had agreed to combine efforts for realization of the project, and did so to achieve a common goal, which, pursuant to Articles 530 et seq. of the CO, is the conduct that generates a simple partnership, which implies joint and several liability of its members (Article 544 of the CO).

143. The S.N.EL. objects to these arguments and maintains that there is no joint and several liability between it and the Government for the following reasons:

   o   There is no clause in the Credit Agreement that commits it to the debt.

   o   Joint and several liability is not assumed under Swiss law. It must result from an explicit declaration, absent which ". . . *joint and several liability shall only exist in cases prescribed by law*" (Article 143 of the CO).

   o   Collaboration between the Respondents does not mean the existence of a simple partnership because in the case in question there was no commingling of contributions by each of the intended partners; thus the parties were not on an equal footing with regard to the project, and their goals, even if they did converge, do not constitute a common goal.

144. Article 1044, paragraph 1 of the CO prescribes that "*anyone who draws, accepts, endorses, or guarantees a bill of exchange is jointly and severally liable to the bearer.*" The drafts intended for repayment of the loan were accepted by the S.N.EL. and guaranteed by the DRC; thus they are jointly and severally liable.

Furthermore, the Court of Arbitration observed that even if joint and several liability were not assumed under Swiss law, the intention to make a joint and several commitment need not result from an explicit (written) declaration. Exclusion of the assumption simply means that the fact that an obligation is undertaken jointly

by a plurality of entities does not have the automatic legal consequence of their joint and several liability for such an obligation. However, the intention of a plurality of entities to bind themselves jointly and severally need not be expressly declared: it is sufficient for such an intention to result tacitly from other manifestations (cf. ATF 116 II 712; ATF 49 III 205).

145. The Court of Arbitration ascertained that the intention of the Republic of Zaire and the S.N.EL. to obligate themselves jointly and severally resulted, in particular, from:

- o  The fact that in the Credit Agreement the term "Borrower" is used indiscriminately for the Government (in the designation of the contracting parties) and for the S.N.EL. (in Article 2.1, with regard to the obligation by the S.N.EL. to enter into the "Technical" Contract with ENERGOINVEST);

- o  The way in which the parties stipulated repayment of the loan in the Credit Agreement, i.e., issuance of drafts that the S.N.EL. undertakes to accept and the Government undertakes to guarantee, which is one confirmation of joint and several liability of the obligation contracted by the Government and the S.N.EL.;

- o  The fact that the authorization for the transfer of foreign exchange for the loan was given by the Banque du Zaire jointly "*to the Republic of Zaire and to the Société Nationale d'Electricité "S.N.EL.*" (see Exhibit No. 19-A appended to the Statement of Case of June 28, 2002);

- o  The fact that as a result of the direct conclusion of the "Technical" Contract and the Private Markets, the S.N.EL. – even if we disregard the signature on the bottom of the Credit Agreement – made a commitment to "*repay the credit . . . on the basis of and under the conditions of the Credit Agreement*" (see Private Market payment clause), which means that

its commitment is joint and several with that of the Government, the principal signatory of the Credit Agreement;

- o The fact that payments in execution of the obligation to repay the loan were effected by the S.N.EL..

- o The fact that the Rescheduling Convention, even if it was signed by the Government and not by the S.N.EL., was certainly negotiated by the Government and also in the interest of the S.N.EL., with the latter participating in negotiations and executing the Convention under its signature, which confirms the similarity of the interests and commitments of the Government and the S.N.EL. with regard to the debt due to ENERGOINVEST.

- o The fact that the conduct of the Government and the S.N.EL. with regard to repayment of the financing granted by ENERGOINVEST fully justifies the fact that the latter considered them jointly and severally liable, even on the basis of the principles of good faith and trust, which are the basic principles of Swiss law on obligations

146. For all of the above reasons, the Court of Arbitration considers that the obligation of the two Respondents concerning payment of the debt that they jointly contracted with ENERGOINVEST is a joint and several obligation. Having established this, there is no need to analyze the subsidiary issue of the Respondent with regard to a possible simple partnership between the Government and the S.N.EL., which issue, at first glance, would appear to be rather doubtful.


## IX - REQUEST FOR PAYMENT OF INTEREST

147. In its conclusions, set forth in its Brief of June 28, 2002, and upheld at the oral pleadings of December 9, 2002, the Claimant asked that the Respondents be jointly and severally ordered to pay the

amount of US$11,725,845.37 as principal *"plus interest at the contractual rate of 9% from the maturity date of each installment until full payment is made."*

It also asked that the Respondents to be ordered to pay additional interest *"on amounts granted, at the corresponding interest rates."*

148. In that award, the Court of Arbitration has already affirmed the Claimant's right to payment of the sum of US$11,179,266.36, which, after the correction of a small mathematical error, is the sum that the debtors, through the Ministry of Finance of the Republic of Zaire, acknowledged as corresponding to unpaid maturities of principal and interest repayments on the financing granted by ENERGOINVEST in execution of the Credit Agreement of April 2, 1980, and the Rescheduling Convention of May 31, 1986 (see paragraphs 103 and 104 of this award).

149. The Court of Arbitration also upheld the Claimant's right to payment in the amount of US$546,578.60, which corresponds to interest due it and which it claimed with regard to payments that the Respondents made in arrears (see paragraph 111 of this award).

150. The Court has already remarked that the nature of the debt of US$11,179,266.36 is not the same as that of the debt of US$546,578.60, and, consequently, these two amounts cannot be added together in order to reach a total on which penalty interest at a rate of 9% should be paid, as the Claimant wants (see paragraph 112 of this award).

151. The interest rate of 9% results from application of Article 4.4 of the Credit Agreement, confirmed by Article 7 of the Rescheduling Agreement, and consists of an increase on the order of 50% of the interest

rate of 6% per year fixed for repayment of the financing granted, as a penalty in case of nonpayment of the semiannual tranches as agreed between the parties.

152. The sum of US$11,179,266.36 constitutes all the maturities for which the debtors are in default (see letter of March 4, 1991, from the Ministry of Finance of the Republic of Zaire). It is thus fully justified that an interest rate of 9% be applied to the amount in question from the date of each one of the unpaid maturities which make up this amount until payment is made.

153. In contrast, the sum of US$546,578.60 constitutes all interest already calculated at a rate of 9%, which was to have been paid but has not been paid in comparison with payments that were already made before March 4, 1991 (date of the aforementioned letter from the Ministry), but were determined to be in arrears with respect to the agreed upon maturities. This is thus clearly a debt to ENERGOINVEST, which debt is moreover recognized by the Government in the same letter of March 4, 1991, as already mentioned (see paragraph 111 of this award). Nevertheless, the interest claimable on this debt is only penalty interest at a rate of 5% (Article 104 of the CO) from the date of the Motion for Arbitration (Article 105 of the CO). Since the ICC received the Motion for Arbitration on March 4, 2001, the Court of Arbitration has decided that penalty interest shall be calculated as of that date.

154. The Claimant has also requested that interest "*at an appropriate rate*" be paid "*on the amounts granted.*"

If, as it appears, such a request concerns interest that should be added to what we just spoke about in paragraphs 151 and 152 above, this would not be justified because:

    --   interest that should be paid on the sum of US$11,179,266.36 is contractual interest increased by 50% as a penalty, and this interest continues to run until the debt is fully paid off;

    --   only penalty interest at a rate of 5% is payable on the sum of US$546,578.60, and this as of the date of the Motion for Arbitration until full satisfaction of this debt.

## X – ARBITRATION EXPENSES

155. The Court of Arbitration is free to make a decision with regard to arbitration expenses (Article 31(3) of the Regulations).

156. Despite this discretionary power, which allows it to take into account an entire series of circumstances which, in the case in question, could justify an award of costs, thus departing from the principle of charging costs to the losing party, this latter principle is the one that is most often applied in arbitration proceedings involving international trade and is certainly the most logical, since the need for a party to have recourse to arbitration proceedings in order to have its rights recognized should not constitute a penalty for said party as a result of the costs entailed by such proceedings.

157. The Court has no reason to depart from said principle in this arbitration.

158. Even if one could take into consideration the fact that several questions argued by the parties and which required a decision by the Court are the result of the poor drafting of the

contracts, one must also consider, on the one hand, that both parties are equally responsible for this poor drafting and, on the other, that the parties were clear with regard to their agreement, i.e., with regard to the purpose of their commitments, which means that the defaulting party acted in bad faith with regard to certain aspects of its defense.

159. The DRC's nonparticipation in the arbitration proceedings, even though it had taken part in the negotiations that failed in September 2001 following the presentation of the Motion for Arbitration and just before the proceedings got underway, cannot be justified.

160. The late participation of the S.N.EL. in the proceedings (which clearly caused them to be extended) and the numerous arguments it presented in its defense were, in the end, found by the Court to be groundless.

161. As has already been mentioned and although it deeply regrets them, the Court is not interested in the possible political or economic problems of the DRC, just as it is not interested in the damage sustained by ENERGOINVEST as a result of the political events that occurred in Bosnia-Herzegovina, which it equally regrets. It is interested in an international trade agreement with which one of the parties, it appears, failed to comply. No one disputes ENERGOINVEST's claim in this matter, but apparently no one wants to pay it: neither the government, which was absent from the arbitration proceedings, nor S.N.EL., which participated in them only to assert, without grounds, that it was not a debtor. No one has contested the fact that the project that was financed and carried out by ENERGOINVEST was financed and carried out to the complete satisfaction of the DRC and the S.N.EL., who, for approximately the last fifteen years, have benefited from the project in question.

162. For these reasons, the Court of Arbitration rules that the arbitration expenses shall be paid in full by the two Respondents, jointly and severally.

These expenses include:

— the arbiters' fees and expenses established by the Court in the amount of US$220,900.00

— administrative costs totaling US$25,000.00

— fees and expenses related to ENERGOINVEST's defense in the amount requested of US$168,000.00, which the Court of Arbitration considers appropriate and justified

For all of the above reasons

## THE COURT OF ARBITRATION UNANIMOUSLY RULES

1. The Court of Arbitration has jurisdiction over the Democratic Republic of the Congo (Respondent No. 1).

2. The Court of Arbitration has jurisdiction over the Société Nationale d'Electricité, S.N.EL. (Respondent No. 2).

3. The two Respondents are jointly and severally ordered to pay to the Claimant the sum of US$11,725,844.96.

4. The two Respondents are jointly and severally ordered to pay interest to the Claimant as follows:

   o interest at an annual rate of 9% on the sum of US$11,179,266.36, to be calculated based on the amount of each overdue installment payment included in said sum, starting on the respective due date and up to the date of full payment;

o   interest at an annual rate of 5% on the sum of US$546,578.60, starting on March 4, 2001 (date on which the Motion for Arbitration was presented) and up to the date of full payment.

5.   The Court of Arbitration orders the two Respondents to pay, jointly and severally, the arbitration expenses, as follows:

US$25,000.00 for the Court's administrative costs

US$220,900.00 for the Arbiters' fees and expenses

US$168,000.00 as repayment of the expenses related to the Claimant's defense

Place of arbitration: Zurich

April 30, 2003

### THE COURT OF ARBITRATION

Attorney Renato Roncaglia, Presiding Judge          [signature]

Dr. Marc Ronca, Co-Arbiter                          [signature]

Dr. Mohamed T. Abu-Samra, Co-Arbiter                [signature]